GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
GREGORY E. GARMAN, ESQ.
Nevada Bar No. 6654
E-mail: ggarman@gordonsilver.com
TALITHA B. GRAY, ESQ.
Nevada Bar No. 9040
E-mail: tgray@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtors

E-Filed On  3-1-10

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

In re:

BLACK GAMING, LLC

☐ Affects this Debtor.
☒ Affects all Debtors.
☐ Affects VIRGIN RIVER CASINO CORPORATION
☐ Affects B & BB, INC.
☐ Affects R. BLACK, INC.
☐ Affects RBG, LLC
☐ Affects CASABLANCA RESORTS, LLC
☐ Affects OASIS INTERVAL OWNERSHIP, LLC
☐ Affects OASIS INTERVAL MANAGEMENT, LLC
☐ Affects OASIS RECREATIONAL PROPERTIES, INC.

Case No.: BK-10-13301-BAM;  Chapter 11
Jointly Administered with:

| | |
|---|---|
| 10-13303 | Virgin River Casino Corporation |
| 10-13305 | B & BB, Inc. |
| 10-13306 | R. Black, Inc. |
| 10-13307 | RBG, LLC |
| 10-13309 | Casablanca Resorts, LLC |
| 10-13310 | Oasis Interval Ownership, LLC |
| 10-13311 | Oasis Interval Management, LLC |
| 10-13312 | Oasis Recreational Properties, Inc. |

Date:  March 3, 2010
Time:  9:30 a.m.
Courtroom #3

### OMNIBUS DECLARATION OF SEAN P. MCKAY
### IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS

I, Sean P. McKay, hereby declare as follows:

1.    I am over the age of 18 and am mentally competent.  I have personal knowledge of the facts in this matter and if called upon to testify, could and would do so.  I make this declaration (the "Declaration") in support of the motions and applications requesting various types of immediate relief (collectively, the "First Day Motions") filed by the Debtors (as hereinafter defined) in their respective bankruptcy cases (collectively, the "Bankruptcy Cases").[1]

. . .

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant First Day Motions.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

2. The debtors in these Bankruptcy Cases are as follows: Black Gaming, LLC, a Nevada limited liability company ("Black Gaming"), Virgin River Casino Corporation, a Nevada corporation ("Virgin River"), B & BB, Inc. d/b/a Virgin River Hotel Casino & Bingo, a Nevada corporation ("BBB"), R. Black, Inc., a Nevada corporation ("Black Inc."), RBG, LLC d/b/a CasaBlanca Resort & Casino, a Nevada limited liability company ("RBG"), CasaBlanca Resorts, LLC d/b/a Oasis Hotel, Casino, Spa and Golf, a Nevada limited liability company ("CasaBlanca Resorts"), Oasis Interval Ownership, LLC, a Nevada limited liability company ("Oasis Own"), Oasis Interval Management, LLC, a Nevada limited liability company ("Oasis Mgmt"), and Oasis Recreational Properties, Inc., a Nevada corporation ("Oasis Rec," and together with Black Gaming, Virgin River, BBB, Black Inc., RBG, CasaBlanca Resorts, Oasis Own, and Oasis Mgmt, the "Debtors").

3. My involvement with the Debtors began in July of 2005. From July 2005 through January 2008, I served as Corporate Controller to Virgin River, RBG, and BBB. Since January 2008, I have served as the Debtors' Chief Accounting Officer, and most recently as their Chief Financial Officer. Prior to my employment with the Debtors, from May 2002 to July 2005, I was employed by Avery Dennison, most recently as the General Accounting Manager. From 2000 to 2002, I was employed by the accounting firm of Arthur Andersen, LLP in the firm's Las Vegas office providing audit services to the hospitality and gaming industry.

4. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtors' management and Debtors' various business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

5. This Declaration is filed on the same date that each of the Debtors have filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Code (the "Petition Date").[2] The Debtors have filed their respective First Day Motions to allow them, individually

---

[2] Unless otherwise expressly stated herein, all subsequent references to Chapters or Sections shall refer to 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and all Rule references shall refer to the Federal Rules of Bankruptcy

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

2

and collectively, to efficiently and effectively operate in their Bankruptcy Cases. The relief sought in the First Day Motions is critical to the Debtors' business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtors are provided the opportunity to reorganize successfully.

6.    This Declaration is intended to provide the Court and parties-in-interest with background information regarding the Debtors, as well as the context and evidentiary support for the initial relief sought by the Debtors. Accordingly, the Declaration is organized into two parts: (i) background information, including, (A) an overview of Debtors' business, their prior and current organizational structures, their assets and operations, and their prepetition equity and management structure, (B) the Debtors' prepetition capital structure, and (C) the events leadings up to these Bankruptcy Cases; and (ii) an explanation of the relief sought in the First Day Motions, as well as certain of the factual basis necessitating the requested relief, which relief is critical to the Debtors' reorganization.

# I.
# GENERAL BACKGROUND INFORMATION

## A.    The Debtors' Businesses.

### 1.    Corporate Structure.

7.    Robert R. Black, Sr. as the trustee of the Robert R. Black, Sr. Gaming Trust u/a/d May 24, 2004 (the "Black Trust") owns 99.03% of Black Gaming's membership interest and Glenn Teixeira[3] owns the remaining 0.97%.

8.    Black Gaming is the sole shareholder of Virgin River and BBB, and solely owns, either directly or indirectly, Black Inc., RBG, CasaBlanca Resorts, Oasis Own, Oasis Mgmt, and Oasis Rec.

---

———————————————— (continued)
Procedure, 1001-9037 (the "Bankruptcy Rules").

[3] In 2004, the Black Trust completed a buy-out of all but one of the prior investors in the Casino businesses (as defined herein), with the sole exception of Mr. Teixeira, who decided, in his sole judgment, not to sell his equity interest. Other than holding the 0.97% equity interest in Black Gaming, Mr. Teixeira's only involvement with the Debtors is through his provision of certain marketing services to the Debtors.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

3

9.      Since December 31, 2006, Black Gaming has been the sole shareholder of Virgin River and BBB. BBB does not hold any subsidiary interests. Virgin River holds interests in two subsidiaries; it is the sole shareholder of Black Inc. and further holds a 94.53% membership interest in RBG. The remaining 5.47% membership interest in RBG is held by Black Inc. RBG is the sole member of CasaBlanca Resorts, which is the sole member of Oasis Own and Oasis Mgmt, and the sole shareholder of Oasis Rec. The following chart illustrates the relationship among Black Gaming and its direct and indirect subsidiaries.

**BLACK GAMING ORGANIZATIONAL CHART**



Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

4

### 2. The Pre-December 31, 2006 Corporate Structure.

10. Black Gaming was organized as a Nevada limited liability company on August 4, 2006 in anticipation of modifying BBB's and Virgin River's organizational structure through a holding company reorganization (the "Holding Company Reorganization"). The Holding Company Reorganization was completed to enable the preparation of one comprehensive financial statement and public filing with the United States Securities and Exchange Commission (the "SEC").[4] This reorganization, which included a transfer of BBB and Virgin River's shares for membership interests in Black Gaming was completed on December 31, 2006. As a result of this reorganization, the Black Trust owns a 99.03% membership interest in Black Gaming and Glenn Teixeira owns the remaining 0.97%.[5]

11. As a result of the Holding Company Reorganization, BBB and Virgin River became Black Gaming's wholly-owned subsidiaries that wholly own, directly or indirectly, the remaining Debtors.

### 3. An Overview Of The Debtors' Assets.

12. As indicated above, Black Gaming is a Nevada limited liability company organized on August 4, 2006 that serves as a holding company for the entities that own and operate the Casinos (as defined herein) and the Debtors' related businesses.

13. Virgin River, a Nevada corporation incorporated on July 1, 1988, owns the real property in Mesquite, Nevada, upon which the Virgin River Casino & Bingo (the "Virgin River Casino") is located. Virgin River also owns the real property upon which the Virgin River Convention Center, formerly known as the Mesquite Star Hotel and Casino (the "Convention Center"), is located as well as the personal property, including furniture and fixtures and leasehold improvements located within the Convention Center.

14. BBB, a Nevada corporation incorporated on December 7, 1989, operates the Virgin River Casino in Mesquite, Nevada, and owns certain personal property, including

---

[4] While Black Gaming is not a publicly registered company, as more fully set forth below, portions of its debt is publicly-registered.

[5] A full description of the Holding Company Reorganization is set forth in Black Gaming's filings with the SEC available at www.sec.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

1    furniture and fixtures, leasehold improvements, and gaming equipment located within the Virgin

2    River Casino.

3        15.    Black Inc. is a Nevada corporation incorporated on February 19, 1997 that serves

4    solely as a holding company for a 5.47% membership interest in RBG.

5        16.    RBG, a Nevada limited liability company organized on February 18, 1997, owns

6    the real property in Mesquite, Nevada, upon which the CasaBlanca Hotel & Casino (the

7    "CasaBlanca Casino") is located, as well as the personal property, including furniture and

8    fixtures, leasehold improvements, and gaming equipment located in the CasaBlanca Casino.

9    RBG also owns approximately 34.4 acres located southwest of the CasaBlanca Casino's golf

10   course, as well as certain timeshare intervals.

11       17.    CasaBlanca Resorts, a Nevada limited liability company organized on February 6,

12   2001, owns the real property in Mesquite, Nevada, upon which the Oasis Hotel, Casino, Spa and

13   Golf (the "Oasis Casino")[6] is located, as well as all of the personal property, including furniture

14   and fixtures, leasehold improvements, and gaming equipment located in the Oasis Casino.

15   CasaBlanca Resorts additionally solely owns the following three subsidiaries - Oasis Own, Oasis

16   Mgmt, and Oasis Rec

17       18.    Oasis Own, a Nevada limited liability company, was organized on March 31,

18   2001 for purposes of holding the remaining timeshare interests at the Oasis Casino.

19       19.    Oasis Mgmt, a Nevada limited labiality company, was organized on March 31,

20   2001.  Oasis Mgmt provides certain services with regard to the timeshares located at the Oasis

21   Casino and the CasaBlanca Casino.

22       20.    Oasis Rec, a Nevada corporation, was formed on March 23, 2001.  Oasis Rec

23   owns the gun club, motocross facilities,[7] a deli, and the Palms Golf Course, all of which are

24   located in Arizona.

25   . . .

26   _____

[6] The Oasis Casino, the Virgin River Casino, and the CasaBlanca Casino are collectively referred to herein as the "Casinos."

27

[7] The motocross facilities are leased by CasaBlanca Resorts to Dirt Sports, a Nevada limited liability company pursuant to a lease commencing July 1, 2009 and terminating June 30, 2014.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

6

1    **4.    The Debtors' Operations.**

2        21.    The Debtors collectively form a diversified gaming company owning and

3    operating three[8] of the four casino hotels located in Mesquite, Nevada, two championship golf

4    courses, a full-service spa, a bowling center, a gun club, both gourmet and casual restaurants, and

5    banquet and conference facilities.   The Debtors' revenues are primarily derived from three

6    sources: (i) gaming revenues, which include revenues from slot machines, table games, live

7    keno, race and sports book wagering, poker and bingo; (ii) hotel room revenues; and (iii) food

8    and beverage revenues.

9        22.    As of the Petition Date, the Casinos contained an aggregate of approximately

10   2,100 hotel rooms, 97 timeshare units located at the Oasis Casino and CasaBlanca Casino, 1,579

11   slot machines, and 40 table games.

12            a.    The CasaBlanca Casino.

13       23.    The CasaBlanca Casino is a full-service entertainment and resort destination

14   located off of Interstate 15 in Mesquite, Nevada.  The CasaBlanca Casino targets middle-market

15   guests looking for a high-quality gaming experience in a full-service resort environment and a

16   value alternative to Las Vegas, Nevada.  The CasaBlanca Casino offers approximately 472 tower

17   rooms (including 24 suites) and 24 timeshare units.   The approximately 27,000 square foot

18   casino offers approximately[9] 792 video poker and slot machines, 24 table games, a full-service

19   race and sports book, lounge entertainment, and dancing.

20       24.    The CasaBlanca Casino offers various resort and entertainment amenities,

21   including  a golf club, a full-service spa, tennis courts, a lagoon swimming pool with a waterfall

22   and slide, a hot tub, a sand volleyball court, and an arcade.  In addition, the CasaBlanca offers a

23   320-seat buffet restaurant, a 180-seat 24-hour café, a 136-seat fine dining restaurant, an ice

24   cream parlor, a Starbucks® coffee outlet, a gift shop, a 10,000 square foot banquet and

[8] As discussed more fully herein, the Oasis Casino effectively closed in May 2009, thereby leaving only three operating casinos in Mesquite, Nevada, two of which are owned and operated by the Debtors.

[9] As discussed more fully herein, upon the reduced operations and ultimate closure of the Oasis Casino, certain of the slot and video poker machines were moved from the Oasis Casino to the CasaBlanca Casino and the Virgin River Casino.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

7

conference facility, and a 500-seat showroom. The CasaBlanca Casino is situated on an approximately 43-acre fee simple site, containing a parking lot with a capacity for approximately 1,940 cars, as well as a 45-unit full-service R.V. park.

          b.     The CasaBlanca Golf Club.

25. Approximately one mile from the CasaBlanca Casino, situated on a 221-acre site, is the CasaBlanca Golf Club featuring an 18-hole, 7,011-yard championship course designed by Cal Olson. The land on which the CasaBlanca Golf Club is located is leased by RBG from River View Limited Liability Company pursuant to a 99-year lease that expires in June of 2094 (the "CasaBlanca Golf Club Lease"). As of the Petition Date, the CasaBlanca Golf Club Lease is current and not in default.

26. RBG additionally owns approximately 34 acres of unimproved land near the CasaBlanca Golf Club.

          c.     The Virgin River Casino.

27. The Virgin River Casino is located off Interstate 15 in Mesquite, Nevada, across the highway from the Convention Center. The Virgin River Casino generally attracts local customers and drive-in middle-market customers. The Virgin River Casino has 717 guest rooms, including 6 suites, and a 36,000 square foot casino with approximately[10] 771 video poker and slot machines, 16 table games, a full-service race and sports book, a 183-seat bingo parlor, poker tables, and live keno.

28. The Virgin River Casino offers various resort and entertainment amenities, including swimming pools and hot tubs, a 24-lane state-of-the art bowling center, an arcade, and a lounge for entertainment and dancing. In addition, the Virgin River Casino offers a 182-seat 24-hour café, a 178-seat buffet restaurant, a Starbucks® coffee outlet, and a gift shop. The Virgin River Casino is situated on an approximately 32-acre fee simple site, containing a parking lot with a capacity for 1,650 cars.

. . .

---

[10] As previously stated, upon the reduced operations and ultimate closure of the Oasis Casino, certain of the slot and video poker machines were relocated from the Oasis Casino to the CasaBlanca Casino and the Virgin River Casino.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

29.     Virgin River also owns approximately 31 acres of unimproved land adjacent to the Virgin River Casino, which land was acquired to permit future expansion of the Virgin River Casino.

d.     The Convention Center.

30.     The Convention Center is situated on an approximately 14-acre site located off Interstate 15 and the East Mesquite Boulevard interchange in Mesquite, Nevada. The Convention Center was acquired out of its prior owner's bankruptcy proceeding in November 2000.[11]  The Convention Center has 12,000 square feet of potential gaming space and 210 hotel rooms.  The Convention Center is presently utilized as a special event facility and for overflow hotel traffic from the Casinos.  Black Gaming does not hold and has not yet sought a gaming license to operate a casino at the Convention Center.  Black Gaming will apply for a gaming license at the Convention Center if it decides to operate a casino at the Convention Center.

31.     The Convention Center provides a competitive advantage in the Mesquite market as it allows flexibility to meet market demand and to maintain the Debtors' market share in the future on a cost-effective basis.

e.     The Oasis Casino.

32.     Prior to December 5, 2008, the Oasis Casino was a full-service entertainment and resort destination located off Interstate 15 in Mesquite, Nevada, across Mesquite Boulevard from the CasaBlanca Casino.  Due to deteriorating economic conditions, on December 5, 2008, operations at the Oasis Casino were significantly reduced.[12]  Under the initially reduced operations, the Oasis Casino offered 144 video poker and slot machines, as well as various resort and entertainment amenities, including golf at the Palm Golf Course, swimming pools and hot tubs, tennis courts, an arcade, a go-kart track, and a miniature golf range.  Due to the continued deterioration of economic conditions, in May 2009, the Oasis Casino subsequently further

---

[11] At the time of acquisition, the Convention Center had a gourmet restaurant, a cocktail lounge with a performance stage, a coffee shop, an arcade, and a gift shop, none of which are currently in operation.

[12] Prior to December 5, 2008, there were full scale operations at the Oasis Casino, offering approximately 900 rooms currently utilized for overflow hotel needs.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

1    reduced operations to 16 video poker and slot machines and golf course operations.[13]   The Oasis

2    Casino is situated on an approximately 26-acre fee simple site, containing a parking lot with a

3    capacity for approximately 1,800 cars as well as an 80-unit full-service R.V. park.

4                        f.      The Oasis Recreational Facility.

5            33.     Approximately four miles from the Oasis Casino is the Palms Golf Course

6    featuring an 18-hole, 7,008 yard championship course designed by Arnold Palmer.  The scenic

7    Palms Golf Course straddles the Nevada/Arizona border.  A portion of the course is located on

8    property leased by Oasis Rec from the State of Arizona pursuant to a 7-year lease commencing

9    on May 13, 2008.

10           34.     The Oasis Ranch and Gun Club encompasses over 1,000 acres of farmland, game

11   pasture, and river bottom and offers ten stations on a sporting clay course, two trap and skeet

12   fields with 15 stands, and gun safety classes, plus horseback riding, motocross, and hayrides.

13                       g.      The Timeshares.

14           35.     The Debtors are involved with three different timeshare projects, two of which are

15   located at the Oasis Casino - The Grand Destinations Vacation Club (Mesquite) (the "Grand

16   Destinations") and the Peppermill Palms at Mesquite (the "Peppermill Palms") - and one of

17   which is located at the CasaBlanca Casino - the CasaBlanca Vacation Club.

18           36.     The Peppermill Palms and the CasaBlanca Vacation Club have been turned over

19   to their respective owners associations to manage and operate.  The Grand Destinations

20   anticipates completing its conversion to its owners association in 2010.

21                       (i)     The Grand Destinations.

22           37.     The Grand Destinations is a deeded property[14] comprised of 34 one-bedroom and

23   two-bedroom units, which units are located in a parceled building referred to internally as

24   Building 9, which building is part of the larger Oasis Casino property.

25   ───────────────

26   [13] The reduction in operations affected approximately 147 of the Debtors' 1,700 employees and was completed by
July 19, 2009

27   [14] Unlike "right to use" timeshares, a deeded timeshare means that each individual owner who purchases one or
more intervals owns a fee simple undivided interest in the real property with the right to use an unspecified unit in
28   the project of a particular unit type.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc                                                                10

38.    The Grand Destinations has approximately 846 owners, with 2,498 intervals owned.  Oasis Own owns 55 additional intervals.  The timeshare intervals may be purchased either by: (1) the immediate payment of the purchase price at closing; or (2) through carry-back financing, whereby the purchase price, together with interest, is paid to Oasis Own over 84 consecutive months, which payments are memorialized by a promissory note and secured by a deed of trust recorded against the purchased undivided ownership interest.  As of the Petition Date, the approximate sum due and owing to Oasis Own under such promissory notes is approximately $195,515.

39.    The Grand Destinations Owners Association (Mesquite) (the "GD Owners Association") was incorporated as a nonprofit corporation in or about November of 1994.  Each owner of an annual timeshare interval owns a $1/3,120^{th}$ fee simple interest in the Grand Destinations[15] and a right to use the common areas and certain amenities within the Oasis Casino to the extent that such services and amenities are also provided to the Oasis Casino hotel guests.[16]

40.    Pursuant to a management agreement with the GD Owners Association, Oasis Mgmt provides management services to the Grand Destinations in exchange for a management fee.

(ii)    The Peppermill Palms.

41.    The Peppermill Palms is a deeded property comprised on 39 one-bedroom and studio suites,[17] which are located in a parceled building referred to internally as Building 8, with less than half of the building having been dedicated to such timeshares, which building is also part of the larger Oasis Casino property.

---

[15] Each alternate year timeshare owner owns an undivided $1/6,240^{th}$ fee simple interest in the Grand Destinations.

[16] Pursuant to various agreements by and between the developer and the GD Owners Association, the members of the GD Owners Association have a limited and non-exclusive license to use and enjoy certain recreational and golf facilities located at the Oasis Casino for so long as such amenities are also available for use by the Oasis Casino hotel guests, and a corresponding non-exclusive easement over such property.

[17] Combining a one-bedroom and a studio suit results in a two-bedroom unit.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

11

42. The Peppermill Palms has approximately 1,603 owners, with 3,392 intervals owned, and 331.5 unsold intervals owned by Oasis Own.[18]

43. Consistent with the Grand Destinations intervals, the Peppermill Palms timeshare intervals were purchased either by: (1) the immediate payment of the purchase price at closing; or (2) through carry-back financing, whereby the purchase price, together with interest, is paid to Oasis Own over 84 consecutive months, which payments are memorialized by a promissory note and secured by a deed of trust recorded against the purchased undivided ownership interest. No obligations are currently owed to the Debtors on account of such financing.

44. The Peppermill Palms Property Owners Association, Inc. ("PPOA") is incorporated as a nonprofit corporation. Each owner of an annual timeshare interval owns a 1/1,989th fee simple interest in the Peppermill Palms[19] and a right to use the common areas and certain amenities within the Oasis Casino to the extent such services and amenities are also provided to the Oasis hotel guests.[20]

45. In January 2006, the PPOA entered into a service agreement with Oasis Mgmt pursuant to which it provides the PPOA managerial services, including without limitation housekeeping services, reservation services, and maintenance services. PPOA has retained an unaffiliated entity, Vacation Resorts International, to provide all administrative and financial services.

(iii)    The CasaBlanca Vacation Club.

46. The CasaBlanca Vacation Club was incorporated as a nonprofit, nonstock corporation in or about November of 1997. The CasaBlanca Vacation Club offers to its members a 40-year right to use certain units located at the CasaBlanca Casino, and related amenities,[21] rather than a fee simple interest in the property.

---

[18] Oasis Own does not currently have a license to sell its intervals in Peppermill Palms.

[19] Each alternate year timeshare owners will own an undivided 1/3,978th fee interest in the Peppermill Palms.

[20] Pursuant to various agreements by and between the developer and the PPOA, the members of the PPOA have a limited and non-exclusive license to use and enjoy certain recreational facilities, a corresponding non-exclusive easement over such property, and the right to use and enjoy the golf courses and related services.

[21] Pursuant to various agreements by and between RBG and the CasaBlanca Vacation Club, RBG granted the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc                                            12

47.    Pursuant to the CasaBlanca Vacation Club's bylaws and rules and regulations, a managing agent is responsible for the management and operations of the CasaBlanca Vacation Club's membership program.[22]  Diversified Interests, a Nevada corporation[23] is retained by the CasaBlanca Vacation Club as its managing agent.  Oasis Mgmt has been retained by Diversified Interests to provide certain of the services required of the managing agent.  In exchange for providing these services, Oasis Mgmt receives a fee.

48.    Additionally, RBG continues to provide various services, including without limitation maid service, emergency repair and maintenance, and front desk and related guest services, for which RBG receives a portion of the assessments paid by the CasaBlanca Vacation Club's members.

49.    Each membership in the CasaBlanca Vacation Club is evidenced by a membership certificate issued to the member upon full-payment of the purchase price for the membership under a membership purchase agreement, which agreement serves as evidence of the membership interest until such agreement is paid in full.

50.    The CasaBlanca Vacation Club's memberships were initially owned by RBG. Currently, there are approximately 1,036 owners of membership interests, with 1,269.5 total intervals being owned.  RBG presently owns 76.5 intervals for which purchase agreements have not been executed.

51.    The majority of such membership sales are financed through RBG, with title to such financed memberships remaining in RBG as security for the purchasers' obligations under the Membership Purchase Agreement until such obligations are fulfilled.  As of the Petition Date, the approximate sum due and owing to RBG under the Membership Purchase Agreements is approximately $181,404.

---------------------------------- (continued)
CasaBlanca Vacation Club certain privileges relating to the CasaBlanca Golf Course, including golf-related discounts, a limited and non-exclusive license to use and enjoy certain recreational located at the CasaBlanca Casino facilities on substantially the same terms, subject to certain discounts for certain platinum members, as guests of the CasaBlanca Casino, and a corresponding non-exclusive easement over such property.

[22] The CasaBlanca Vacation Club also owns all of the furniture and fixtures and other personal property within the suites that are part of the CasaBlanca Vacation Club's membership program.

[23] Diversified Interest is solely owned by Mr. Black.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

13

**5.**     **The Debtors' Prepetition Equity And Management Structure.**

52.     As previously stated, the Black Trust owns a 99.03% membership interest in Black Gaming, and thereby effectively owns, directly or indirectly, 99.03% of the Debtors. The remaining 0.97% is owned by Glenn Teixeira.

53.     Since August 2006, Robert R. Black, Sr. has been the sole manager of Black Gaming. Since December 2004, Mr. Black has been the Chairman of the Board, Chief Executive Officer ("CEO"), and President of Virgin River and BBB. Mr. Black has also been the sole manager of RBG since February 1997.

54.     Pursuant to his employment agreement, Mr. Black is employed as the CEO of Black Gaming with the duties, responsibilities, and authorities customarily associated with such position for other businesses of the same size and industry, together with any other duties as may be reasonably requested with regard to one or more of the other Debtors.

55.     As previously stated, my involvement with the Debtors began in July 2005. From July 2005 through January 2008, I served as Corporate Controller to Virgin River, RBG, and BBB. Since January 2008, I have served as the Debtors' Chief Accounting Officer, and most recently as the Debtors' Chief Financial Officer. Prior to my employment with the Debtors, from May 2002 to July 2005, I was employed by Avery Dennison, most recently as the General Accounting Manager. From 2000 to 2002, I was employed by the accounting firm of Arthur Andersen, LLP in the firm's Las Vegas office providing audit services to the hospitality and gaming industry.

56.     Between November 2007 and December 2008, Anthony Toti served as the General Manager of the CasaBlanca Casino and Director of Casino Operations for Black Gaming. Since December 2008, Mr. Toti has served as the Chief Operating Officer and Director of Casino Operations for Black Gaming. Mr. Toti has approximately twenty-eight years of experience in the gaming industry, most recently as the Director of Casino Operations at the Suncoast Hotel and Casino from October 2006 to October 2007. From July 2000 to October 2006, Mr. Toti served as Casino Manager at the Suncoast Hotel and Casino. Pursuant to his employment agreement, Mr. Toti is employed as the Chief Operating Officer of Black Gaming

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

14

1    with the duties, responsibilities, and authorities customarily associated with such position for

2    other businesses of the same size and industry, together with any other duties as may be

3    reasonably requested, which may include duties for one or more of the other Debtors.

### 6.    Related Party Agreements.

57.    Prepetition, the Debtors' operations were conducted from their executive offices located at 10777 W. Twain Avenue, Las Vegas, Nevada. The executed office space was leased from Town Center Drive & 215, LLC, which is partially owned and managed by Mr. Black, pursuant to an 84 month lease at a monthly rental rate of approximately $11,508.00. However, to reduce the Debtors' expenses, this lease was terminated prepetition and during the end of February 2010, the Debtors relocated their executive offices to the CasaBlanca Casino located at 950 W. Mesquite Blvd., Mesquite, Nevada.

58.    Virgin River Foodmart, Inc., a Nevada corporation ("Foodmart"), is owned by former shareholders of Virgin River. Participants in the Casinos' slot club program are able to redeem their points for gasoline at the Foodmart. Foodmart charges BBB, CasaBlanca Resorts, or RBG the retail amount of gas purchased with such Debtor's player points. Charges associated with the point redemption for gasoline at the Foodmart were approximately $6,000 for the six month period ending July 31, 2009 and approximately $0 for the sixth month period ending December 31, 2009.

### B.    The Debtors' Prepetition Capital Structure.

59.    Commencing in 2004, the Debtors financed the contemplated renovation and expansion of the Casinos,[24] as well as the buyout of the then-existing equity interests, in part, by incurring additional long-term debt from the following three sources: (i) the Senior Credit Facility, a revolving credit facility for up to $15 Million, which is secured by a first position lien on substantially all of the Debtors' real and personal property, including a first position lien on $66^{2/3}$% of the Black Trust's equity interest in Black Gaming and 100% of the equity interests of

---

[24] For instance, in 2004, the Debtors undertook to expand the Casablanca Casino with a 180-room hotel tower; however, despite redrafting such architectural plans, the substantial rise in the price of commodities precluded the construction of the additional tower.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

1   Virgin River, RBG, and BBB; (ii) notes issued pursuant to the Senior Secured Indenture of

2   which The Bank Of New York Mellon Trust Company, N.A. f/k/a/ The Bank of New York Trust

3   Company, N.A. ("BNY") is the Senior Secured Indenture Trustee, in the aggregate principal

4   amount at maturity of $125 Million, which is secured by a second position lien on substantially

5   all of the Debtors' real and personal property; and (iii) the Senior Subordinated Notes issued

6   pursuant to the Senior Subordinated Indenture of which BNY is the Senior Subordinated

7   Indenture Trustee, in the aggregate principal amount at maturity of $66 Million, which are

8   unsecured.

9           1.      **The Senior Credit Facility.**

10          60.     On December 20, 2004, BBB, CasaBlanca Resorts, RBG, Virgin River, Oasis

11  Mgmt, Oasis Own, and Oasis Rec, as borrowers (the "Borrowers"), entered into the Credit

12  Agreement (the "Credit Agreement") with Wells Fargo Capital Finance, Inc. f/k/a Wells Fargo

13  Foothill, Inc. ("Wells Fargo"),[25] as the arranger and administrative agent for the Lender Group

14  and Bank Product Provider,[26] thereby providing the revolving credit facility. The Senior Credit

15  Facility authorizes the Borrowers to borrow up to the lesser of: (i) $15 Million less the Letter of

16  Credit Usage,[27] less the Bank Product Reserve[28]; or (ii) the Borrowing Base[29] less the Letter of

---

[25] Unless otherwise expressly stated herein, the term Wells Fargo shall solely refer to Wells Fargo in its capacity as the arranger and administrative agent for the Lender Group and the Bank Product Provider.

[26] The terms "Lender Group" and "Bank Product Provider" shall have the meanings ascribed to them in the Credit Agreement, as amended.

[27] "Letter of Credit Usage" was initially defined within the Credit Agreement to mean "of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit."

[28] "Bank Product Reserve" was initially defined within the Credit Agreement to mean "as of any date of determination, the lesser of (a) $1.5 million, and (b) the amount of reserves that Agent has established (based upon the Bank Product Providers' reasonable determination of the credit exposure of Administrative Borrower and its Subsidiaries in respect of Bank Products) in respect of Bank Products then provided or outstanding."

[29] "Borrowing Base" was initially defined within the Credit Agreement to mean "as of any date of determination, the result of:

    (a)     the product of (i) 1.0 *multiplied* by (ii) the TTM EBTIDA for the most recently ended 12 month period for which financial statements have been delivered pursuant to Section 5.3, *minus*

    (b)     the sum of (i) the Bank Product Reserve, (ii) the Environmental Reserve, (iii) the Lien Reserve, and (iv) the aggregate amount of reserves, if any, established by Agent under Section 2.1(b)."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc                                            16

1    Credit Usage.  A true and correct copy of the Credit Agreement without all referenced exhibits is

2    attached hereto as Exhibit "1."

3         61.    Contemporaneously with the execution of the Credit Agreement, the Borrowers

4    and Wells Fargo entered into the Security Agreement.  As more fully described in the Security

5    Agreement, the Security Agreement grants a first priority security interest in substantially all of

6    the Borrowers' existing and after-acquired personal property, including all present or future

7    accounts, including deposit accounts; books and records; chattel paper; equipment and fixtures;

8    general intangibles; inventory; investment related property; negotiable collateral; supporting

9    obligations; interests in commercial tort claims; money, cash equivalents, or other assets that are

10   or subsequently come into the possession, custody, or control of Wells Fargo or the Lender

11   Group; and all proceeds and products, whether tangible or intangible, in any of the foregoing

12   (collectively, the "Encumbered Personal Property").  See Security Agreement § 2.  A true and

13   correct copy of the Security Agreement excluding certain referenced exhibits is attached hereto

14   as Exhibit "2."

15        62.    The Encumbered Personal Property expressly excludes the following assets: (i)

16   the land-based facilities and amenities comprising the Oasis Recreational Facility, including

17   without limitation all leased property related thereto; (ii) all owned real property and leasehold

18   interests in the unimproved real property consisting of: (A) approximately 24.45 acres located to

19   the southwest and west of the Convention Center, (B) approximately 34.4 acres located

20   southwest of the CasaBlanca Golf Course, (C) approximately 4.61 acres on which truck parking

21   for Virgin River is located, which is situated to the east of the Virgin River Casino; (iii) assets

22   securing certain permitted furniture/fixtures/inventory financing, purchase money debt, or

23   capitalized lease obligations; (iv) leasehold estates in leasehold property, unless Wells Fargo

24   requests a security interest in such leasehold estates; (v) minimum casino bankroll requirements;

25   (vi) any investment related property constituting stock of the Borrowers' subsidiaries that are

26   controlled foreign corporations to the extent that such property is in excess of 65% of the voting

27   power of the stock of such controlled foreign corporations; and (vii) all leases, permits, licenses,

28   including gaming licenses, or other contracts, agreements, assets, or property to the extent that a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

17

grant of a lien thereon: (A) is prohibited by law or would result in the abandonment, invalidation, or unenforcement of the respective Borrowers' right therein, (B) would require the consent of third- parties and such consent has not been obtained after Borrowers' commercially reasonable efforts to obtain such consent, or (C) other than as a result of requiring a consent of third-parties that has not been obtained, would result in a breach of the provisions thereof, or constitute a default under or result in a termination of such lease, permit, license, contract, or agreement (collectively, the "Excluded Assets"). See id. § 1(i).

63.    The obligations under the Senior Credit Facility are further secured by the Collateral Assignment Of Notes And Deeds Of Trust ("Collateral Assignment") dated December 20, 2004, pursuant to which Oasis Own assigned to Wells Fargo its timeshare interest in and to those certain Short Form Deeds of Trust With Assignments Of Rent, the Notes Secured By Deeds Of Trust, and all similar documents enumerated in the Collateral Assignment (the "Encumbered Timeshare Interests"). A true and correct copy of the Collateral Assignment without certain referenced exhibits is attached hereto as Exhibit "3."

64.    Additionally, those Debtors with interests in real property and leasehold interests entered into the following Leasehold And Fee Deeds Of Trust dated December 20, 2004 (collectively, the Deeds of Trust") to further secure their indebtedness under the Credit Agreement: (i) the Leasehold And Fee Deed Of Trust, Fixture Filing With Assignment Of Rents And Leases, And Security Agreement (Nevada), by and between RBG, Virgin River, CasaBlanca Resorts, BBB, and Oasis Own as grantors, Nevada Title Company as trustee, and Wells Fargo; and (ii) the Leasehold And Fee Deed Of Trust, Assignment Of Rents And Leases, Security Agreement And Fixture Filing (Arizona), by and between Oasis Rec as grantor, Transnation Title Insurance Company ("Transnational") as trustee, and Wells Fargo. True and correct copies of the Deeds of Trust are attached hereto as Exhibits "4" and "5." Each of the Deeds of Trust was recorded in the real property records of the subject real property.

65.    Like the Security Agreement for the Encumbered Personal Property, each of the Deeds of Trust executed by a Debtor secures substantially all of that Debtor's real property. The Deeds of Trust for the Debtors' respective realty include, as more fully set forth in the Deeds of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

18

Trust, all rights, titles, and interests in the real property described in the Deeds of Trust; all existing and subsequently constructed improvements on the realty; all fixtures; all reserves, escrows, or impounds required under the Credit Agreement and all deposit accounts maintained with respect to the realty; the ground lease agreements and the leasehold estates created thereby in that certain real property located in Mohave County, Arizona, all as described in the Deeds of Trust; all existing and future leases, licenses, concessions, occupancy agreements, lease guarantees; all of the rents, revenues, and royalties incurred from the use of the realty; all property tax refunds, utility refunds, and rebates; all accessions, replacements, and substitutions for any of the foregoing and all proceeds thereof; all oil and gas and other mineral rights and all royalty, leasehold, and other rights pertaining thereto; and all right, title, and interest of the grantors in and to all tangible property and intangible property (except, with respect to gaming licenses, as prohibited by applicable gaming laws) now or subsequently located on or appurtenant to the realty and used or useful in connection with the ownership or operation of the realty, including, the personalty (collectively, and including the additional secured real property listed under the Deeds of Trust, the "Encumbered Real Property"). See id. §§ 1.1(l) and 2.1.

66.    In conjunction with the foregoing Deeds of Trust, all of the following personal property relating to the realty subject to the Deeds of Trust was assigned to Wells Fargo as additional security: (i) all assignable leases and purchases of furniture, fixtures, equipment, signs, and other items of personal property relating to the realty or any hotel, casino, or other business conducted on the realty; (ii) all assignable leases, subleases, licenses, permits, entitlements, concessions, franchises, and other use or occupancy agreements that relate to the realty, and (iii) all present and future rents, issues, profits, products, earnings, accounts, rights, benefits, income, proceeds, payments, revenue, receipts, and deposits of any kind or nature which relate to, or are derived from any of the foregoing, including, without limitation, proceeds with respect to, casinos, bars, restaurants, hotel rooms, spa facilities, golf courses, banquet facilities, convention facilities, retail premises, and other facilities related to, or used in connection with, the realty, with the sole exception of the Excluded Assets (the "Encumbered Realty Personal Property"). True and correct copies of the Assignment Of Entitlements, Contracts, Rents And Revenues

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

19

1    (Arizona) and the Assignment Of Entitlements, Contracts, Rents And Revenues (Nevada) are

2    attached hereto as Exhibits "6" and "7," respectively.

3          67.    Through the Trademark Security Agreement, the Borrowers granted Wells Fargo

4    a continuing first priority security interest in all of the Borrowers' trademarks, trademark-related

5    licenses, all related goodwill, and all products and proceeds of the foregoing (the "Encumbered

6    Trademark Intellectual Property").   A true and correct copy of the Trademark Security

7    Agreement without certain referenced exhibits is attached hereto as Exhibit "8."

8          68.    The obligations under the Senior Credit Facility were also secured by the Black

9    Trust, and Black, Inc. as pledgors, pursuant to the Parent Pledge Agreement, a true and correct

10    copy of which is attached hereto as Exhibit "9" without certain referenced exhibits.  Pursuant to

11    the Parent Pledge Agreement, the pledgors, granted to Wells Fargo a continuing security interest

12    in the equity interests of Virgin River, BBB, and RBG, as well as all proceeds and products

13    therefrom (the "Pledged Interests," and together with the Encumber Personal Property, the

14    Encumbered Real Property, the Encumbered Realty Personal Property, the Encumbered

15    Trademark Intellectual Property, and the Encumbered Timeshare Interests, and expressly

16    excluding the Excluded Assets, the "Collateral").   In connection with the Parent Pledge

17    Agreement, the pledgors entered into a Bailee Agreement with Wells Fargo, BNY, and Nevada

18    Title Company, in which Nevada Title Company agreed to act as bailee for the Pledged Interests

19    on behalf of Wells Fargo and BNY.  A true and correct copy of the Bailee Agreement is attached

20    hereto as Exhibit "10."

21          69.    Contemporaneously with the execution of the Credit Agreement, Wells Fargo,

22    and the Borrowers entered into that certain Intercreditor And Lien Subordination Agreement,

23    whereby all liens granted by the Borrowers under the Senior Secured Notes are subordinated to

24    the liens granted to Wells Fargo with regard to the Senior Credit Facility.  A true and correct

25    copy of the Intercreditor And Lien Subordination Agreement is attached hereto as Exhibit "11."

26          70.    Similarly,   through   that   certain   Intercompany   Subordination   Agreement,

27    Borrowers subordinated, on the terms and conditions set forth therein, all debt by and between

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

20

1  them to the prior repayment of the Senior Credit Facility. A true and correct copy of the

2  Intercompany Subordination Agreement is attached hereto as Exhibit "12."

3         **2.     The 9% $125 Million Senior Secured Notes.**

4         71.     On December 20, 2004, Virgin River, RBG, and BBB issued through a private

5  placement $125 Million of 9% notes due January 15, 2012 under the Senior Secured Note

6  Facility (the "Senior Secured Notes"). The Senior Secured Notes are secured on a second

7  priority basis by the Collateral. BNY is the indenture trustee (the "Senior Secured Indenture

8  Trustee"). A true and correct copy of the Indenture (the "Senior Secured Indenture") is attached

9  hereto as Exhibit "13."

10        72.     Pursuant to the Senior Secured Indenture, the Senior Secured Notes mature on

11  January 15, 2012 unless sooner accelerated. Commencing on July 15, 2005, interest is payable

12  in cash at a rate of 9% per annum on January 15 and July 15 of each year. The Senior Secured

13  Indenture contains various limitations and restrictions, including limitations on: (i) changes in

14  control, (ii) consolidation, merger, and asset sales, (iii) indebtedness, and (iv) certain payments,

15  such as dividends.

16        73.     As provided for in the Senior Secured Indenture and the Intercreditor And Lien

17  Subordination Agreement, the Debtors' obligations under the Senior Secured Notes are secured

18  by a second priority lien on the Collateral. True and correct copies of the pertinent security

19  documents excluding certain of the referenced exhibits are attached hereto as follows: (1) the

20  Senior Secured Note Security Agreement, by and between Borrowers and BNY is attached

21  hereto as Exhibit "14"; (2) the Collateral Assignment Of Notes And Deeds Of Trust, by and

22  between Oasis Own and BNY, is attached hereto as Exhibit "15"; (3) the Parent Pledge

23  Agreement, by and between the Black Trust and Black Inc., as pledgors, and the BNY, is

24  attached hereto as Exhibit "16"; (4) the Leasehold And Fee Deed Of Trust, Security Agreement

25  And Fixture Filing With Assignment Of Rents, by and between Virgin River, RBG, CasaBlanca

26  Resorts, and Oasis Own, as trustor, Nevada Title Company, as trustee, and the BNY, as

27  beneficiary, is attached hereto as Exhibit "17;" (5) the Leasehold And Fee Deed Of Trust,

28  Security Agreement And Fixture Filing With Assignment Of Rents, by and between Oasis Rec,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

21

as trustor, Transnation, as trustee, and BNY, as beneficiary, is attached hereto as Exhibit "18;" (6) the Assignment Of Entitlements, Contracts, Rents And Revenues, by and between Oasis Rec and BNY, is attached hereto as Exhibit "19"; (7) the Assignment Of Entitlements, Contracts, Rents And Revenues, by and between Virgin River, RBG, BBB, Oasis Own, and BNY, is attached hereto as Exhibit "20"; and (8) the Trademark Security Agreement is attached hereto as Exhibit "21."

### 3. The 12.750% $66 Million PIK Senior Subordinated Notes.

74. On December 20, 2004, Virgin River, RBG, and BBB issued through a private placement $66 Million of 12.75% notes due January 15, 2013 (the "Senior Subordinated Notes").[30] The Senior Subordinated Notes are unsecured and are guaranteed, on a joint and several basis, by all of the Debtors. BNY is the indenture trustee (the "Senior Subordinated Indenture Trustee").[31] A true and correct copy of the Indenture (the "Senior Subordinated Indenture") is attached hereto as Exhibit "22."

75. Pursuant the Senior Subordinated Indenture, the Senior Subordinated Notes mature on January 15, 2013 unless sooner accelerated. Commencing on July 15, 2009, interest became payable in cash at a rate of 12.750% per annum on January 15 and July 15 of each year. The Senior Subordinated Indenture contains various limitations and restrictions, including limitations on: (i) changes in control, (ii) consolidation, merger, and asset sales, (iii) indebtedness, and (iv) certain payments, such as dividends.

76. As provided for in the Senior Subordinated Indenture, the Senior Subordinated Notes were contractually subordinated in payment to the obligations due under the Senior Credit Facility and the Senior Secured Notes.

### 4. The 2006 Amendments.

77. The Parent Pledge Agreements and the Bailee Agreement were amended in December of 2006 to remove Black Inc. as a pledgor in order to maintain consistency with the

---

[30] Gross proceeds of approximately $39 Million were received which accreted to the full face value of $66 Million.

[31] On or about April 28, 2009, the Senior Subordinated Indenture Trustee expressed its intent to resign. However, under the Senior Subordinated Indenture, such resignation is not effective until a successor trustee has delivered written acceptance to the retiring trustee and the issuers.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

Holding Company Reorganization under which Black Inc. became an indirect wholly-owned subsidiary of the Black Trust and joined in and became bound by the Credit Agreement as set forth below. The following chart identifies the equity interests in which Wells Fargo currently holds a first priority security interest and the Senior Secured Noteholders holds a second priority security interest:

| Pledgor | Issuer | Number of Shares or Other Interests | Class | Pledgor's % Ownership Represented By The Pledged Interest | Pledgor's Total % Ownership In Issuer |
|---------|--------|------------------------------------|-------|------------------------------------------------------------|----------------------------------------|
| Black Gaming | Virgin River | 100 shares | Common stock | 100% | 100% |
| Black Gaming | BBB | 16.75 shares | Common stock | 100% | 100% |
| Black Inc. | RBG | N/A | Membership interest | 100% | 5.47% |
| Virgin River | RBG | N/A | Membership interest | 100% | 94.53% |
| Black Trust | Black Gaming | 6602 units | Units | 66 2/3% | 99.03% |
| Virgin River | Black Inc. | 100 shares | Common Stock | 100% | 100% |

78.    True and correct copies of the Amended And Restated Parent Pledge Agreement, the Annex 1 To The Pledge and Security Agreement, and the Joinder To The Bailee Agreement are attached hereto as Exhibits "23" through "25."

79.    Through the General Continuing Guaranty and Joinder Agreement And Amendment dated December 31, 2006, Black Gaming and Black Inc. joined in and became bound by the Credit Agreement, the Security Agreement, the Intercompany Subordination Agreement, and the related loan documents and became a guarantor under the Credit Agreement, a grantor under the Security Agreement, and an obligor under the Intercompany Subordination Agreement. The General Continuing Guaranty and the Joinder Agreement And Amendment arose from the Holding Company Reorganization and serve to ensure the continuation of Wells Fargo's security interest in all of the Collateral. True and correct copy of the General Continuing Guaranty and the Joinder Agreement And Amendment are attached hereto as Exhibits "26" and "27," respectively.

80.    Similarly, pursuant to the Security Agreement Supplement, attached hereto as Exhibit "28," Black Gaming and Black Inc. agreed to be bound by the Security Agreement.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

23

81.    Additionally, through the First Supplemental Indentures and Guarantees, copies of which are attached hereto as Exhibits "29" through "32," Black Gaming and Black Inc. guaranteed all of the obligations due and owing under the Senior Secured Notes, as well as the obligations due and owing under the Senior Subordinated Notes.

**5.    The Amendments To The Senior Credit Facility Credit Agreement.**

82.    The Credit Agreement was amended on October 26, 2007, to amend certain schedules and to revise the allowable capital expenditures. A true and correct copy of the First Amendment To Credit Agreement is attached hereto as Exhibit "33."

83.    On June 20, 2008, the Credit Agreement was amended for a second time primarily to: (i) extend the term of the Senior Credit Facility from December 21, 2008 to June 30, 2011; and (ii) to redefine capital expenditures and EBITDA. A true and correct copy of the Second Amendment To Credit Agreement is attached hereto as Exhibit "34."

**6.    The Defaults And Forbearance Agreements.**

a.    The Senior Credit Facility Forbearance Agreements.

84.    By the fourth quarter of 2008, it was anticipated that the Debtors would default on the Senior Credit Facility as a result of the Debtors': (i) failure to achieve EBITDA in the required amounts for the 12-month period ending September 30, 2008 and December 31, 2008; (ii) failure to pay the overadvance amount existing as of September 30, 2008 and continuing thereafter; and (iii) potential default with respect to the representations of the Debtors required to be made in connection with the delivery of financial statements for the periods ending September 30, 2008, October 31, 2008, November 30, 2008, and December 31, 2008.

85.    Consequently, on November 3, 2008, the Debtors entered into a Forbearance, Consent And Third Amendment To Credit Agreement (the "Senior Secured Forbearance Agreement") with respect to the amended Senior Credit Facility. The Forbearance Agreement amended the Senior Credit Facility and provided that Wells Fargo would forebear from exercising certain rights and remedies under the amended Senior Credit Facility and other loan documents as a result of the anticipated defaults described above, and modified certain financial

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

24

covenants, calculations, and rates of the Senior Credit Facility through January 15, 2009.  The

Senior Secured Forbearance Agreement provided, among other things, for the following:

1.   The LIBOR Rate Margin was increased from 3.50% to 5%, and the Base Rate Margin was increased from 2% to 5%. Therefore, the interest rate premium payable in respect of loans available under the Foothill Facility was increased accordingly;

2.   The minimum EBITDA covenant was reduced from $15 Million to $10 Million for the September 2008 through December 2008 reporting periods;

3.   The Borrowing Base multiple was increased from 1.0x to 1.5x from the execution of the Forbearance Agreement until January 15, 2009; and

4.   Debtors were allowed to temporarily reduce operations at the Oasis Casino during the forbearance period.

86.     Between January 15, 2009 and February 25, 2009, the Debtors entered into four additional amendments to the Forbearance Agreement, which provided in pertinent part for: (i) the extension of the forbearance period, with the last extension expiring at the latest on March 6, 2009 if a term sheet and certain projections were provided, or otherwise expiring at the latest on March 2, 2009; (ii) consent to the continued reduction of operations at the Oasis Casino during the forbearance period; and (iii) authorization to transfer slot machines and video poker machines from the Oasis Casino to the other Casinos.

87.     Although the Debtors provided a restructuring term sheet and certain projections to Wells Fargo by the required date, the extended forbearance period expired, thereby permitting Wells Fargo to exercise any and all rights and remedies under the Senior Credit Facility, including the acceleration of the Debtors' obligations due and owing under the Senior Credit Facility.

88.     On or about May 4, 2009, the Debtors received a Notice Of Default And Reservation Of Rights from Wells Fargo, a true and correct copy of which is attached hereto as Exhibit "35," identifying various defaults under the Credit Agreement and advising that due to such defaults, Wells Fargo was no longer obligated to fund any advances, issue any letters of credit, or to otherwise extend credit under the Senior Credit Facility.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

25

89.     As of the Petition Date, approximately $14,681,408 of principal is due and owing under the Senior Credit Facility, plus any accrued and unpaid interest, fees, costs, and expenses under the Credit Agreement.

...

                    b.     The Senior Secured Forbearance Agreement.

90.     Due to existing covenant defaults under the Senior Secured Notes and the anticipated default on the January 15, 2009 interest installment payment of $5.625 Million (the "2009 Senior Secured Interest Payment"), the Debtors' and a consortium of holders of the majority of the Senior Secured Notes (the "Noteholder Consortium") commenced discussions regarding restructuring the Debtors' obligations under the Senior Secured Notes.

91.     In furtherance of such negotiations, the Noteholder Consortium retained Cadwalader, Wickersham & Taft, LLP ("Cadwalader") as the counsel and Morgan Joseph & Co., Inc. ("Morgan Joseph") as their financial advisors.  By letter agreement effective October 1, 2008, the Debtors agreed to reimburse Cadwalader for the fees and expenses incurred in their representation of the Noteholder Consortium, and by letter dated January 8, 2009, the Debtors agreed to pay Morgan Joseph certain monthly and completion fees for their financial advisory services rendered to the Noteholder Consortium.

92.     The Debtors did not make the 2009 Senior Secured Interest Payment, thereby permitting the Senior Secured Noteholders and the Senior Secured Indenture Trustee to exercise any and all rights and remedies under the Senior Secured Notes, including declaring all principal, premiums, and accrued and unpaid interest immediately due and payable.

93.     On February 19, 2009, the Debtors and the Noteholder Consortium entered into a Forbearance Agreement (the "Senior Secured Forbearance Agreement"), whereby the Noteholder Consortium agreed to forbear and to cause the Senior Secured Indenture Trustee to forebear on exercising their rights under the Senior Secured Notes and related loan documents until March 9, 2009, provided that: (i) on or before March 2, 2009, the Debtors provide a summary of the terms and conditions indicative of the restructuring of the Senior Secured Notes; and (ii) on or before March 6, 2009, the Debtors provide an acceptable 13-week cash flow

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc                                        26

1 | forecast.

2 | 94.    Although the Debtors timely provided the required term sheet and projections, the

3 | forbearance period expired, thereby permitting the holders of at least 25% of the Senior Secured

4 | Notes and the Senior Secured Indenture Trustee to exercise any and all rights and remedies under

5 | the Senior Secured Notes, including declaring the aggregate principal amount of the Senior

6 | Secured Notes, plus unpaid interest and any other amounts provided under the Senior Secured

7 | Notes immediately due and payable.  To date, neither the Senior Secured Noteholders nor the

8 | Senior Secured Indenture Trustee have declared such debt immediately due and payable.

9 | 95.    As of the Petition Date, approximately $125 Million of principal is due and owing

10 | under the Senior Secured Notes, with accrued interest of approximately $18,200,342.

11 |                          c.    Default Under The Senior Subordinated Notes.

12 | 96.    The Debtors defaulted under the Senior Subordinated Notes by failing to tendered

13 | the initial interest payment due under the Senior Subordinated Notes on July 15, 2009.  As a

14 | result of such default, the aggregate principal amount of the Senior Subordinated Notes, plus

15 | accrued and unpaid interest, and any other amounts due and owing on the Senior Subordinated

16 | Notes could be declared immediately due and payable by the Senior Subordinated Trustee or

17 | holders of 25% or more of the Senior Subordinated Notes.

18 | 97.    To date, neither the Senior Subordinated Noteholders nor the Senior Subordinated

19 | Indenture Trustee have declared such debt immediately due and payable.

20 | 98.    As of the Petition Date, approximately $66 Million of principal is due and owing

21 | under the Senior Subordinated Notes, with accrued interest of approximately $9,406,356.

22 | **C.    Events Leading To These Chapter 11 Cases.**

23 | **1.    Economic Pressures.**

24 |                          a.    Increased Competition.

25 | 99.    In December 2004, the Black Trust acquired all of the equity interests in the then-

26 | existing entities comprising the Debtors, with the sole exception of above-discussed Mr.

27 | Teixeira's equity interest.  At this time, the Debtors held an approximately 75% market share in

28 | the Mesquite hotel and gaming industry.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

27

1        100.     Between 2004 and 2008, the only non-Debtor owned hotel and casino in

2 Mesquite, the Eureka, completed a $30 Million expansion project.    Despite the Debtors

3 renovation and expansion efforts, the completion of the Eureka expansion project, together with

4 the increase of gaming devises at other locations within Mesquite, reduced the Debtors' market

5 share to approximately 54%. This increased competition necessarily resulted in the reduction of

6 Debtors' gaming and hotel revenues.

7                b.     <u>Unforeseeable Economic Downturn Throughout The Southwestern United States.</u>

8

9        101.     The real estate market in Clark County, Nevada, as well as across the

10 southwestern United States, has experienced a significant downturn due to plummeting real

11 estate values, substantially reduced mortgage loan originations and securitizations, increased

12 residential mortgage foreclosures, and more generalized credit market dislocations and

13 significant contraction in available liquidity. In fact, Nevada's foreclosure and unemployment

14 rates are among the highest in the country. These factors, combined with significantly higher oil

15 and gasoline prices commencing in 2008, declining business and consumer confidence, and

16 increased unemployment, precipitated the recession resulting in Nevada experiencing dramatic

17 decreases in tourism, convention, and gaming revenues. These same factors have resulted in

18 consumers within Nevada reducing spending on gaming.

19        102.     The industry-wide plummeting of revenues has resulted in traditionally higher-

20 priced hotel-casinos substantially discounting their rates and offering incentive packages such as

21 free slot play and credits or discounts at restaurants and spas to entice customers, including

22 customers who traditionally would have stayed or gambled at the Casinos.

23        103.     According to the Abbreviated Revenue Release from the State of Nevada,

24 Gaming Control Board, Tax and License Division (the "Revenue Release") for October 2009,

25 Nevada gaming win has dropped precipitously for the current fiscal year to date, with statewide

26 win decreasing 11.56%, and Clark County decreasing 11.10%.[32]

27

28

---

[32] <u>See</u> Nevada Gaming Commission and State Gaming Control Board, Abbreviated Revenue Release Index, *available at* http://gaming.nv.gov/mrrindex.htm.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

28

104.   In Mesquite, for September 2009 the gross gaming revenue was down 12.7% compared to September 2008.[33]  Similarly, the gross gaming revenue in Mesquite for the month of October 2009 was down 14% compared to October 2008.[34]  Additionally, for 2009, the total room nights occupied in Mesquite was down 26.6% and gross gaming revenue was down 16.6%.[35]

105.   Slot machine revenue has suffered substantial declines during this economic downturn.  In Nevada, slot machine revenues statewide were down 12.78% for the first through the third quarter of 2009 as compared with 2008, with Clark County being down 12.65%.[36]  Similarly, slot machine revenues statewide were down 8.46% for the calendar year ending December 31, 2008 as compared with 2007.[37]

106.   Revenue from games and tables statewide was also down 11.56% for the calendar year through the third quarter of 2009 as compared with 2008, with Clark County down 10.70%.[38]  Similarly, revenue from games and tables statewide was down 12.16% for the calendar year ending December 31, 2008, with Clark County down 8.47%.[39]

107.   Consistent with the market, in 2008, the Debtors' Casino revenue decreased 23.6% to $81.8 Million for the year ending December 31, 2008, as compared to $107.1 Million for the year ending December 31, 2007.  This includes a $22.1 Million decrease in slot revenues and a $2.1 Million decrease in table game revenues.  Other gambling revenues decreased $1.1

---

[33] See  www.lvca.com/getfile/479/ES-YTD2009.pdf.

[34] See id.

[35] See id.

[36] See Nevada Gaming Commission and State Gaming Control Board, Quarterly Report for the quarter ended September 30, 2009, *available at* http://gaming.nv.gov/documents/pdf/r5_09sep.pdf.; see also Liz Benston, Gaming Revenue, Especially Slots, Continue Their Decline, Las Vegas Sun (May 9, 2008), *available at* http://www.lasvegassun.com/blogs/gaming/2008/may/09/gaming-revenue-especially-slots-continue-their-dec/;   see also Howard Stutz, Gaming Revenues Tumble Again, Amount Wagered On Slots Decreases For Sixth Straight Month, Las Vegas Review-Journal (June 12, 2008), *available at* http://www.lvrj.com/business/19817134.html.

[37] See id. at http://gaming.nv.gov/documents/pdf/r5_08dec.pdf.

[38] See id. at http://gaming.nv.gov/documents/pdf/r5_09sep.pdf.

[39] See id. at http://gaming.nv.gov/documents/pdf/r5_08dec.pdf.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

29

1  Million, the majority of which were poker revenues.  Similarly, food and beverage revenues

2  decreased by 23% and hotel revenues decreased by 15% in 2008.[40]

3      108.  Indeed, the gaming and hotel industry as a whole has faced challenges recently

4  stemming from declining revenues and property values in addition to other factors, as evidenced

5  by at least five large gaming businesses filing for Chapter 11 protection recently: (1) the

6  Greektown Casino in Detroit, Michigan, see In re Greektown Holdings, LLC, et al., Case No. 08-

7  53104-WSD (Bank. E.D. Mich. 2008); (2) the Tropicana casino group, see In re Tropicana

8  Entertainment, LLC, et al., Case No. 08-10856-KJC (Bankr. D. Del. 2008), which owns hotel

9  and casino properties throughout the country including a property on the Las Vegas Strip and

10  properties in Atlantic City, New Jersey; (3) Trump Entertainment Resorts, see In re TCI 2

11  Holdings, LLC, et al., Case No. 09-13654-JHW (Bank. D.N.J. 2009), which involves a property

12  in Atlantic City, New Jersey; (4) the Stations Casino group, see In re Stations Casinos, Inc. et al.,

13  Case No. 09-52477-GWZ (Bankr. D. Nev. 2009), which owns several hotels and casino in

14  Nevada; and (5) the Herbst Casino group, see In re Zante, Inc., et al., Case No. 09-50746-GWZ

15  (Bankr. D. Nev. 2009), which owns hotel and casino properties and slot routes in Nevada,

16  California, Iowa, and Missouri.

17      109.  In sum, due to the increased costs that precluded the construction of the additional

18  180-room tower at the CasaBlanca Casino and the contemplated revenues therefrom, the Debtors

19  needed strong financial performance under their existing operations in order to satisfy their

20  financial obligations.  Instead, in the last few years, the Debtors have faced dramatically

21  declining hotel and casino revenues based on reduced consumer spending, a tightening credit

22  market, and an overall weakening economy.  These market-driven challenges manifested after

23  the Debtors leveraged themselves in 2004, thus leaving the Debtors in a highly precarious

24  position at a time when they needed robust financial performance.

25  …

26  …

27

28  [40] Source: Debtor's Form 10-K for the fiscal year ending December 31, 2008, available at www.sec.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

**2.    Financial Performance.**

110.    The Debtors' recent financial performance on a consolidated basis has been as follows:

|  | Year Ended 12-31-08 (audited)[41] | Year Ended 12-31-09 (unaudited) |
|---|---|---|
| **Revenues** | | |
| **Casino Gaming** | $81,831,000 | $62,584,000 |
| **Food and Beverage** | $31,849,000 | $22,596,000 |
| **Hotel** | $29,141,000 | $22,026,000 |
| **Other Revenues** | $16,348,000 | $11,561,000 |
| **Total Revenues** | $159,169,000 | $118,767,000 |
| **Net Revenues** | $131,637,000 | $97,779,000 |
| **EBITDAR** | $11,154,000 | $11,345,000 |

111.    As of the Petition Date, the estimated value of the Collateral securing the Senior Credit Facility and the Senior Secured Notes is thought to be approximately $85 - $90 Million.

112.    I am informed and believe that the enterprise value of the Debtors' businesses as a going concern as of the Petition Date is thought to be approximately $85 - $90 Million.

113.    I am also informed and believe that the enterprise value of the Debtors' businesses will not diminish subject to the businesses continuing to operate in the ordinary course and the expenditure of capital expenditures as proposed in the Budget attached to the proposed Stipulation Authorizing Use Of Cash Collateral By Debtors And Granting Adequate Protection, the gaming licenses and permits remaining in place, and present management remaining in place.

**D.    Prenegotiated Plan Of Reorganization.**

114.    Provided the above-discussed economic recession substantially reducing the Debtors' revenues, thereby resulting in the impending inability to service the obligation owing under the Senior Credit Facility, the Senior Secured Notes, and the Senior Subordinated Notes,

---

[41] Source: Debtor's Form 10-K for the fiscal year ending December 31, 2008, available at www.sec.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

in 2008, the Debtors retained the services of Gordon Silver as their restructuring counsel and XRoads Solutions Group, LLC as their financial advisors. For in excess of a year, the Debtors have been analyzing and exploring various restructuring scenarios and proposals, which discussions have included, to varying degrees, Wells Fargo, the Noteholders Consortium, and the Investor Parties, as defined below.

115. Despite the expiration of the March 9, 2009 forbearance period provided with regard to the Senior Secured Notes, the parties remained in active discussions regarding the terms of a restructuring agreement.

116. On December 22, 2009, an Agreement, together with the Restructuring Term Sheet attached thereto (the "Lockup"), was entered into by the: (i) Debtors, (ii) the Black Trust, (iii) certain holders of a majority of the Senior Secured Notes (collectively, the "Consenting Senior Secured Noteholders"), (iv) Michael Gaughan, on behalf of himself or his designee ("Gaughan"), (v) Anthony Toti ("Toti"), and (vi) Newport Global Advisors LP or its affiliates ("Newport," and together with the Black Trust, Gaughan, and Toti, the "Investor Parties"). The Lockup provides for a restructuring of the Debtors to be effectuated pursuant to a plan of reorganization (the "Plan"), which, together with the proposed Disclosure Statement To Accompany Debtors' Plan Of Reorganization (the "Disclosure Statement"), have been filed on the Petition Date. A true and correct copy of the Lockup is attached hereto as Exhibit "36."

117. Pursuant to the Lockup, the Debtors have filed the Plan that principally provides that:[42]

(a) all existing memberships in Black Gaming will be extinguished and cancelled;

(b) a new entity will be formed ("New Black Gaming, LLC");

(c) each of the Senior Secured Noteholders will receive, in full satisfaction of their claims, their pro rata share of each of the following: (i) newly issued promissory notes of New Black Gaming under the New Loan Facility, which is a $62.5 Million term loan with an interest rate of LIBOR (floor of 1.5% and ceiling of 4.5%) plus 700 basis points due 5 years from the

---

[42] The following is merely a high-level summary of the Plan provisions. All parties-in-interest should read the Plan in its entirety.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

1  Substantial Consummation Date by Black Gaming, collateralized by substantially the same

2  collateral presently securing the Senior Secured Notes, (ii) a Cash Contribution tendered by the

3  Investor Parties of up to the maximum of an amount equal to $9.25 Million, less the amount

4  equal to the new equity interests issued to the Senior Secured Noteholders; and (iii) the Cash

5  Payment, which is the cash in the possession of the Debtors immediately prior to the Substantial

6  Consummation Date plus the $9 Million Cash Investment, minus the sum of (i) $10 Million, (ii)

7  the amount of the unpaid balance owing on the Senior Credit Facility immediately prior to the

8  Substantial Consummation Date, and (iii) the Disputed Claim Reserve (as defined in the Plan);

9      (d) the Senior Subordinated Noteholders receiving, in full satisfaction of their claims,

10  warrants for 5% of the fully-diluted new equity interests in New Black Gaming struck at the

11  enterprise value of (x) $140 Million, plus (y) the aggregate amount as of the Effective Date of

12  accrued and unpaid interest in respect of the notes issued pursuant to the new Senior Secured

13  Note Facility less the Cash Payment;

14      (e) Wells Fargo receiving payment in full of their allowed claims under the Senior Credit

15  Facility; and

16      (f) the Investor Parties making the Investors Parties' Contribution, which is an aggregate

17  amount up to the maximum of $18.25 Million, consisting of the Cash Contribution and the $9

18  Million Cash Investment, in exchange for 100% of the equity interests in New Black Gaming,

19  subject to dilution as a result of warrants issued to the Senior Subordinated Noteholders.

## II.
## FIRST DAY MOTIONS

118.    The Debtors have commenced their Chapter 11 Cases in response to their debt

obligations and the aforementioned market challenges.  The Debtors' transition into Chapter 11

proceedings must be comprehensively and effectively organized to ensure that they will be able

to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from

their Chapter 11 Cases.  Accordingly, it is critical that the Debtors maintain strong relationships

with their customers, employees, partners, vendors, creditors, gaming regulators and other

governmental entities, and such other parties that enable the Debtors to conduct their business.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

33

1    To maintain and foster these relationships, it is important to minimize the distractions to the

2    Debtors' business operations that could result from the Debtors' petitioning for Chapter 11 relief.

3         119.    I have reviewed and am generally familiar with the contents of each of the First

4    Day Motions.  Based on that familiarity and information supplied to me by other members of the

5    Debtors' management and the Debtors' various business and legal advisors, I believe that the

6    relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in

7    their Chapter 11 Cases with minimal disruption or loss of productivity or value.  I also believe

8    that the First Day Motions are vital to the Debtors' successful reorganization and are in the best

9    interests of the Debtors and their creditors.

10   **A.    Joint Administration.**

11        120.    The affiliated nature of the Debtors' financial and operational relationships will

12   enable joint administration of these Chapter 11 Cases to provide significant administrative

13   convenience.  The Debtors form a consolidated gaming company that focuses on gaming and

14   associated operations.  They share the same management and, ultimately, the same ownership.

15   The Debtors also maintain consolidated books and records and are generally viewed as one

16   business enterprise.

17        121.    Many of the motions, hearings, and orders that will arise in these Chapter 11

18   Cases will jointly affect each and every Debtor.  As such, through joint administration, Debtors

19   and this Court will be able to achieve fair and efficient administration of the related Chapter 11

20   Cases, Debtors will be able to reduce fees and costs by avoiding duplicative filings and

21   objections, and the ability of the parties-in-interest to monitor these Chapter 11 Cases will be

22   facilitated by having all pleadings grouped together on one docket.

23        122.    The Debtors are jointly and severally liable under the Senior Credit Facility, the

24   Senior Secured Notes, and the Senior Subordinated Notes.    Thus, the contemplated

25   reorganization set forth in the Plan, or by any alternate reorganization of these Debtors will

26   require a joint and coordinated approach and, in all probability, a jointly proposed plan of

27   reorganization.

28   ...

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

34

**B.    Employment Of Kurtzman Carson Consultants LLC ("KCC") As Claims And Noticing Agent For Debtors.**

123.    The Debtors have determined that in order to carry out their duties as provided for under Sections 1107 and 1108 of the Bankruptcy Code, it is necessary and in the best interest of the estates to employ an experienced claims and noticing agent.  The Debtors desire to employ KCC as their claims and notice agent to perform the services enumerated within the Application For Order Authorizing The Employment Of Kurtzman Carson Consultants LLC As Claims And Noticing Agent For Debtors.

124.    The Debtors believe that engaging KCC as claims and noticing agent will expedite the service of Rule 2002 notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

125.    The proposed rates to be charged by KCC are reasonably and appropriate for services of this nature given the quality of KCC's services and prior bankruptcy experience. Prior to the Petition Date, the Debtors paid KCC a retainer of $25,000.

**C.    Motion Seeking Interim Approval Of Cash Collateral Stipulation.**

126.    The Debtors, Wells Fargo, the Consenting Senior Secured Noteholders, and the Senior Secured Indenture Trustee negotiated the Stipulation Authorizing Use Of Cash Collateral By The Debtors And Granting Adequate Protection (the "Cash Collateral Stipulation") at arms' length and in good faith.  The Cash Collateral Stipulation is in the best interest of the Debtors and their estates.

127.    The Debtors cannot meet their ongoing postpetition obligations unless they have the immediate ability to use Cash on Hand, the Deposit Accounts, and Postpetition Cash.  In the absence of such use, immediate and irreparable harm will result to the Debtors, their Estates, and their creditors, and will render an effective and orderly reorganization of the Debtors' businesses impossible.

128.    Upon information and belief after reasonable inquiry, Wells Fargo and the Senior Secured Noteholders are the only parties with a properly perfected security interest in Cash Collateral and Disputed Cash Collateral (except as limited by the Cash Collateral Stipulation),

35

101900-001/668442_10.doc

1   and Wells Fargo, the Consenting Senior Secured Noteholders, and the Senior Secured Indenture

2   Trustee consent to the Debtors' use thereof, subject to the terms and conditions set forth in the

3   Stipulation and in accordance with the Budget.[43]

4           129.    Moreover, the Debtors' immediate use of Cash Collateral and Disputed Cash

5   Collateral is essential to its ongoing operations and ability to reorganize.  An integral aspect of

6   maintaining the Debtors' relationships, compliance with applicable gaming laws and regulations,

7   and their business operations is the Debtors' ability to use Cash Collateral and Disputed Cash

8   Collateral to maintain a sufficient level of working capital in order to pay ordinary course

9   obligations such as those to their employees, customer programs, vendors, utilities, and taxing

10  authorities, to pay for necessary ordinary course property maintenance and projects, and to

11  maintain minimum bankroll requirements as determined by the Nevada Gaming Authority.  The

12  Cash Collateral Stipulation allows for the use of both Cash Collateral and Disputed Cash

13  Collateral in accordance with the Budget attached to the Cash Collateral Stipulation while

14  preserving the Debtors, Wells Fargo, the Consenting Senior Secured Noteholders, and the Senior

15  Secured Indenture Trustee's claims regarding the Cash Collateral and Disputed Cash Collateral.

16          130.    The Cash Collateral Stipulation allows the Debtors to effectively operate and

17  maintain their businesses during the Chapter 11 cases and is essential to an effective

18  reorganization.  By the very nature of the Debtors' gaming businesses, the amounts of cash and

19  cash equivalents provided for in the Budget are required.

20  **D.      Motion To Tender Payment To Administrative Priority Goods Claims.**

21          131.    The Debtors depend on a normal and regular supply of goods from various

22  vendors in the ordinary course operations of their businesses, and any interruption of such supply

23  would severely impact the Debtors' businesses and their ability to serve their customers.

24  Moreover, with respect to certain kinds of trade relationships, the Debtors may be unable to

25  obtain the necessary goods elsewhere in the marketplace and/or on competitive terms.

26  ---

[43] The Budget was formulated after review of the Debtors' normal and ordinary cash needs in the operation of its
27  businesses and allows the Debtors' to operate through the reorganization process and maintain the integrity of the
businesses.  The Budget has been reviewed and approved by Wells Fargo and the Consenting Senior Secured
28  Noteholders.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc                                                    36

Case 10-13301-bam    Doc 18    Entered 03/01/10 22:28:30    Page 37 of 50

132.    In order to minimize the impact and need for the Motion, the Debtors have attempted to pay in full all ordinary course trade creditors prior to the Petition Date. Notwithstanding this effort, the Debtors anticipate that there may be some creditors who delivered goods that were received by the Debtors within twenty (20) days before the Petition Date, which the goods were sold to the Debtors in the ordinary course of such Debtors' business, all within the meaning of Section 503(b)(9) (such alleged claims, the "Priority Goods Claims" and the alleged holders, the "Priority Goods Claimants"). In the case at hand, it is estimated that they may still owe approximately $20,000 to potential Priority Goods Claimants.

133.    The Debtors propose to pay the Priority Goods Claims held by those Priority Goods Claimants that the Debtors wish to continue doing business with and who agree to continue to supply goods to the Debtors on ordinary and acceptable trade terms to Debtors. If a particular Priority Goods Claimant refuses to continue doing business with Debtors and/or refuses to do so on the same terms as allowed prepetition, the Debtors request that they be given the discretion not to pay that Priority Goods Claimant pursuant to terms of the Motion.

134.    The relief requested in the <u>Emergency Motion For An Order: (I) Allowing Administrative Expense Status For Goods Received Within The Twenty Day Period Before The Petition Date, And (II) Authorizing, But Not Directing, The Debtors To Pay Such Obligations</u> is in the best interests of the Debtors' estates because: (i) favorable trade terms will prevent the contraction of the Debtors' liquidity; and (ii) the Court's time and resources will not be burdened with numerous motions from individual Priority Goods Claimants requesting payment of such administrative expenses.

**E.    Motion For Authorization To Honor Hotel Room And Other Customer Deposits And Travel Agent Commissions.**

135.    As of the Petition Date, BBB, CasaBlanca Resorts, RBG, Virgin River, Oasis Mgmt, Oasis Own, and Oasis Rec had hotel room, timeshare, and RV site reservation deposits for post-petition dates, as well as other deposits for use of the golf and other recreational facilities. Numerous prospective guests and other customers had placed deposits for hotel rooms, timeshare, and RV sites they intended to occupy or facilities they intended to use. In

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

addition, some of these hotel room, timeshare, and RV site reservations had been placed by travel agencies, which pursuant to commission agreements, are entitled to receive commissions when such sites are occupied and the customers pay their bills. The Debtors request that the Court enter an order permitting them without further order of this Court to honor all prepetition Customer Deposits and Travel Agent Commissions.[44]

136.    Maintaining the satisfaction and goodwill of prospective guests and other customers is imperative to the success of any reorganization by the Debtors. If the Debtors are unable to honor advance deposits for hotel room, timeshares, RV site reservations, as well as other related deposits, their operations will be severely affected.

137.    Likewise, travel agents will be unlikely to direct their future customers to the Debtors if prepetition deposits and commission agreements are not honored. Consequently, maintaining the satisfaction and confidence of travel agents is important to the Debtors' on-going business operations and the success of any reorganization by the Debtors.

138.    As of the Petition Date, the Debtors estimate that they are holding the Customer Deposits and Travel Agent Commissions in the aggregate approximate sum of $1,124,428.

139.    The respective Debtors have sufficient cash on hand and with their financial institutions to honor all of the Customer Deposits and Travel Agent Commissions. The Debtors' operations are currently cash flow positive, prior to debt service, and the Debtors presently have approximately $12 Million either in cash or in their bank accounts as of the Petition Date.

140.    The relief requested in the <u>Emergency Application For Order Permitting Debtors To Honor Hotel Room And Other Customer Deposits And To Honor Travel Agent Commissions</u> is in the best interests of the Debtors' estates, as it will have little, if any, economic impact on the Debtors' creditors, while preserving for the creditors invaluable customer goodwill and travel agent confidence. It is necessary that this Court grant the relief requested herein to facilitate

---

[44] The terms Customer Deposits and Travel Agent Commissions shall have the meaning ascribed to them in <u>Emergency Application For Order Permitting Debtors To Honor Hotel Room And Other Customer Deposits And To Honor Travel Agent Commissions</u> filed contemporaneously herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

1    continued operation of the Debtors' business.  The importance of the Debtors' customer loyalty

2    and the need to encourage travel agents to continue booking business for customer is critical.

3    **F.    <u>Motion For Authorization To Honor Casino Chips And Other Gaming Liabilities.</u>**

4            141.    It would be extremely detrimental to the Debtors' gaming operations, and

5    therefore, to their overall results of operation if they are required to distinguish between pre and

6    post-Petition Date gaming liability and related types of liability.  In this regard, as of the Petition

7    Date, BBB, CasaBlanca Resorts, and RBG had the following types of gaming liabilities:

8                    a.    Prepetition casino chips and tokens in the public domain, with such

9            amounts totaling an estimated $766,000 as of the Petition Date;

10                   b.    Progressive slot liability on various gaming devices throughout the

11           Casinos, which represents a portion of prepetition wagering on the applicable gaming

12           devices that will be paid post-petition when a customer wins the appropriate jackpot,

13           participation and lease fees relating to prepetition gaming, and contractual obligations

14           with third parties operating wide area progressive systems;

15                   c.    Deposits placed by customers with casino cages to cover wagers, as well

16           as any checks[45] such as jackpots issued from the casino cage accounts;[46] and

17                   d.    Ongoing customer promotions, including but not limited to, player cards

18           and slot machine player cards, whereby individual participants accumulate points in

19           proportion to the individual customer's wagerings; as these points accumulate,

20           participants become eligible to redeem the points for various prizes, including cash,

21           complimentary meals, gift shop discounts, and other promotions.

22           142.    The requested relief in the <u>Emergency Motion For Order Authorizing Debtors To</u>

23   <u>Honor Casino Chips And Other Gaming Liabilities</u> (the "Casino Chips Motion") is in the best

24   interests of the Debtors' estates as it will have little, if any, economic impact upon their creditors,

25   _____

26   [45] The Debtors undertook measures prepetition to ensure that substantially all of such outstanding checks had cleared the Debtors' accounts prepetition.

27   [46] Debtors' casino cage accounts are discussed more specifically in the <u>Emergency Application For Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts.</u>

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

39

1   while preserving for the creditors more viable casino business operations, as well as customer

2   goodwill.

3       143.   It would be extremely harmful to the Debtors' casino business operations and,

4   therefore, to the Debtors' overall results of operations if they are required to distinguish between

5   prepetition and post-petition casino chips, tokens, wagerings, participation gaming, promotions,

6   and progressive liability.   In addition to the expenses that would arise from devising and

7   implementing a system for making such distinctions, there would undoubtedly be a chilling

8   effect on the casino business if each such claim had to be examined for the purpose of

9   ascertaining whether the claim arose pre or post-petition.   Furthermore, the respective Debtors'

10  failure to honor their gaming liabilities would also likely cause substantial regulatory compliance

11  issues with their applicable gaming authorities.

12      144.   It is necessary that this Court grant the relief requested in the Casino Chips

13  Motion to facilitate continued operation of the Debtors' casino business.   The importance of the

14  Debtors' customer loyalty cannot be underestimated.   The Debtors operate in a competitive

15  environment where there are casinos and slot machines open for customers to patronize.   If the

16  respective Debtors do not immediately honor their gaming liabilities incurred in the ordinary

17  course of their businesses, the Debtors' customers will simply turn to the Debtors' numerous

18  competitors to gamble.   Those customers will gamble where there is not an issue as to collecting

19  on casino chips or otherwise redeeming assets owing to them from gaming activity.   Any such

20  customer defection and losses in customer loyalty would be disastrous to the Debtors' prospects

21  to successfully reorganize.   Indeed, in order to operate effectively in their Chapter 11 Cases, the

22  Debtors' and the Casinos' customers must be able to immediately exchange their cash for casino

23  chips and tokens, and vice versa.   Finally, it is essential that the Debtors be allowed to

24  immediately honor and continue ongoing customer promotions and pay progressive slot machine

25  payouts and jackpots.

26      145.   Authorizing the respective Debtors to honor all casino chips, tokens, and wagers

27  in existence as of the Petition Date, progressive slot liabilities and deposits, and all prepetition

28  customer promotion accumulations and similar customer promotions is crucial to the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

40

preservation, protection, and maximization of the Debtors' estates. These obligations represent but a small percentage of the Debtors' total prepetition debts, yet their satisfaction will contribute significantly to the Debtors' revenue-generating capability and toward fostering customer goodwill.

146. Indeed, the Debtors' creditors will benefit from the relief sought herein. If the Debtors are prohibited from honoring and maintaining all casino chips, tokens, and wagers in existence as of the Petition Date, progressive slot liabilities and deposits, and all prepetition customer promotion accumulations and similar customer promotions, consistent with their past business practices, then customers' lost confidence will damage Debtors' businesses to an extent that far exceeds the cost associated with honoring and continuing such practices. Accordingly, the relief requested in the Casino Chip Motion will preserve customer goodwill and help protect and maintain the value of the Debtors' estates during this critical time.

**G.** **Motion Seeking Authorization To Pay Wages And Other Employee Obligations.**

147. As of the Petition Date, RBG, Oasis Rec, and BBB employ approximately 1,680 full and part-time employees (the "Employees") in the ordinary course of their businesses. Notwithstanding the fact that RBG, Oasis Rec, and BBB employ the Employees, the Employees ultimately provide services that benefit each of the Debtors. Continued service by the Employees is therefore vital to the Debtors' ongoing operations and reorganization.

148. As of the Petition Date, the Employees were owed or had accrued in their favor various sums from the Debtors for wages and salaries incurred in the ordinary course of the Debtors' businesses (the "Wage Obligations"). The Debtors pay their Employees on a bi-weekly pay cycle. The total estimated gross amount of the Wage Obligations that will have accrued, but remain unpaid as of the Petition Date is approximately $1,432,523.

149. The Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities. To the extent that the Debtors have deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes, and FICA contributions attributable to Wage Obligations which are due but

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

41

have not yet been paid to any governmental entity, the Debtors seek authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.

150.    In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance.    The Debtors seek authorization to continue to pay these funds in the ordinary course of business.

151.    In the ordinary course of processing payroll checks for their Employees, the Debtors also withhold certain amounts for various garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) (collectively, the "Garnishments"), which amounts have not yet been forwarded to the respective law firms and government agencies who are tasked with collecting the funds.  The Debtors request permission to pay over any such withholdings in the ordinary course of business.

152.    In the ordinary course of their businesses, the Debtors have accrued amounts for employee contributions to 401(k) retirement plans, and various health and welfare benefit programs for their Employees prior to the Petition Date (collectively, the "Employee Benefit Plans").[47]  These benefits include health plans (i.e., medical, dental, and vision), various welfare plans (i.e., life insurance, disability insurance, accidental death and dismemberment insurance, long-term care and critical illness insurance), and other employee assistance programs.  These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled.  The total amount of Employee Benefit Contributions that will have accrued, but will remain unpaid as of the Petition Date is estimated to be less than $17,000.

153.    The Debtors also permit Employees to accrue various paid time off, pursuant to which Employees are eligible, in certain circumstances, to receive their full wages for, among

_____

[47] The contributions are tendered at the sole discretion of the Employees and as such, the contributions may be terminated at anytime at the direction of the Employees.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

42

other things, vacation and/or personal days, among other matters (the "Vacation Accruals"). The total amount of Vacation Accrual that will have accrued but will remain unpaid prior to the Petition Date is estimated to be less than $720,000.

154.    In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of the Debtors (the "Reimbursable Business Expenses"). As of the Petition Date, Employees may not have been reimbursed for these Reimbursable Business Expenses. Although a definitive amount of Reimbursable Business Expenses as of the Petition Date cannot be provided, but based upon prior business practices, it is estimated that the amount does not exceed $5,000.

155.    Chapter 11 Cases were filed during the Debtors' normal payroll periods for hourly and salaried Employees. Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations are unpaid and unreimbursed.

156.    If the Debtors are unable to take the necessary steps to ensure that wages and related obligations are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that large numbers of essential Employees will resign and that those Employees who remain will be discontented and demoralized.

157.    All of the Debtors' operations subject to the Wages Motion all qualify as self-insured employers pursuant to NRS Chapters 616A through 617, and their Employees are covered under their respective Certificate of Qualification issued April 1, 1995 for self-insured worker's compensation. The self-insured status results in substantial cost savings to the Debtors. the Debtors must satisfy several statutory and administrative code conditions to maintain their self-insured status. In particular, the Debtors must administer and pay all worker's compensation claims fairly and promptly, including such claims that arose prepetition, and must maintain with the State of Nevada, Department of Business and Industry, Division of Insurance, a security deposit, evidence of a surety bond, and evidence of excess insurance as more specifically

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

1    provided by law.  Thus, the settlement and payment of workers' compensation claims, and the

2    maintenance of deposits, surety bonds, and excess insurance, are ordinary course activities for

3    the Debtors.

4        158.    The Debtors have sufficient cash on hand and in their bank accounts to honor all

5    of the foregoing employee related obligations as set forth herein.  The Debtors' operations are

6    currently cash flow positive, prior to debt service, and the Debtors presently have approximately

7    $12 Million either in cash or in their bank accounts as of the Petition Date.

8        159.    By this Motion, the Debtors seek authority to pay and/or honor the obligations

9    described herein to their Employees.  The aggregate of Wage Obligations and Vacation Accrual

10   to be paid to or for the benefit of each of the Employees pursuant to this Motion will not exceed

11   the $10,950 per Employee cap in Section 507(a)(4).    Similarly, the aggregate of Employee

12   Benefit Contributions to be paid to or for the benefit of each of the Employees pursuant to this

13   Motion will not exceed the $10,950 per Employee cap in Section 507(a)(5).

14       160.    Continued payment of Wage Obligations, Employee Benefit Contributions, and

15   Reimbursable Business Expenses, as well as honoring Vacation Accrual, and maintaining its

16   worker's compensation system, are essential to preserve the morale and to maintain positive

17   relations between the Debtors and their Employees, as well as to allow them to continue

18   operating.    If the relief requested herein is not granted, the success of the Debtors'

19   reorganizations will be placed in substantial jeopardy.  Thus, the relief requested in this Wage

20   Motion is in the best interests of the Debtors' estates, creditors, and parties-in-interest.

21   **H.**    **Motion Determining That Adequate Assurance Has Been Provided To The Utility**
     **Company.**
22

23       161.    In the ordinary course of their businesses, the Debtors incur utility expenses for

24   water, sewer service, electricity, gas, telephone service, internet service, and waste management.

     These utility services are provided by the utilities (as such term is used in Section 366,
25
     collectively, the "Utility Providers") listed on Exhibit "1" (the "Utility Service List") to the
26
     Emergency Motion Pursuant To 11 U.S.C. §§ 105(a) And 366 For An Order Determining That
27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

44

Adequate Assurance Has Been Provided To The Utility Companies (the "Utility Motion") filed contemporaneously herewith.

162.    On average, the Debtors collectively spend approximately $442,300 each month on utility costs.  As of the Petition Date, the Debtors believe they are substantially current on their utility payments as set forth on the Utility Service List.

163.    Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Any interruption of utility services, even for a brief period of time, would disrupt the Debtors' ability to continue servicing their customers, thereby negatively impacting customer relationships, revenues and profits.  Such a result could jeopardize the Debtors' reorganizations efforts and, ultimately, value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during these Chapter 11 Cases.

164.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that they will have ample liquidity, based upon cash on hand and cash flow from operations, to pay their postpetition obligations to their Utility Providers.  Specifically, the Debtors' operations are currently cash flow positive, prior to debt service, and the Debtors presently have approximately $12 Million either in cash on hand or in their bank accounts as of the Petition Date.

165.    To provide additional assurance of payment for future services to the Utility Providers, the Debtors have deposited $225,000 (a sum equal to more than approximately 50% of the Debtors' estimated cost of their monthly utility consumption) into a separate, interest-bearing account (the "Utility Deposit Account").  The Utility Deposit Account will provide still further assurance of future payment, over and above the Debtors' ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively with the Utility Deposit Account, the "Proposed Adequate Assurance").  The Debtors submit that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

45

166.    The proposed Procedures set forth in the Utility Motion are necessary for the Debtors to carry out their reorganization efforts.  If they are not approved, the Debtors could be forced to address a host of requests by their Utility Providers in a disorganized manner during the critical first weeks of their reorganization.  Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service, particularly electricity at any given Casino, could essentially shut down operations, and any significant disruption of operations could put the Debtors' reorganization efforts in jeopardy.

167.    Prior to the Petition Date, the Debtors used their best efforts to contact all of their Utility Providers and get specific and personal contact information (i.e., not just the general Post Office box where payments are remitted) where notices of bankruptcy and this Motion could be sent, including but not limited to fax and e-mail addresses to allow for immediate delivery when such information was available.  This specific delivery information is reflected on <u>Exhibit "2"</u> to the Utility Motion under the column labeled "Address to Serve Utility Motion," whereas the general addresses for remittance of monthly payments is reflected in the column labeled "Remit Address."  As such, the Debtors have used their best efforts under the circumstances to provide Utility Providers notice of this Motion and the proposed Procedures going forward.

I.    **Application For Order Limiting Notice Pursuant To Bankruptcy Rule 2002(m) & (l).**

168.    The Debtors approximate that collectively there are more than 18,000 parties-in-interest (the "Parties-In-Interest") among the Bankruptcy Cases.

169.    Dating back to 2006, the Debtors have employed over 4,000 other persons (the "Former Employees").  With the exception of a few Former Employees who have previously asserted claims against the Debtors, the Debtors do not believe that the Former Employees have any claims against them.  However, as the relevant statutes of limitation regarding certain claims have not yet run, the Debtors deem it prudent to provide the 341 notice of the meeting of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

46

1     creditors (the "341 Notice") to their Former Employees, thereby providing them notice of the

2     Bankruptcy Cases and an opportunity to file a proof of claim.

3          170.    Additionally, approximately 6,250 persons ("Timeshare Holders") hold timeshare

4     interests in certain real property of the Debtors. Although the Debtors do not believe that such

5     Timeshare Holders have any claims against the Debtors, due to their relationship to the Debtors,

6     and out of an abundance of caution, the Debtors deem it prudent to provide a copy of the 341

7     Notice to the Timeshare Holders, thereby providing them with notice of the Bankruptcy Cases

8     and an opportunity to file a proof of claim.

9          171.    Furthermore, dating back to 2006, the Debtors have engaged in over 6,000

10     business relationships with vendors (the "Vendors"), some of which could conceivably assert

11     claims against one or more of the Debtors arising out of their present or prior business dealings

12     with Debtors. As such, the Debtors intend to provide a copy of the 341 Notice to such vendors.

13          172.    Other Parties-In-Interest include Casino patrons who are owed winnings as of the

14     Petition Date, and hotel guests who have paid deposits or room fees for hotel rooms to be

15     occupied post-petition.

16          173.    As the Debtors anticipate that the vast majority of the Parties-In-Interest do not

17     have claims against one or more of the Debtors, full notices for each hearing and proceeding

18     throughout the Bankruptcy Cases would present burdensome costs to the estates. As such, the

19     Debtors strongly believe that the expenditure of large portions of its available resources to notify

20     all Parties-In-Interest of a proceeding in which they will have no interest is unwarranted under

21     the circumstances. Permitting the Debtors to solely provide a copy of the 341 Notice to such

22     Parties-in-Interest provides a cost-effective and viable solution as it provides the Parties-In-

23     Interest with notice of the Bankruptcy Cases and an opportunity to file a proof of claim and to

24     participate in the Bankruptcy Cases should they believe that they have a claim.

25          174.    To ensure meaningful notice and participation of all Parties-In-Interest, the

26     Debtors propose the publication of legal notices in both The Spectrum, a newspaper published

27     daily for circulation in the Southern Utah and Mesquite, NV regions, and the Las Vegas Review-

28     Journal, a newspaper published daily for circulation in the Southern Nevada region.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

47

**J.**     **Motion For Order Authorizing The Debtors To Pay Prepetition Taxes And Fees.**

175.    In the ordinary course of their business, the Debtors (a) collect and incur taxes, including property, sale and use, gaming, franchise, income, business, and other taxes in connection with the operation of their business (collectively, the "Taxes"); and (b) collect or incur fees and similar charges and assessments (collectively, the "Fees"). The Taxes and Fees are payable periodically at various times to various taxing, licensing, and other governmental authorities (collectively, the "Authorities"). Certain Taxes and Fees are direct obligations of the Debtors, while other Taxes and Fees are collected by the Debtors from hotel and casino customers or other parties and are held until remitted for the benefit of the Authorities.

176.    In the ordinary course of business, the Debtors collect and incur various Taxes and Fees, which are payable to the appropriate Authorities. Taxes and Fees are paid at different times depending on the frequency of when each Tax and Fee must be remitted, and are paid to the relevant Authority in accordance with each Authority's requirements, including payments made by check or by electronic fund transfer. These Taxes and Fees include the following:

a.    Real and Personal Property Taxes. The Debtors own a substantial amount of real and personal property located in Nevada and Arizona that is subject to state and local property taxes (collectively, "Property Taxes"). Within Arizona, Property Taxes are normally determined on an annual basis and paid in arrears. Therefore, Property Taxes may accrue long before they are actually due. Within Nevada, Property Taxes are normally determined on an annual basis and are paid in advance. Failure to pay Property Taxes in the ordinary course of business may result in the imposition of statutory liens on the Debtors' real and personal property. The Debtors estimate that as of the Petition Date, approximately $5,900 in Property Taxes are accrued but unpaid.

b.    Sales Taxes. The Debtors collect from customers or incur an assortment of state and local sales taxes (collectively, the "Sales Taxes"), and remit the Sales Taxes to the appropriate Authorities. Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated based on a statutory percentage of the sale price invoiced to the customer. If such taxes are not remitted to the Authorities on a timely basis, the Authorities

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

48

often impose personal liability on officers of a corporation. The Debtors remit Sales Taxes on a monthly basis. The Debtors estimate that as of the Petition Date, approximately $135,000 in Sales Taxes are accrued but unpaid.

c.    Use Taxes. The Debtors may be responsible for payment of use taxes ("Use Taxes") when they purchase certain tangible personal property for use in a jurisdiction where the acquisition of such property is taxable, but Sales Tax was not charged by the vendor. In such instances, the Debtors are responsible for assessing upon themselves and paying the Use Taxes when applicable. If such taxes are not remitted to the Authorities on a timely basis, the Authorities often impose personal liability on officers of a corporation. The Debtors estimate that as of the Petition Date, approximately $10,600 in Use Taxes are accrued but unpaid

d.    Gross Receipts Taxes. The Debtors may be responsible for payment of gross receipts taxes and/or business and occupation taxes (collectively, "Gross Receipts Taxes") which are levied against the seller of goods or provider of services. The Debtors estimate that as of the Petition Date, approximately $189,029 in Gross Receipts Taxes are accrued but unpaid, which sum is comprised of approximately $68,529 in business taxes and $120,500 in room taxes.

e.    Franchise and Income Taxes. The Debtors may be responsible for payment of certain franchise taxes and income taxes (collectively, "Franchise and Income Taxes") to the Authorities. Franchise and Income Taxes have been paid through February 2010 in accordance with the requirements of the applicable taxing jurisdiction. Thus, the Debtors estimate that as of the Petition Date, no Franchise and Income Taxes that have accrued remain unpaid. However, out of an abundance of caution, the Debtors seek authorization to pay any accrued, but unpaid Franshise and Income Taxes that may subsequently be assessed.

f.    Business Taxes, Including Gaming Taxes, and License Fees. The Debtors are required to obtain business licensing and pay corresponding business licenses fees to remain in good standing for the purposes of conducting the Debtors' business. Additionally, taxes are assessed to the Debtors or to the Debtors' customers for services provided in the Debtors' business, including hotel, entertainment, liquor, gaming, and similar taxes. In accordance with applicable authorities, gaming tax obligations are prepaid in three month rolling estimates.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc

49

1    Provided such requirements, the Debtors estimate that, as of the Petition Date, they owe

2    approximately $380,000 on account of pre-petition gaming, and taxes.

3            g.       Miscellaneous Taxes and Fees.  Various state and local laws may require the

4    Debtors to obtain and pay fees for a wide range of licenses and permits from a number of local,

5    state, and federal regulatory agencies.  The amount owed, if any, for these taxes and fees is de

6    minimis.  To the extent there are pre-petition amounts outstanding with respect to these taxes and

7    fees, the Debtors request the authority to pay such amounts.

8            177.   Paying the Taxes and Fees will benefit the Debtors and their creditors by allowing

9    business operations to continue without operation, interference, or distraction, and to allow the

10   Debtors to operate their respective Bankruptcy Cases without interference from the Authorities.

11   Therefore, there is a valid business justification for payment of Taxes and Fees in the ordinary

12   course of business.

13          178.   Payment of Taxes and Fees will also benefit the Debtors and their creditors by

14   allowing the Debtors to continue operations without interruption and by reducing the amount and

15   priority of claims to be asserted against the Debtors' estates.  The relief requested in the Motion

16   For Order Authorizing Debtors To Pay Pre-Petition Taxes And Fees Pursuant To 11 U.S.C. §§

17   105(a), 363(b), 507(a)(8), And 541(d) is integral to the continuing operation of the Debtors'

18   businesses and their successful reorganization, and is in the best interests of the Debtors, their

19   estates, and their creditors.

20          I declare under penalty of perjury of the laws of the United States that these facts are true

21   to the best of my knowledge and belief.

22          DATED this 1st day of March, 2010.

23

24                                                                 SEAN MCKAY

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/668442_10.doc