1

**GORDON SILVER**
GERALD M. GORDON, ESQ., Nevada Bar No. 229
2   E-mail: ggordon@gordonsilver.com
GREGORY E. GARMAN, ESQ., Nevada Bar No. 6654
3   E-mail: ggarman@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
4   Las Vegas, Nevada 89169
Telephone (702) 796-5555
5   Facsimile (702) 369-2666
Attorneys for Debtors
6

E-Filed _3/1/10_

7
           **UNITED STATES BANKRUPTCY COURT**
8             **FOR THE DISTRICT OF NEVADA**

9   In re:

BLACK GAMING, LLC
10
☐  Affects this Debtor.
11  ☒ Affects all Debtors.
☐ Affects VIRGIN RIVER CASINO CORPORATION
12  ☐ Affects B & BB, INC.
☐ Affects R. BLACK, INC.
13  ☐ Affects RBG, LLC
☐ Affects CASABLANCA RESORTS, LLC
14  ☐ Affects OASIS INTERVAL OWNERSHIP, LLC
☐ Affects OASIS INTERVAL MANAGEMENT, LLC
15  ☐ Affects OASIS RECREATIONAL PROPERTIES, INC.

**Case No.: BK-10-13301-BAM;  Chapter 11**
**Jointly Administered with:**

| | |
|---|---|
| 10-13303 | Virgin River Casino Corporation |
| 10-13305 | B & BB, Inc. |
| 10-13306 | R. Black, Inc. |
| 10-13307 | RBG, LLC |
| 10-13309 | Casablanca Resorts, LLC |
| 10-13310 | Oasis Interval Ownership, LLC |
| 10-13311 | Oasis Interval Management, LLC |
| 10-13312 | Oasis Recreational Properties, Inc. |

Date:
Time:

16
      **[PROPOSED] DISCLOSURE STATEMENT TO ACCOMPANY**
17    **DEBTORS' JOINT PLAN OF REORGANIZATION**

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

I. INTRODUCTION ........................................................................................................ 1

II. INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE
    STATEMENT ........................................................................................................ 2

III. OVERVIEW ............................................................................................................ 5

IV. SUMMARY OF THE PLAN ................................................................................... 6

V. DISCLAIMER .......................................................................................................... 10

VI. SUMMARY OF VOTING PROCESS .................................................................... 12
    A.    Who May Vote To Accept Or Reject The Plan. .................................... 12
    B.    Summary Of Voting Requirements. ...................................................... 12

VII. GENERAL INFORMATION ABOUT THE DEBTORS' BUSINESS,
     RESTRUCTURING EFFORTS AND THE FILING OF THE CHAPTER 11
     CASES .................................................................................................................. 13
    A.    The Debtors' Business. .......................................................................... 13

        1.    Corporate Structure. ................................................................ 13
        2.    The Pre-December 31, 2006 Corporate Structure. .................. 14
        3.    An Overview Of The Debtors' Assets And Operations. ......... 15
        4.    Operations. ............................................................................... 16
        5.    The Debtors' Prepetition Equity And Management
           Structure. ................................................................................. 23
        6.    Related Party Agreements. ....................................................... 24

    B.    The Debtors' Prepetition Capital Structure. .......................................... 24

        1.    The Senior Credit Facility. ...................................................... 25
        2.    The 9% $125 Million Senior Secured Note Facility. .............. 29
        3.    The 12.750% $66 Million PIK Senior Subordinated Notes. .. 30
        4.    The 2006 Amendments. ........................................................... 30
        5.    Amendments To The Senior Credit Facility. .......................... 31
        6.    The Defaults And Forbearance Agreements. .......................... 32

    C.    Events Leading To The Chapter 11 Cases. ............................................ 35

        1.    Economic Pressures. ................................................................ 35
        2.    Financial Performance. ............................................................ 38

    D.    Prenegotiated Plan Of Reorganization. ................................................. 39
    E.    Significant Events During The Chapter 11 Cases. ................................ 41

        1.    First Day Motions. ................................................................... 41
        2.    Other Significant Motions And Post-Petition Events. ............ 42

VIII. DESCRIPTION OF THE PLAN .......................................................................... 43
    A.    Overview Of Chapter 11 ........................................................................ 43

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

B.   Treatment Of Unclassified Claims Under The Plan ........................................... 46

    1.   Treatment Of Administrative Claims.................................................... 46
    2.   Treatment Of Priority Tax Claims. ....................................................... 46

C.   Classification And Treatment Of Claims And Equity Interests Under The Plan. .......................................................................................................... 46

    1.   Treatment Of Class 1 (Other Priority Claims). ................................... 46
    2.   Treatment Of Class 2 (Other Secured Claims). ................................. 47
    3.   Treatment Of Class 3 (Senior Credit Facility Claims)....................... 47
    4.   Treatment Of Class 4 (General Unsecured Claims). ......................... 47
    5.   Treatment Of Class 5 (Senior Secured Note Facility Secured Claims). ............................................................................................ 48
    6.   Treatment Of Class 6 (Senior Secured Note Facility Unsecured Claims. .......................................................................................... 49
    7.   Treatment Of Class 7 (Senior Subordinated Note Claims)............... 49
    8.   Treatment Of Class 8 (Intercompany Claims). .................................. 49
    9.   Treatment Of Class 9 (Equity Interests In Black Gaming). ............... 50
    10.  Treatment Of Class 10 (Intercompany Equity Interests). ................. 50

D.   Means For Implementation Of The Plan. ......................................................... 50

    1.   Black Gaming. ...................................................................................... 50
    2.   New Black Gaming............................................................................... 51
    3.   Reorganized Debtors........................................................................... 51
    4.   Additional New Black Gaming Provisions. ......................................... 52
    5.   Post-Effective Date And Pre-Substantial Consummation Date Management And Operations................................................. 53
    6.   Post-Substantial Consummation Date Management Of New Black Gaming. ................................................................................... 53
    7.   Initial Management Of Reorganized Debtors. .................................... 54
    8.   No Corporate Or Limited Liability Company Action Required. .......................................................................................... 54
    9.   Effectuation Of Transactions. ............................................................. 55
    10.  Debtors' Organizational Documents.................................................... 55
    11.  Employment Agreements. ................................................................... 55

E.   Executory Contracts And Unexpired Leases. .................................................. 56

    1.   Executory Contracts. ........................................................................... 56
    2.   Approval Of Assumption Or Rejection. ............................................... 56
    3.   Cure Of Defaults. ................................................................................. 57
    4.   Post-Petition Date Contracts And Leases. ......................................... 58
    5.   Bar Date. .............................................................................................. 58

F.   Manner Of Distribution Of Property Under The Plan. ...................................... 58

    1.   Distributions......................................................................................... 58
    2.   No Recourse. ....................................................................................... 59
    3.   Reserves. .............................................................................................. 59
    4.   Statements. .......................................................................................... 59

G.   Conditions To Confirmation Of The Plan, The Effective Date And The Substantial Consummation Date.................................................................. 59

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

ii

1.    Condition To Confirmation..........................................................59
2.    Conditions To The Effective Date. .............................................60
3.    Conditions To The Substantial Consummation Date.................60
4.    Waiver Of Conditions. ...............................................................60

IX. RISK FACTORS ...........................................................................61

A.   The Debtors Have No Duty To Update. ...........................................61
B.   Information Presented Is Based On The Debtors' Books And Records, And Is Unaudited. .......................................................61
C.   Projections And Other Forward-Looking Statements Are Not Assured, And Actual Results Will Vary. .......................................61
D.   This Disclosure Statement Has Not Been Approved By The SEC......................62
E.   No Legal Or Tax Advice Is Provided To You By This Disclosure Statement...........................................................62
F.   No Admissions Made...............................................................62
G.   No Waiver Of Right To Object Or Right To Recover Transfers And Estate Assets. .................................................62
H.   Bankruptcy Law Risks And Considerations. .....................................62

1.    Confirmation Of The Plan Is Not Assured. ..............................62
2.    The Effective Date Or The Substantial Consummation Date Might Be Delayed Or Never Occur. ........................................63
3.    The Projected Value Of Estate Assets Might Not Be Realized..................................................................64
4.    Allowed Claims In The Various Classes May Exceed Projections................................................................64
5.    No Representations Outside Of This Disclosure Statement Are Authorized.............................................................64

I.    Gaming Law Risk Factors .....................................................64
J.    Risks Related To The Debtors' Business Operations. .........................64

1.    Effect Of The Chapter 11 Cases. ............................................64
2.    The Volatility And Disruption Of The Capital And Credit Markets And Adverse Changes In The Global Economy Have Negatively Impacted The Debtors' Access To Financing..........................................................65
3.    The Gaming Industry Has Been Adversely Affected By The Economic Downturn. ..............................................66
4.    The Geographic Concentration Of The Debtors' Properties Exposes The Debtors To Greater Risks Than Geographically Diversified Gaming Companies. ...................66
5.    The Debtors Face Substantial Competition In The Gaming Industry...............................................................67
6.    The Debtors Rely On Robert R. Black, Sr., The Loss Of Whose Services Could Materially And Adversely Affect The Debtors' Business. ..............................................68
7.    The Debtors Face Extensive Regulation From Gaming And Other Government Authorities. ........................................68
8.    If The State Of Nevada Or Clark County Increases Gaming Taxes And Fees, The Debtors' Results Of Operations Could Be Adversely Affected...........................................69
9.    The Debtors' Business, Financial Condition And Results Of Operations May Be Harmed By Union Efforts To

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

iii

|  |  | Organize Employees. | 70 |
|  | 10. | The Debtors' Business, Financial Condition And Results Of Operations Are Dependent In Part On A Number Of Factors That Are Beyond The Debtors' Control. | 70 |
|  | 11. | The Debtors Are Subject To Environmental Laws And Potential Exposure To Environmental Liabilities. | 70 |

X. CERTAIN GAMING LAW CONSIDERATIONS.................................................. 72

| A. | Introduction. | 72 |
| B. | Background On Nevada Gaming Regulations. | 72 |
| C. | Summary Of Gaming Regulatory Risks Under The Plan. | 80 |

XI. CERTAIN SECURITIES LAW CONSIDERATIONS .............................. 83

XII. POST-SUBSTANTIAL CONSUMMATION DATE OPERATIONS ............................ 85

| A. | Title To Property; Discharge; Injunction. | 85 |

| | 1. | Vesting Of Assets. | 85 |
| | 2. | Preservation Of Litigation Claims. | 86 |
| | 3. | Settlement Of Litigation Claims. | 86 |
| | 4. | Discharge. | 86 |
| | 5. | Compromise And Settlement. | 87 |
| | 6. | Injunction. | 87 |
| | 7. | Debtors' Releases. | 88 |
| | 8. | Third Party Release. | 89 |

| B. | Exculpation. | 89 |
| C. | Director And Officer Liability Insurance. | 90 |
| D. | Indemnification. | 90 |

XIII. RETENTION OF JURISDICTION.................................................. 91

| A. | Jurisdiction. | 91 |

XIV. MODIFICATION AND AMENDMENT OF THE PLAN........................... 93

XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................ 93

| A. | Introduction. | 93 |
| B. | Tax Consequences To The Debtors And Newly Formed Entities. | 95 |

| | 1. | Overview Of Transaction Steps. | 95 |

| C. | Tax Consequences To Certain Holders Of Claims And Equity Interests. | 102 |

| | 11. | Limitation on NOL Carryforwards. | 114 |

XVI. CONFIRMATION OF THE PLAN .................................................. 116

| A. | Confirmation Of The Plan. | 116 |
| B. | Objections To Confirmation Of The Plan. | 116 |
| C. | The Best Interest Test And Feasibility Of The Plan. | 118 |

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

1.   Best Interest Of Creditors. ........................................................ 118
2.   Valuation. ................................................................................... 118
3.   Liquidation Analysis. ................................................................. 119
4.   Feasibility. .................................................................................. 122
5.   Confirmation Of The Plan Without Acceptance By All
     Impaired Classes: The "Cramdown" Alternative ...................... 123
6.   Accepting Impaired Class. .......................................................... 124
7.   Acceptance Of The Plan. ............................................................ 125
8.   Allowed Claims. .......................................................................... 125
9.   Impaired Claims And Impaired Equity Interests. ...................... 125
10.  Voting Procedures. ...................................................................... 126

XVII. MISCELLANEOUS ................................................................................ 127

A.   Post-Effective Date Objections To Claims Or Equity Interests. ........... 127
B.   Resolution Of Objections After Effective Date; Distributions. ............ 127

1.   Resolution Of Objections. .......................................................... 127
2.   Distributions. .............................................................................. 128
3.   Late-Filed Claims. ...................................................................... 128
4.   Effectuating Documents; Further Transactions; Timing. .......... 128
5.   Exemption From Transfer Taxes. ............................................... 129
6.   Revocation Or Withdrawal Of The Plan. ................................... 129
7.   Binding Effect. ............................................................................ 130
8.   Governing Law. ........................................................................... 130
9.   Modification Of Payment Terms. ............................................... 130
10.  Allocation Of Plan Distributions Between Principal And
     Interest. ....................................................................................... 131
11.  Means Of Cash Payment. ........................................................... 131
12.  Providing For Claims Payments. ............................................... 131
13.  Set-Offs. ...................................................................................... 132
14.  Notices. ....................................................................................... 132
15.  Statutory Committee. .................................................................. 134
16.  Severability. ................................................................................ 134
17.  Withholding And Reporting Requirements. ............................... 134
18.  Cramdown. .................................................................................. 135
19.  Quarterly Fees To The United States Trustee. ........................... 135

XVIII. ALTERNATIVES TO THE PLAN ...................................................... 135

A.   Alternative Plans Of Reorganization. ........................................ 136
B.   Liquidation Under Chapter 7. ..................................................... 136

XIX. PREFERENCE AND OTHER AVOIDANCE ACTIONS ..................... 136

XX. RECOMMENDATION AND CONCLUSION .......................................... 137

**APPENDIX**

EXHIBIT "A": PLAN OF REORGANIZATION

EXHIBIT "B": LIQUIDATION ANALYSIS

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc                                         v

EXHIBIT "C":  LOCKUP

EXHIBIT "D":  FINANCIAL PROJECTIONS

EXHIBIT "E":  NEW BLACK GAMING ORGANIZATIONAL DOCUMENTS

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

# I.
## INTRODUCTION

On February 23, 2010 (the "Petition Date"), Black Gaming, LLC ("Black Gaming"); Virgin River Casino Corporation ("Virgin"); B & BB, Inc. ("BBB"); R. Black, Inc. ("Black Inc."); RBG, LLC ("RBG"); Casablanca Resorts, LLC ("Casablanca"); Oasis Interval Ownership, LLC ("Oasis Own"); Oasis Interval Management, LLC ("Oasis Mgmt"); and Oasis Recreational Properties, Inc. ("Oasis Rec" and, together with Black Gaming, Virgin, BBB, Black Inc., RBG, Casablanca, Oasis Own and Oasis Mgmt, the "Debtors") filed petitions for relief (collectively, the "Petition") under Title 11, Chapter 11 of the United States Code (the "Bankruptcy Code").

The Debtors have prepared this Disclosure Statement in connection with the solicitation of votes on the Joint Plan of Reorganization (the "Plan") dated February 23, 2010 [Docket No. ____], proposed by the Debtors to treat the Claims of Creditors and Holders of Equity Interests in the Chapter 11 Cases.

**Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. In the event of a conflict or difference between the definitions used in this Disclosure Statement and in the Plan, the definitions contained in the Plan shall control.**

The Exhibits to this Disclosure Statement included in the Appendix are incorporated into, and are a part of, this Disclosure Statement. The Plan is attached as Exhibit A. Any interested party desiring further information should contact:

> Gordon Silver
> Attn: Gregory E. Garman, Esq.
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, Nevada 89169
> Telephone: (702) 796-5555
> Email: ggarman@gordonsilver.com

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

Interested parties may also obtain further information from the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") at its website: http://www.nvb.uscourts.gov, or from the Debtors' case website at: http://www._____.

Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Exhibits hereto including the Plan, and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.

## II.
## INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE STATEMENT

The objective of a case under Chapter 11 of the Bankruptcy Code ("Chapter 11") is the confirmation (i.e. approval by the bankruptcy court) of a plan of reorganization. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying claims against, and equity interests in, a debtor. After a plan has been filed, the holders of such claims and equity interests that are impaired (as defined in Section 1124 of the Bankruptcy Code) and receiving some cash or property on account of such claims or equity interests are permitted to vote to accept or reject the plan. Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 of the Bankruptcy Code requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed voting decision about whether to accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable Holders of Senior Secured Note Facility Claims, Senior Subordinated Note Claims and Intercompany Claims to make an informed voting decision about whether to accept or reject the Plan. (Holders of other Claims or Equity Interests will be deemed to have accepted or rejected the Plan, as the case may be, without the need for them to vote.) This Disclosure Statement is being used to solicit acceptances of the Plan. The Bankruptcy Court has found that this Disclosure Statement provides adequate information and has entered an

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

2

order approving this Disclosure Statement, in accordance with Section 1125 of the Bankruptcy Code. Approval by the Bankruptcy Court is not an opinion or ruling on the merits of the Plan and it does not mean that the Plan has been or will be approved by the Bankruptcy Court.

After the appropriate Persons have voted to accept or reject the Plan, there will be a Confirmation Hearing to determine whether the Plan should be confirmed by the Bankruptcy Court. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code. The Bankruptcy Court will also receive and consider a Ballot summary, which will present a tally of the votes cast by those Classes entitled to vote on the Plan. Once confirmed, the Plan will be treated essentially as a contract binding on all Creditors, Holders of Equity Interests and other parties-in-interest in the Chapter 11 Cases, even if they rejected the Plan.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION THAT ARE INCORPORATED BY REFERENCE HEREIN (COLLECTIVELY, THE "INCORPORATED DOCUMENTS"). THE SUMMARIES CONTAINED HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE INCORPORATED DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE ACTUAL CONTENT OF ANY OF THE INCORPORATED DOCUMENTS, THE INCORPORATED DOCUMENTS SHALL GOVERN FOR ALL PURPOSES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE CONFIRMATION, EFFECTIVENESS AND CONSUMMATION OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

3

PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING THOSE HOLDERS WHO DO NOT VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT OR LIABILITY, A STIPULATION OR A WAIVER.  THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

THE DEBTORS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  PERSONS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

4

EACH HOLDER OF AN IMPAIRED CLAIM WHO IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.   ALL PERSONS DESIRING SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO PROVIDE ANY INFORMATION ABOUT THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS ABOUT THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE OR GIVEN TO OBTAIN THEIR APPROVAL OF THE PLAN THAT DIFFER FROM, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE MANAGEMENT OF EACH DEBTOR HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE ENDEAVORED TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS OTHERWISE STATED HEREIN.

### III.
### OVERVIEW

The primary objective of the reorganization and restructuring under the Plan is to maximize returns to those Creditors entitled to recoveries from the Estates.  The Debtors desire to achieve this objective through an expeditious restructuring of, among other things, the Senior

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

5

Secured Note Facility and certain other debt obligations of, and Equity Interests in, the Debtors and other actions described herein and in the Plan. The key aspects of the Plan are as follows:

        A.     The Debtors have determined that the enterprise value of their Assets, consisting of _____, ranges from $_____ to $_____. (See Section XVI.C.2.)

        B.     The Allowed Claims of Holders of Senior Secured Note Facility Claims (including Secured Claims and unsecured Claims) totaled approximately $_____ in principal plus accrued interest of $_____ for a total of $_____ as of the Petition Date.

        C.     The Allowed Claims of Holders of Senior Subordinated Notes totaled approximately $_____ in principal plus accrued interest of $_____ for a total of $_____ as of the Petition Date.

        D.     The Allowed Claims of Senior Credit Facility Lenders will be paid in full at the non-default rate of interest.

        E.     The Allowed Claims of Holders of General Unsecured Claims will be paid in full.

        F.     Holders of Senior Secured Note Facility Allowed Claims will receive $62,500,000 of promissory notes under the New Senior Secured Credit Agreement and New Senior Secured Loan (New Senior Notes"), plus the Cash Contribution, plus the Cash Payment.

        G.     Holders of Senior Subordinated Notes Allowed Claims will receive five-year profit participants warrants for non-voting New Black Gaming Equity Interests amounting (if exercised) to 5% of the fully-diluted Equity Interests in New Black Gaming.

**IV.**
**SUMMARY OF THE PLAN**

       The following summary of the Plan is qualified in its entirety by reference to the detailed explanations in this Disclosure Statement and the Plan itself. For a more detailed description of the Plan, see Article VIII hereof and the Plan.

       Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and Priority Tax Claims are not designated as Classes under the Plan. In general, these Claims

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

6

consist of the fees and costs of professionals employed on behalf of the Estates. The Holders of such unclassified Claims are not entitled to vote on the Plan and will be paid in full under the Plan consistently with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

The Distributions under the Plan to each Class are summarized in the following table:

| Class | Description | Treatment | Estimated Amount of Claims[1] |
|---|---|---|---|
| Class 1: | Other Priority Claims | Unimpaired. Paid in full in Cash. See Section VIII.C.1. | $_____ |
| Class 2: | Other Secured Claims | Unimpaired. Paid in full in Cash or otherwise left Unimpaired. See Section VIII.C.2. | $_____ |
| Class 3: | Senior Credit Facility Claims | Unimpaired. Paid in full at the non-default rate, plus reasonable attorneys' fees and costs. Also, between the Petition Date and the Substantial Consummation Date, certain "adequate protection" payments will be made at the non-default rate. See Section VIII.C.3. | $_____ |
| Class 4: | General Unsecured Claims | Unimpaired. Paid in full in Cash or otherwise left Unimpaired. See Section VIII.C.4. | $_____ |
| Class 5 | Senior Secured Note Facility Secured Claims | Impaired. Pro Rata shares of (i) New Senior Notes, (ii) the Cash Contribution and (iii) the Cash Payment. See Section VIII.C.5. | $_____ |

---

[1] These amounts were compiled by combining the undisputed claims listed on the Debtors' bankruptcy schedules, together with the proofs of claim on file as of the time of the Debtors' filing of their motion to approve this Disclosure Statement. As such, these amounts are estimates only, and may change as more proofs of claim are filed, and the adjudication or other resolution of pending contingent, unliquidated or disputed claims.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

7

| | | | |
|---|---|---|---|
| Class 6 | Senior Secured Note Facility Unsecured Claims | Impaired. Subordinated to payment in full of Class 4 General Unsecured Claims. See Section VIII.C.6. | $_____ |
| Class 7: | Senior Subordinated Note Claims | Impaired. Senior Subordinated Note Warrants, exercisable for non-voting New Black Gaming Equity Interests. See Section VIII.C.7. | $_____ |
| Class 8: | Intercompany Claims | Impaired. Reinstated or canceled (in whole or in part) at the option of the Debtors or Reorganized Debtors. See Section VIII.C.8. | $_____ |
| Class 9: | Equity Interests in Black Gaming | Impaired. No Distribution. See Section VIII.C.9. | n/a |
| Class 10: | Intercompany Equity Interests | Unimpaired. Interests remain unaltered. See Section VIII.C.10. | n/a |

Other Priority Claims, which consist of any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, are provided for in Class 1. Allowed Claims in Class 1 ("Allowed Class 1 Claims") will be paid in full in Cash under the Plan; therefore, Holders of Allowed Class 1 Claims are Unimpaired.

Other Secured Claims, which consist of all Secured Claims, except Senior Credit Facility Claims, Senior Secured Note Facility Claims, Administrative Claims and Secured Tax Claims to the extent any such Claims are Secured Claims, are provided for in Class 2. Allowed Claims in Class 2 ("Allowed Class 2 Claims"), if any, will be paid in full in Cash or otherwise left Unimpaired, in full and final satisfaction of such Claims.

Senior Credit Facility Claims are provided for in Class 3, which is an Unimpaired Class. As explained in Section VIII.C.3, from the Petition Date until the Substantial Consummation Date, Holders of Allowed Claims in Class 3 ("Allowed Class 3 Claims") will receive certain "adequate protection" payments and on the Substantial Consummation Date, Holders of Allowed

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

8

1    Class 3 Claims will be paid in full at the non-default rate, together with reasonable attorneys'

2    fees and costs.

3    General Unsecured Claims are provided for in Class 4. Holders of Class 4 Claims are

4    Unimpaired. Each Holder of an Allowed Claim that is a General Unsecured Claim ("Allowed

5    General Unsecured Claim") will be paid in full in Cash or otherwise left Unimpaired. As set

6    forth in Section XVI.C.4, the Debtors are projected to have Cash on hand of approximately

7    $_____ as of the Effective Date and are thus capable of meeting all Cash demands

8    under the Plan, including payments to Holders of Class 4 Claims on the Effective Date and

9    funding the Disputed Claim Reserve.

10    Senior Secured Note Facility Secured Claims are provided for in Class 5, which is an

11    Impaired Class. As explained in Section VIII.C.5, Holders of Allowed Claims in Class 5

12    ("Allowed Class 5 Claims") will receive their Pro Rata shares of a combination of (i)

13    $62,500,000 of New Senior Notes under the New Senior Credit Facility, (ii) the Cash

14    Contribution and (iii) the Cash Payment. Items (i) and (ii) above will be distributed on the

15    Substantial Consummation Date; item (iii) above will be distributed seven days thereafter.

16    Senior Secured Note Facility Unsecured Claims are provided for in Class 6, which is an

17    Impaired Class. As explained in Section VIII.C.6, Allowed Claims in Class 6 ("Allowed Class 6

18    Claims") will be subordinated to payment in full of Class 4 Allowed General Unsecured Claims

19    and will be discharged contemporaneously with the discharge of all Senior Subordinated Note

20    Claims under the Plan.

21    Senior Subordinated Note Claims are provided for in Class 7, which is an Impaired Class.

22    As explained in Section VIII.C.7, on the Substantial Consummation Date, Holders of Allowed

23    Claims in Class 7 ("Allowed Class 7 Claims" or "Allowed Senior Subordinated Note Claims")

24    will receive their Pro Rata share of Senior Subordinated Note Warrants for non-voting New

25    Black Gaming Equity Interests amounting to 5% of the New Black Gaming Equity Interests

26    calculated on a fully-diluted basis.

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

9

Claims that any Debtor has against another Debtor are classified as Intercompany Claims in Class 8, which is an Impaired Class. Intercompany Claims will either be reinstated or canceled, or partially reinstated and partially canceled, at the option of the Debtors or the Reorganized Debtors. No payment will be made under the Plan for any such Intercompany Claims that are canceled. Holders of Allowed Class 8 Claims are Impaired and will be entitled to vote on the Plan, except for such Holders whose Intercompany Claims will be canceled and who will be deemed to have rejected the Plan without the need for their vote.

Holders of Equity Interests in Black Gaming are in Class 9. Holders of Class 9 Claims are Impaired. On the Substantial Consummation Date all Equity Interests in Black Gaming will be canceled and Holders of Claims in Class 9 will not receive or retain anything on account of their Claims. Such Holders will be deemed to have rejected the Plan without the need for their vote.

Any Equity Interest in a Debtor other than Black Gaming that is held by another Debtor or an Affiliate of another Debtor is classified as an Intercompany Interest in Class 10. All Intercompany Interests in Class 10 will be retained and will remain unaltered. All such Equity Interests are Unimpaired. Holders of Intercompany Interests will not be entitled to vote on the Plan.

## V.
## DISCLAIMER

In formulating the Plan, the Debtors relied on financial data derived from their books and records as well as the valuation of the Debtors' Assets by XRoads Solutions Group, LLC, as more particularly described in Section XVI.C.2. The Debtors represent that as of the date of this Disclosure Statement, everything stated in this Disclosure Statement is true to the best of their knowledge. However, the Debtors cannot and do not confirm the current accuracy of the statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward-looking statements," as that term is used in the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than one of historical fact, and can be identified

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

10

by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate," "likely," "probable" or "continue" or the negative thereof or other variations thereof or comparable terminology. All such forward-looking statements are speculative, and there are risks and uncertainties that could cause actual events or results to differ materially form those referred to in such forward-looking statements. The liquidation analysis and distribution projections are estimates only, and the timing and amounts of actual distributions may be affected by many factors that cannot be predicted. Therefore, any analysis, estimates or recovery projections may not turn out to be accurate.

NOTHING IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.

ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR INFORMATION CONTAINED IN, OR OMITTED FROM, THIS DISCLOSURE STATEMENT.

THE DEBTORS AND THEIR PROFESSIONALS HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT AND IN THE PLAN PENDING LITIGATION CLAIMS, PROJECTED CAUSES OF ACTION AND OBJECTIONS TO CLAIMS. HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM, PROJECTED CAUSE OF

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

11

ACTION OR OBJECTION TO A CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT OR THE PLAN. THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE LITIGATION CLAIMS AND PROJECTED CAUSES OF ACTION AND OBJECTIONS TO CLAIMS AFTER THE CONFIRMATION DATE, EFFECTIVE DATE OR SUBSTANTIAL CONSUMMATION DATE, IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT OR THE PLAN IDENTIFIES SUCH CLAIMS, CAUSES OF ACTION OR OBJECTIONS TO CLAIMS.

## VI.
## SUMMARY OF VOTING PROCESS

**A.    Who May Vote To Accept Or Reject The Plan.**

Generally, holders of allowed claims or equity interests that are "impaired" under a plan of reorganization and who are receiving some cash or property on account of such claims or equity interests are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor; an equity interest represents an ownership stake in a debtor. In order to vote, a creditor or holder of an equity interest must have an allowed claim. The solicitation of votes on the Plan will be sought only from Holders of Allowed Claims whose Claims are Impaired and who will receive property or rights under the Plan. As explained further below, to be entitled to vote, a Person must be a Holder of a Claim that is both an "Allowed Claim" and "Impaired."

**B.    Summary Of Voting Requirements.**

In order for the Plan to be confirmed, it must be accepted by at least one Impaired Class of Claims, excluding the votes of any Insiders within that Class. A Class of Claims is deemed to have accepted the Plan if and when allowed votes representing at least two-thirds in amount and a majority in number of the Claims of the Class actually voting cast votes in favor of the Plan.

A Class of Equity Interests would be deemed to have accepted the Plan if votes representing at least two-thirds in amount of the outstanding Equity Interests of the Class actually voting cast votes in favor of the Plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

12

Holders of certain Impaired Classes of Claims or Equity Interests will not receive or retain anything on account of their Claims or Equity Interests. As such, they will be deemed to have voted against the Plan without the need for them to cast votes or receive voting ballots.

The Debtors are soliciting votes only from Holders of Allowed Claims in the following three Classes, which are Impaired under the Plan: Class 5 (Senior Secured Note Facility Secured Claims), Class 6 (Senior Secured Note Facility Unsecured Claims), Class 7 (Senior Subordinated Note Claims) and Class 8 (Intercompany Claims).

The Debtors have the right to supplement this Disclosure Statement as to additional Impaired Classes, if any. The treatment of each Class is described in the Plan and is summarized generally in Articles IV and VIII of this Disclosure Statement.

**A VOTE FOR ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE DEBTORS BELIEVE THAT THE TREATMENT OF HOLDERS OF EACH OF THE SENIOR SECURED NOTE FACILITY SECURED CLAIMS, SENIOR SECURED NOTE FACILITY UNSECURED CLAIMS, SENIOR SUBORDINATED NOTE CLAIMS, AND INTERCOMPANY CLAIMS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR EACH OF THEM, AND THE DEBTORS RECOMMEND THAT THE HOLDERS OF THOSE ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

## VII.
## GENERAL INFORMATION ABOUT THE DEBTORS' BUSINESS, RESTRUCTURING EFFORTS AND THE FILING OF THE CHAPTER 11 CASES

A.      **The Debtors' Business.**

1.      **Corporate Structure.**

Since December 31, 2006, Black Gaming has been the sole shareholder of Virgin and BBB. BBB does not have any subsidiaries. Virgin has two subsidiaries, namely (i) Black Inc. of which it is the sole shareholder, and (ii) RBG in which it owns a 94.53% membership interest. The remaining 5.47% membership interest in RBG is owned by Black Inc. RBG is the sole member of Casablanca, which is the sole owner of Oasis Own, Oasis Mgmt, and Oasis Rec. The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

following chart illustrates the relationship among Black Gaming and its direct and indirect subsidiaries.

**BLACK GAMING ORGANIZATIONAL CHART**



2.      <u>The Pre-December 31, 2006 Corporate Structure.</u>

Black Gaming was organized as a Nevada limited liability company on August 4, 2006 in anticipation of modifying BBB's and Virgin's organizational structure through a holding company reorganization (the "Holding Company Reorganization"). The Holding Company Reorganization was completed to enable the preparation of one comprehensive financial statement and public filing with the United States Securities and Exchange Commission (the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

14

1   "SEC").[2]   This reorganization, which included a transfer of BBB and Virgin's shares for

2   membership interests in Black Gaming was completed on December 31, 2006.  As a result, the

3   Black Trust now owns a 99.03% membership interest in Black Gaming and Glenn Teixeira owns

4   the remaining 0.97%.[3]

5        Also as a result of the Holding Company Reorganization, BBB and Virgin River became

6   Black Gaming's wholly-owned subsidiaries that wholly own, directly or indirectly, the

7   remaining Debtors.

8        **3.    An Overview Of The Debtors' Assets And Operations.**

9        Black Gaming serves as the holding company for the entities that own and operate the

10  Casinos and the Debtors' related businesses.

11       Virgin, a Nevada corporation incorporated on July 1, 1988, owns the real property in

12  Mesquite, Nevada, upon which the Virgin River Hotel & Casino (the "Virgin River Casino") is

13  located.  Virgin also owns the real property upon which the Virgin River Convention Center

14  formerly known as the Mesquite Star Hotel and Casino (the "Convention Center") is located, as

15  well as the personal property, including furniture, fixtures and leasehold improvements in the

16  Convention Center.

17       BBB, a Nevada corporation incorporated on December 7, 1989, operates the Virgin River

18  Casino and owns certain personal property, including furniture and fixtures, leasehold

19  improvements, and gaming equipment located within the Virgin River Casino.

20       Black Inc. is a Nevada corporation incorporated on February 19, 1997 that serves solely

21  as a holding company for a 5.47% membership interest in RBG.

22       RBG, a Nevada limited liability company organized on February 18, 1997, owns the real

23  property in Mesquite, Nevada, upon which the CasaBlanca Hotel & Casino (the "CasaBlanca

24  Casino") is located, as well as the personal property, including furniture and fixtures, leasehold

25

26  ---

    [2] While Black Gaming is no longer a publicly-reporting company with the SEC, portions of Black Gaming's debt
27  were publicly-registered with the SEC when they were issued.

    [3] A more complete description of the Holding Company Reorganization is set forth in Black Gaming's filings with
28  the SEC available at www.sec.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc                                                      15

1   improvements, and gaming equipment located in the CasaBlanca Casino. RBG also owns

2   approximately 34.4 acres located southwest of the CasaBlanca Golf Course, as well as certain

3   time-share intervals.

4        Casablanca, a Nevada limited liability company organized on February 6, 2001, owns the

5   real property in Mesquite, Nevada, on which the Oasis Hotel & Casino (the "Oasis Casino," and

6   together with the Virgin River Casino and the CasaBlanca Casino, the "Casinos") is located, as

7   well as all of the personal property, including furniture and fixtures, leasehold improvements,

8   and gaming equipment located in the Oasis Casino. Casablanca is also the sole owner of three

9   subsidiaries, namely Oasis Own, Oasis Mgmt, and Oasis Rec.

10        Oasis Own, a Nevada limited liability company, was organized on March 31, 2001 to

11   hold the remaining time-share interests at the Oasis Casino.

12        Oasis Mgmt, a Nevada limited liability company, was organized on March 31, 2001.

13   Oasis Mgmt provides certain services with regard to the time-shares located at the Oasis Casino

14   and the Casablanca Casino.

15        Oasis Rec, a Nevada corporation, was formed on March 23, 2001. Oasis Rec owns and

16   operates the Oasis Recreational Facility, which includes the gun club, motocross facilities,[4] a

17   deli, and the Palms Golf Course, all of which are located in Arizona.

18        **4.**    **Operations.**

19        The Debtors collectively form a diversified gaming company owning and operating three

20   of the four casino hotels in Mesquite, Nevada, two championship golf courses, a full-service spa,

21   a bowling center, a gun club, gourmet and casual restaurants, and banquet and conference

22   facilities. The Debtors' revenues are primarily derived from three sources: (i) gaming, which

23   includes slot machines, table games, live keno, race and sports book wagering, and bingo; (ii)

24   hotel rooms; and (iii) and food and beverage sales.

25

26

27

28

---

[4] The motocross facilities are leased by CasaBlanca Resorts to Dirt Sports, a Nevada limited liability company pursuant to a lease commencing July 1, 2009 and terminating June 30, 2014.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

As of the Petition Date, the Casinos had an aggregate of approximately 2,100 hotel rooms, 97 time-share units located at the Oasis Casino and CasaBlanca Casino, 1,579 slot machines, and 40 table games.

a.    The CasaBlanca Casino.

The CasaBlanca Casino is a full-service entertainment and resort destination located off of Interstate 15 in Mesquite, Nevada.  The CasaBlanca Casino targets middle-market guests looking for a high-quality gaming experience in a full-service resort environment and a value alternative to Las Vegas.  The CasaBlanca Casino offers approximately 472 tower rooms (including 24 suites) and 24 time-share units.  The approximately 27,000 square-foot casino offers approximately[5] 792 video poker and slot machines, 24 table games, a full-service race and sports book, lounge entertainment, and dancing

The CasaBlanca Casino offers various resort and entertainment amenities, including a golf club, a full-service spa, tennis courts, a lagoon swimming pool with a waterfall and slide, a hot tub, a sand volleyball court, and an arcade.  In addition, the CasaBlanca Casino offers a 320-seat buffet restaurant, a 180-seat 24-hour café, a 136-seat fine dining restaurant, an ice cream parlor, a Starbucks® coffee outlet, a gift shop, a 10,000 square-foot banquet and conference facility, and a 500-seat showroom.  The CasaBlanca Casino is situated on an approximately 43-acre fee simple site, with a parking lot for approximately 1,940 cars, as well as a 45-unit full-service R.V. park.

b.    The CasaBlanca Golf Club.

Approximately one mile from the CasaBlanca Casino, situated on a 221-acre site, is the CasaBlanca Golf Club featuring an 18-hole, 7,011-yard championship course designed by Cal Olson.  The land on which the CasaBlanca Golf Club is located is leased by RBG from River View Limited Liability Company pursuant to a 99-year lease that expires in June 2094 (the

---

[5] As discussed more fully herein, upon the reduced operations and ultimate closure of the Oasis Casino, certain of the slot and video poker machines were moved from the Oasis Casino to the CasaBlanca Casino and the Virgin River Casino.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

17

"CasaBlanca Golf Club Lease"). As of the Petition Date, the CasaBlanca Golf Club Lease was current and not in default.

RBG additionally owns approximately 34 acres of unimproved land near the CasaBlanca Golf Club.

c.    The Virgin River Casino.

The Virgin River Casino is located off of Interstate 15 in Mesquite, Nevada, across the highway from the Convention Center. The Virgin River Casino generally attracts local customers and drive-in middle-market customers. The Virgin River Casino has 717 guest rooms, including 6 suites, and a 36,000 square-foot casino with approximately[6] 771 video poker and slot machines, 16 table games, a full-service race and sports book, 6 poker tables, a 183-seat bingo parlor, and live keno.

The Virgin River Casino offers various resort and entertainment amenities, including swimming pools and hot tubs, a 24-lane state-of-the art bowling center, an arcade, and a lounge for entertainment and dancing. In addition, the Virgin River Casino offers a 182-seat 24-hour café, a 178-seat buffet restaurant, a Starbucks® coffee outlet, and a gift shop. The Virgin River Casino is situated on an approximately 32-acre fee simple site, with a parking lot with capacity for approximately 1,650 cars.

Virgin also owns approximately 31 acres of unimproved land adjacent to the Virgin River Casino, which land was acquired to permit future expansion of the Virgin River Casino.

d.    The Convention Center.

The Convention Center is situated on an approximately 14-acre site located off of Interstate 15 and the East Mesquite Boulevard interchange in Mesquite, Nevada. The Convention Center was acquired out of its prior owner's bankruptcy proceeding in November 2000.[7] The Convention Center has 12,000 square feet of potential gaming space and 210 hotel

---

[6] As previously stated, upon the reduced operations and ultimate closure of the Oasis Casino, certain of the slot and video poker machines were moved from the Oasis Casino to the CasaBlanca Casino and the Virgin River Casino.

[7] At the time of acquisition, the Convention Center had a gourmet restaurant, a cocktail lounge with a performance stage, a coffee shop, an arcade, and a gift shop, none of which are currently in operation.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

18

1   rooms.  The Convention Center is presently utilized as a special event facility and for overflow

2   hotel traffic from the Casinos.  Black Gaming does not hold and has not sought a gaming license

3   to operate a casino at the Convention Center.  Black Gaming will apply for a gaming license at

4   the Convention Center if it decides to operate a casino at the Convention Center.

5          The Convention Center provides a competitive advantage in the Mesquite market as it

6   allows flexibility to meet market demand and to maintain the Debtors' market share in the future

7   on a cost-effective basis.

8                    e.        The Oasis Casino.

9          Prior to December 5, 2008, the Oasis Casino was a full-service entertainment and resort

10  destination located off of Interstate 15 in Mesquite, Nevada, across Mesquite Boulevard from the

11  CasaBlanca Casino.  Due to deteriorating economic conditions, on December 5, 2008, operations

12  at the Oasis Casino were significantly reduced.[8]  Under the initially reduced operations, the Oasis

13  Casino offered 144 video poker and slot machines, as well as various resort and entertainment

14  amenities, including golf at the Palm Golf Course, swimming pools and hot tubs, tennis courts,

15  an arcade, a go-kart track, and a miniature golf range.  Due to the continued deterioration of

16  economic conditions, in May 2009 the Oasis Casino subsequently further reduced operations to

17  16 video poker and slot machines and golf course operations.[9]  The Oasis Casino is situated on

18  an approximately 26-acre fee simple site, with a parking lot with capacity for approximately

19  1,800 cars as well as an 80-unit full-service R.V. park.

20                    f.        The Oasis Recreational Facility.

21         Approximately four miles from the Oasis Casino is the Palms Golf Course featuring an

22  18-hole, 7,008-yard championship course designed by Arnold Palmer.  The scenic Palms Golf

23  Course straddles the Nevada/Arizona border and is located on a 256-acre site, of which 180 acres

24  are leased by Oasis Rec from the State of Arizona pursuant to a ten-year lease that expired on

25

26  [8] Prior to December 5, 2008, there were full-scale operations at the Oasis Casino, offering approximately 900 rooms
    currently utilized for overflow hotel needs.

27  [9] The reduction in operations affected approximately 147 of the Debtors' 1,700-plus employees and was completed
28  by July 19, 2009.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

1    May 13, 2008.  Oasis Rec is currently under negotiations with the State of Arizona to renew this

2    lease and is paying on terms that are similar to those of the expired lease.

3         The Oasis Ranch and Gun Club encompasses over 1,000 acres of farmland, game pasture,

4    and river bottom and offers ten stations on a sporting clay course, two trap and skeet fields with

5    15 stands, and gun safety classes, plus horseback riding, motocross, and hayrides.

6                        g.    The Time-Shares.

7         The Debtors are involved with three different time-share projects, two of which are

8    located at the Oasis Casino - The Grand Destinations Vacation Club (Mesquite) (the "Grand

9    Destinations") and the Peppermill Palms at Mesquite (the "Peppermill Palms") - and one of

10   which is located at the CasaBlanca Casino - the CasaBlanca Vacation Club.

11        The Peppermill Palms and the CasaBlanca Vacation Club have been turned over to their

12   respective owners associations to manage and operate.  The Grand Destinations anticipates

13   completing a turnover to its owners association in 2010.

14                        (i)    The Grand Destinations.

15        The Grand Destinations is a deeded property[10] comprised of 34 one-bedroom and two-

16   bedroom units, which are located in a parceled building referred to internally as Building 9,

17   which building is part of the larger Oasis Casino property.

18        The Grand Destinations has approximately 846 owners, with 2,498 intervals owned.

19   Oasis Own owns 55 additional intervals, which it is seeking to sell.  The time-share intervals

20   may be purchased either by: (1) the immediate payment of the purchase price at closing or (2)

21   through carry-back financing, whereby the purchase price, together with interest, is paid to Oasis

22   Own over 84 consecutive months, with such payment obligations evidenced by a promissory

23   note and secured by a deed of trust recorded against the purchased undivided ownership interest.

24   As of the Petition Date, the approximate sum due and owing to Oasis Own under such

25   promissory notes is $_____.

26

27   [10] Unlike "right to use" timeshares, a deeded timeshare means that each individual owner who purchases one or
     more intervals owns a fee simple undivided interest in the real property with the right to use an unspecified unit in

28   the project of a particular unit type.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

The Grand Destinations Owners Association (Mesquite) (the "GD Owners Association") was incorporated as a nonprofit corporation in or about November 1994. Each owner of an annual time-share interval owns a $1/3,120^{th}$ fee interest in the Grand Destinations[11] and a right to use the common areas and certain amenities within the Oasis Casino to the extent that such services and amenities are also provided to the Oasis Casino hotel guests.[12]

Pursuant to a management agreement with the GD Owners Association, Oasis Mgmt provides management services to the Grand Destinations in exchange for a management fee.

(ii)    The Peppermill Palms.

The Peppermill Palms is a deeded property comprised of 39 one-bedroom and studio suites,[13] which are located in a parceled building referred to internally as Building 8, with less than half of the building having been dedicated to such time-shares. This building is also part of the larger Oasis Casino property.

The Peppermill Palms has approximately 1,603 owners, with 3,392 intervals owned, and 331.5 unsold intervals owned by Oasis Own.[14]

Consistent with the Grand Destinations intervals, the Peppermill Palms time-share intervals were purchased either by: (1) the immediate payment of the purchase price at closing or (2) through carry-back financing, whereby the purchase price, together with interest, is paid to Oasis Own over 84 consecutive months, with such payment obligations evidenced by a promissory note and secured by a deed of trust recorded against the purchased undivided ownership interest. As of the Petition Date, the approximate sum due and owing to Oasis Own under such promissory notes is $\$_____$.

---

[11] Each alternate year time-share owner owns an undivided $1/6,240^{th}$ fee interest in the Grand Destination.

[12] Pursuant to various agreements between the developer and the GD Owners Association, the members of the GD Owners Association have a limited and non-exclusive license to use and enjoy certain recreational and golf facilities at the Oasis Casino for so long as such amenities are also available for use by the Oasis Casino hotel guests, and a corresponding non-exclusive easement over such property.

[13] Combining a one-bedroom and a studio suite results in a two-bedroom unit.

[14] Oasis Own does not currently have a license to sell its intervals in the Peppermill Palms.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

21

1    The Peppermill Palms Property Owners Association, Inc. ("PPOA") is incorporated as a

2    nonprofit corporation. Each owner of an annual time-share interval owns a 1/1,989th fee interest

3    in the Peppermill Palms[15] and a right to use the common areas and certain amenities within the

4    Oasis Casino to the extent such services and amenities are also provided to the Oasis hotel

5    guests.[16]

6        In January 2006 the PPOA entered into a service agreement with Oasis Mgmt pursuant to

7    which it provides managerial services, including housekeeping, reservation and maintenance

8    services. PPOA has retained an unaffiliated entity, Vacation Resorts International, to provide all

9    administrative and financial services.

10                    (iii)    The CasaBlanca Vacation Club.

11        The CasaBlanca Vacation Club was incorporated as a nonprofit, nonstock corporation in

12    or about November 1997. The CasaBlanca Vacation Club offers its members a 40-year right to

13    use certain units located at the CasaBlanca Casino, and related amenities,[17] rather than a fee

14    simple interest in the property.

15        Pursuant to the CasaBlanca Vacation Club's bylaws and rules and regulations, a

16    managing agent is responsible for the management and operations of the CasaBlanca Vacation

17    Club's membership program.[18] Diversified Interests, a Nevada corporation[19] is retained by the

18    CasaBlanca Vacation Club as its managing agent. Oasis Mgmt has been retained by Diversified

19    Interests to provide certain of the services required of the managing agent. In exchange for

20    providing these services, Oasis Mgmt receives a fee.

21    _____

22    [15] Each alternate year time-share owner will own an undivided 1/3,978th fee interest in the Peppermill Palms.

[16] Pursuant to various agreements between the developer and the PPOA, the members of the PPOA have a limited

23    and non-exclusive license to use and enjoy certain recreational facilities, a corresponding non-exclusive easement
over such property, and the right to use and enjoy the golf courses and related services.

24    [17] Pursuant to various agreements between RBG and the CasaBlanca Vacation Club, RBG granted the CasaBlanca
Vacation Club certain privileges relating to the CasaBlanca Golf Course, including golf-related discounts, a limited

25    and non-exclusive license to use and enjoy certain recreational facilities located at the CasaBlanca Casino on
substantially the same terms, subject to certain discounts for certain platinum members, as guests of the CasaBlanca

26    Casino, and a corresponding non-exclusive easement over such property.

27    [18] The CasaBlanca Vacation Club also owns all of the furniture and fixtures and other personal property within the
suites that are part of the CasaBlanca Vacation Club's membership program.

28    [19] Diversified Interest is solely owned by Mr. Black.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc                                    22

Additionally, RBG continues to provide various services, including maid service, emergency repair and maintenance, and front desk and related guest services, for which RBG receives a portion of the assessments paid by the CasaBlanca Vacation Club's members.

Each membership in the CasaBlanca Vacation Club is evidenced by a certificate issued to the member upon full payment of the purchase price for the membership under a membership purchase agreement. That agreement serves as evidence of the membership interest until the purchase price is paid in full.

The CasaBlanca Vacation Club's memberships were initially owned by RBG. Currently, there are approximately 1,036 owners of membership interests, with 1,269.5 total intervals being owned. RBG presently owns 76.5 intervals for which purchase agreements have not been executed.

The majority of such membership sales are financed through RBG, with title to the financed memberships remaining in RBG as security for the purchasers' obligations under the Membership Purchase Agreement until such obligations are fulfilled. As of the Petition Date, the approximate sum due and owing to RBG under the Membership Purchase Agreements is $_____.

**5.    The Debtors' Prepetition Equity And Management Structure.**

The Black Trust owns a 99.03% membership interest in Black Gaming, and thereby effectively owns, directly or indirectly, 99.03% of the Debtors. The remaining 0.97% is owned by Glenn Teixeira.

Since August 2006, Robert R. Black, Sr. has been the sole manager of Black Gaming. Since December 2004, Mr. Black has been the Chairman of the Board, Chief Executive Officer ("CEO"), and President of Virgin River and BBB. Mr. Black has also been the sole manager of RBG since February 1997.

Pursuant to his employment agreement, Mr. Black is employed as the CEO of Black Gaming with the duties, responsibilities, and authorities customarily associated with such

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

23

position for other businesses of the same size and industry, together with any other duties as may be reasonably requested with regard to one or more of the other Debtors.

Since January 2008, Sean P. McKay has served as the Debtors' Chief Accounting Officer.  From July 2005 through January 2008, Mr. McKay served as Corporate Controller to Virgin, RBG and BBB.

Between November 2007 and December 2008, Anthony Toti served as the President of Gaming Operations for the CasaBlanca Casino.  Since December 2008, Mr. Toti has served as the Vice President of Gaming Operations for the CasaBlanca Casino.   Mr. Toti has approximately 28 years of experience in the gaming industry, most recently as the Director of Casino Operations at the Suncoast Hotel and Casino from October 2006 to October 2007.  From July 2000 to October 2006, Mr. Toti served as Casino Manager at the Suncoast Hotel and Casino.  Pursuant to his employment agreement, Mr. Toti serves as the Chief Operating Officer ("COO") of Black Gaming with the duties, responsibilities, and authorities customarily associated with such position for other businesses of the same size and industry, together with any other duties as may be reasonably requested, which may include duties for one or more of the other Debtors.

6.    **Related Party Agreements.**

The Debtors' operations are conducted from their executive offices located at 10777 W. Twain Avenue, Las Vegas, Nevada.  The office space is leased from Town Center Drive & 215, LLC, which is partially owned and managed by Mr. Black, pursuant to an 84-month lease at a monthly rental of approximately $11,508.

Virgin River Foodmart, Inc., a Nevada corporation ("Foodmart"), is owned by former shareholders of Virgin.  Participants in the Casinos' slot club program are able to redeem their points for gasoline at the gas station operated by Foodmart.  Foodmart charges BBB, Casablanca or RBG the retail amount of gas purchased with such Debtor's player points.  Charges associated with the point redemption for gasoline Foodmart's gas station were $____ for the six months ending July 31, 2009 and $_____ for the six months ending December 31, 2009.

B.    **The Debtors' Prepetition Capital Structure.**

24

101900-001/824916_7.doc

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Commencing in 2004, the Debtors financed the contemplated renovation and expansion of the Casinos,[20] as well as the buyout of the then-existing equity interests, in part, by incurring additional long-term debt from the following three sources: (i) the Senior Credit Facility, a revolving credit facility for up to $15 million, which is secured by a first-position lien on substantially all of the Debtors' real and personal property, including a first-position lien on $66^{2/3}$% of the Black Trust's equity interest in Black Gaming and 100% of the Equity Interests of Virgin, RBG, BBB, and Black Inc.; (ii) notes issued under the Senior Secured Note Facility pursuant to the Senior Secured Indenture of which The Bank Of New York Mellon Trust Company, N.A. f/k/a The Bank of New York Trust Company, N.A. ("BNY") is the Senior Secured Indenture Trustee, in the aggregate principal amount at maturity of $125 million, which is secured by a second-position lien on substantially all of the Debtors' real and personal property; and (iii) the Senior Subordinated Notes issued pursuant to the Senior Subordinated Note Indenture of which BNY is the Senior Subordinated Indenture Trustee, in the aggregate principal amount at maturity of $66 million, which are unsecured.

### 1.    The Senior Credit Facility.

On December 20, 2004, BBB, Casablanca, RBG, Virgin, Oasis Mgmt, Oasis Own and Oasis Rec, as borrowers (the "Borrowers"), entered into the Senior Credit Facility with Wells Fargo Foothill, Inc. ("Wells Fargo"),[21] as the arranger and administrative agent for the Lender Group and Bank Product Provider, thereby providing the revolving credit facility. The Senior Credit Facility authorizes the Borrowers to borrow up to the lesser of: (i) $15 million less the

---

[20] For instance, in 2004, the Debtors undertook to expand the Casablanca Casino with a 180-room hotel tower; however, despite redrafting architectural plans, the substantial rise in the price of commodities precluded the construction of the additional tower.

[21] Unless otherwise expressly stated herein, the term "Wells Fargo" solely refers to Wells Fargo Foothill, Inc. in its capacity as the arranger and administrative agent for the Lender Group (as defined in note 22 below) and the Bank Product Provider (as defined in note 22 below).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

Letter of Credit Usage[22], less the Bank Product Reserve[23]; or (ii) the Borrowing Base[24] less the Letter of Credit Usage.

Contemporaneously with the execution of the Senior Credit Facility, the Borrowers and Wells Fargo entered into a Security Agreement. The Security Agreement grants a first-priority security interest in substantially all of the Borrowers' existing and after-acquired personal property, including all present or future accounts, including deposit accounts; books and records; chattel paper; equipment and fixtures; general intangibles, inventory; investment-related property; negotiable collateral; supporting obligations; interests in commercial tort claims; money, cash equivalents, or other assets that are in or subsequently come into the possession, custody, or control of Wells Fargo or the Lender Group; and all proceeds and products, whether tangible or intangible, in any of the foregoing (collectively, the "Encumbered Personal Property").

The Encumbered Personal Property, however, excludes the following assets: (i) the land-based facilities and amenities comprising the Oasis Recreational Facility, including all leased property related thereto; (ii) all owned real property and leasehold interests in the unimproved real property consisting of: (A) approximately 24.45 acres located to the southwest and west of the Convention Center, (B) approximately 34.4 acres located southwest of the CasaBlanca Golf Course, (C) approximately 4.61 acres on which truck parking for the Virgin River Casino is located, which is situated to the east of the Virgin River Casino; (iii) assets securing certain

---

[22] The terms "Lender Group" and "Bank Product Provider" shall have the meanings ascribed to them in the Credit Agreement, as amended. "Letter of Credit Usage" was initially defined within the Credit Agreement to mean "of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit."

[23] "Bank of Product Reserve" is defined within the Senior Credit Facility to mean "as of any date of determination, the lesser of (a) $1.5 million, and (b) the amount of reserves that Agent has established (based upon the Bank Product Providers' reasonable determination of the credit exposure of Administrative Borrower and its Subsidiaries in respect of Bank Products) in respect of Bank Products then provided or outstanding."

[24] "Borrowing Base" is defined within the Senior Credit Facility to mean "as of any date of determination, the result of:

(a)    the product of (i) 1.0 *multiplied* by (ii) the TTM EBTIDA for the most recently ended 12 month period for which financial statements have been delivered pursuant to Section 5.3, *minus*

(b)    the sum of (i) the Bank Product Reserve, (ii) the Environmental Reserve, (iii) the Lien Reserve, and (iv) the aggregate amount of reserves, if any, established by Agent under Section 2.1(b)."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

permitted furniture/fixtures/inventory financing, purchase-money debt, or capitalized lease obligations; (iv) leasehold estates in leasehold property, unless Wells Fargo requests a security interest in such leasehold estates; (v) minimum casino bankroll requirements; (vi) any investment-related property constituting stock of the Borrowers' subsidiaries that are controlled foreign corporations, to the extent that such property is in excess of 65% of the voting power of the stock of such controlled foreign corporations; and (vii) all leases, permits, licenses, including gaming licenses, or other contracts, agreements, assets, or property to the extent that a grant of a lien thereon: (A) is prohibited by law or would result in the abandonment, invalidation, or unenforcement of the respective Borrowers' rights therein, (B) would require the consent of third parties and such consent has not been obtained after the Borrowers' commercially reasonable efforts to obtain such consent, or (C) other than as a result of requiring the consent of third parties that has not been obtained, would result in a breach of the provisions thereof, or constitute a default under or result in a termination of such lease, permit, license, contract, or agreement (collectively, the "Excluded Assets").

The obligations under the Senior Credit Facility are further secured by a Collateral Assignment Of Notes And Deeds Of Trust ("Collateral Assignment") dated December 20, 2004, pursuant to which Oasis Own assigned to Wells Fargo its time-share interest in and to those certain Short Form Deeds of Trust With Assignments Of Rent, the Notes Secured By Deeds Of Trust, and all similar documents enumerated in the Collateral Assignment (the "Encumbered Time-Share Interests").

Additionally, those Debtors with interests in real property and leasehold interests entered into the following Leasehold And Fee Deeds Of Trust dated December 20, 2004 (collectively, the "Deeds of Trust") to further secure their indebtedness under the Senior Credit Facility: (i) the Leasehold And Fee Deed Of Trust, Fixture Filing With Assignment Of Rents And Leases, And Security Agreement (Nevada), by and between RBG, Virgin, Casablanca, BBB, and Oasis Own as grantors, Nevada Title Company as trustee, and Wells Fargo; and (ii) the Leasehold And Fee Deed Of Trust, Assignment Of Rents And Leases, Security Agreement And Fixture Filing

101900-001/824916_7.doc

(Arizona), by and between Oasis Rec as grantor, Transnation Title Insurance Company as trustee, and Wells Fargo.  Each of the Deeds of Trust was recorded in the appropriate official real property records.

Like the Security Agreement for the Encumbered Personal Property, each of the Deeds of Trust executed by a Debtor secures substantially all of that Debtor's real property.  The Deeds of Trust include all rights, titles and interests in the real property described in the Deeds of Trust; all existing and subsequently constructed improvements on the realty; all fixtures; all reserves, escrows, or impounds required under the Senior Credit Facility and all deposit accounts maintained with respect to the realty; the ground lease agreements and the leasehold estates created thereby in certain real property located in Mohave County, Arizona, all as described in the Deeds of Trust; all existing and future leases, licenses, concessions, occupancy agreements, lease guarantees; all of the rents, revenues, and royalties incurred from the use of the realty; all property tax refunds, utility refunds, and rebates; all accessions, replacements, and substitutions for any of the foregoing and all proceeds thereof; all oil and gas and other mineral rights and all royalty, leasehold, and other rights pertaining thereto; and all right, title, and interest of the grantors in and to all tangible property and intangible property (except, with respect to gaming licenses, as prohibited by applicable gaming laws) now or subsequently located on or appurtenant to the realty and used or useful in connection with the ownership or operation of the realty, including the personalty (collectively, and including the additional secured real property listed under the Deeds of Trust, the "Encumbered Real Property").

In conjunction with the Deeds of Trust, all of the following personal property relating to the realty subject to the Deeds of Trust was assigned to Wells Fargo as additional security: (i) assignable leases and purchases of furniture, fixtures, equipment, signs and other items of personal property relating to the realty or any hotel, casino, or other business conducted on the realty; (ii) assignable leases, subleases, licenses, permits, entitlements, concessions, franchises, and other use or occupancy agreements that relate to the realty; and (iii) present and future rents, issues, profits, products, earnings, accounts, rights, benefits, income, proceeds, payments,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

28

revenue, receipts, and deposits of any kind or nature which relate to, or are derived from any of the foregoing, including proceeds with respect to, casinos, bars, restaurants, hotel rooms, spa facilities, golf courses, banquet facilities, convention facilities, retail premises, and other facilities related to, or used in connection with, the realty, with the sole exception of the Excluded Assets (the "Encumbered Realty Personal Property").

Through a Trademark Security Agreement, the Borrowers granted Wells Fargo a continuing first-priority security interest in all of the Borrowers' trademarks, trademark-related licenses, all related goodwill, and all products and proceeds of the foregoing (the "Encumbered Trademark Intellectual Property").

The obligations under the Senior Credit Facility were also secured by the Black Trust, and Black Inc., as pledgors, pursuant to a Parent Pledge Agreement. Under the Parent Pledge Agreement, the pledgors granted to Wells Fargo a continuing security interest in the Equity Interests of Virgin, BBB and RBG, as well as all proceeds and products therefrom (the "Pledged Interests," and together with the Encumbered Personal Property, the Encumbered Real Property, the Encumbered Realty Personal Property, the Encumbered Trademark Intellectual Property, and the Encumbered Time-Share Interests, and excluding the Excluded Assets, the "Collateral").

Contemporaneously with the execution of the Senior Credit Facility, Wells Fargo and the Borrowers entered into an Intercreditor And Lien Subordination Agreement, whereby all liens granted by the Borrowers under the Senior Secured Note Facility were subordinated to the liens granted to Wells Fargo under the Senior Credit Facility.

Similarly, through an Intercompany Subordination Agreement, the Borrowers subordinated all debt by and between them to the prior repayment of the Senior Credit Facility.

**2.    The 9% $125 Million Senior Secured Note Facility.**

On December 20, 2004, Virgin, RBG, and BBB issued through a private placement $125 million of 9% notes due January 15, 2012 under the Senior Secured Note Facility (the "Senior Secured Notes"). The Senior Secured Notes are secured on a second-priority basis by the Collateral. BNY is the indenture trustee (the "Senior Secured Indenture Trustee").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

29

Pursuant to the Senior Secured Indenture, the Senior Secured Notes mature on January 15, 2012 unless sooner accelerated. Commencing on July 1, 2005, interest is payable in cash at a rate of 9% per annum on January 15 and July 15 of each year. The Senior Secured Indenture contains various limitations and restrictions, including limitations on: (i) changes in control, (ii) consolidation, merger, and asset sales, (iii) indebtedness, and (iv) certain payments, such as dividends.

As provided for in the Senior Secured Indenture and the Intercreditor And Lien Subordination Agreement, the Debtors' obligations under the Senior Secured Notes are secured by a second priority lien on the Collateral.

### 3.    The 12.750% $66 Million PIK Senior Subordinated Notes.

On December 20, 2004, Virgin, RBG and BBB issued through a private placement $66 million of Senior Subordinated Notes due January 15, 2013. The Senior Subordinated Notes are unsecured and are guaranteed, on a joint and several basis, by all of the remaining Debtors. BNY is the Senior Subordinated Indenture Trustee.[25]

The Senior Subordinated Notes mature on January 15, 2013 unless sooner accelerated. Commencing on July 15, 2009, interest became payable in cash at a rate of 12.750% per annum on January 15 and July 15 of each year. The Senior Subordinated Note Indenture contains various limitations and restrictions, including limitations on: (i) changes in control, (ii) consolidation, merger, and asset sales, (iii) indebtedness, and (iv) certain payments, such as dividends.

The Senior Subordinated Notes are contractually subordinated in payment to the obligations under the Senior Credit Facility and the Senior Secured Note Facility.

### 4.    The 2006 Amendments.

The Parent Pledge Agreements and the Bailee Agreement were amended in December 2006 to remove Black Inc. as a pledgor, in order to maintain consistency with the Holding

---

[25] On or about April 28, 2009, the Senior Subordinated Indenture Trustee expressed its intent to resign. However, under the Senior Subordinated Note Indenture, such resignation is not effective until a successor trustee has delivered written acceptance to the retiring trustee and the issuers.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

30

Company Reorganization under which Black Inc. became an indirect subsidiary of the Black Trust and joined in and became bound by the Senior Credit Facility as set forth below. The following chart identifies the Equity Interests in which Wells Fargo currently holds a first-priority security interest and the Senior Secured Noteholders hold a second-priority security interest:

| Pledgor | Issuer | Number of Shares or Other Interests | Class | Pledgor's % Ownership Represented By The Pledged Interest | Pledgor's Total % Ownership In Issuer |
|---|---|---|---|---|---|
| Black Gaming | Virgin | 100 shares | Common stock | 100% | 100% |
| Black Gaming | BBB | 16.75 shares | Common stock | 100% | 100% |
| Black Inc. | RBG | N/A | Membership interest | 100% | 5.47% |
| Virgin | RBG | N/A | Membership interest | 100% | 94.53% |
| Black Trust | Black Gaming | 6602 units | Units | 66 2/3% | 99.03% |
| Virgin | Black Inc. | 100 shares | Common Stock | 100% | 100% |

Through a General Continuing Guaranty and Joinder Agreement And Amendment dated December 31, 2006, Black Gaming and Black Inc. joined in and became bound by the Senior Credit Facility, the Security Agreement, the Intercompany Subordination Agreement, and the related loan documents and became a guarantor under the Senior Credit Facility, a grantor under the Security Agreement, and an obligor under the Intercompany Subordination Agreement. The General Continuing Guaranty and the Joinder Agreement And Amendment arose from the Holding Company Reorganization and served to ensure the continuation of Wells Fargo's security interest in all of the Collateral.

Similarly, pursuant to a Security Agreement Supplement, Black Gaming and Black Inc. agreed to be bound by the Senior Secured Note Security Agreement.

Additionally, through the First Supplemental Indentures and Guarantees, Black Gaming and Black Inc. guaranteed all of the obligations due and owing under the Senior Secured Notes, as well as the obligations due and owing under the Senior Subordinated Notes.

5.   **Amendments To The Senior Credit Facility.**

The Senior Credit Facility was amended on October 26, 2007, to amend certain schedules and to revise the allowable capital expenditures.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

31

On June 20, 2008, the Senior Credit Facility was amended for a second time, primarily to extend the term of the Senior Credit Facility from December 21, 2008 to June 30, 2011, and to redefine capital expenditures and EBITDA.

**6.    The Defaults And Forbearance Agreements.**

a.    The Senior Credit Facility Forbearance Agreements.

By the fourth quarter of 2008, it was anticipated that the Debtors would default on the Senior Credit Facility as a result of the Debtors': (i) failure to achieve EBITDA in the required amounts for the 12-month periods ending September 30, 2008 and December 31, 2008; (ii) failure to pay the overadvance amount existing as of September 30, 2008 and continuing thereafter; and (iii) potential default with respect to the representations of the Debtors required to be made in connection with the delivery of financial statements for the periods ending September 30, 2008, October 31, 2008, November 30, 2008, and December 31, 2008.

Consequently, on November 3, 2008, the Debtors entered into a Forbearance, Consent And Third Amendment To Credit Agreement (the "Senior Credit Facility Forbearance Agreement") with respect to the Senior Credit Facility. The Forbearance Agreement amended the Senior Credit Facility and provided that Wells Fargo would forebear from exercising certain rights and remedies under the amended Senior Credit Facility and other loan documents as a result of the anticipated defaults described above, and modified certain financial covenants, calculations, and rates of the Senior Credit Facility through January 15, 2009. The Senior Credit Facility Forbearance Agreement provided, among other things, as follows:

1.    The LIBOR Rate Margin was increased from 3.50% to 5%, and the Base Rate Margin was increased from 2% to 5%. Therefore, the interest rate premium payable in respect of loans available under the Senior Credit Facility was increased accordingly.

2.    The minimum EBITDA covenant was reduced from $15 million to $10 million for the September 2008 through December 2008 reporting periods.

3.    The Borrowing Base multiple was increased from 1.0x to 1.5x from the execution of the Forbearance Agreement until January 15, 2009.

4.    The Debtors were allowed to temporarily reduce operations at the Oasis Casino during the forbearance period.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

32

Between January 15, 2009 and February 25, 2009, the Debtors entered into four amendments to the Senior Credit Facility Forbearance Agreement, which provided in pertinent part for: (i) the extension of the forbearance period, with the last extension expiring at the latest on March 6, 2009 if a term sheet and certain projections were provided, or otherwise expiring at the latest on March 2, 2009; (ii) consent to the continued reduction of operations at the Oasis Casino during the forbearance period; and (iii) authorization to transfer slot machines and video poker machines from the Oasis Casino to the other Casinos.

Although the Debtors provided a restructuring term sheet and certain projections to Wells Fargo by the required date, the extended forbearance period expired, thereby permitting Wells Fargo to exercise any and all rights and remedies under the Senior Credit Facility, including the acceleration of the Debtors' obligations under the Senior Credit Facility of approximately $14.8 million.

On or about May 4, 2009, the Debtors received a Notice Of Default And Reservation Of Rights from Wells Fargo identifying various defaults under the Senior Credit Facility and advising that due to such defaults, Wells Fargo was no longer obligated to fund any advances, issue any letters of credit, or to otherwise extend credit under the Senior Credit Facility.

As of the Petition Date, approximately $_____ of principal was due and owing under the Senior Credit Facility, with accrued interest of approximately $_____.

b.      The Senior Secured Forbearance Agreement.

Due to existing covenant defaults under the Senior Secured Notes and the anticipated default on the January 15, 2009 interest installment payment of $5.625 million (the "2009 Senior Secured Interest Payment"), the Debtors and a consortium of holders of a majority of the Senior Secured Notes (the "Noteholder Consortium") commenced discussions regarding the restructuring of the Debtors' obligations under the Senior Secured Notes.

The Debtors did not make the 2009 Senior Secured Interest Payment, thereby permitting the Senior Secured Noteholders and the Senior Secured Indenture Trustee to exercise any and all

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

33

1    rights and remedies under the Senior Secured Notes, including declaring all principal, premiums,

2    and accrued and unpaid interest immediately due and payable.

3         On February 19, 2009, the Debtors and the Noteholder Consortium entered into a

4    Forbearance Agreement (the "Senior Secured Forbearance Agreement"), whereby the

5    Noteholder Consortium agreed to forbear and to cause the Senior Secured Indenture Trustee to

6    forbear on exercising their rights under the Senior Secured Notes and related loan documents

7    until March 9, 2009, provided that: (i) on or before March 2, 2009, the Debtors provide a

8    summary of the terms and conditions indicative of the restructuring of the Senior Secured Notes;

9    and (ii) on or before March 6, 2009, the Debtors provide an acceptable 13-week cash flow

10   forecast.

11        Although the Debtors timely provided the required term sheet and projections, the

12   forbearance period expired, thereby permitting the holders of at least 25% of the Senior Secured

13   Notes and the Senior Secured Indenture Trustee to exercise any and all rights and remedies under

14   the Senior Secured Notes, including declaring the aggregate principal amount of the Senior

15   Secured Notes, plus unpaid interest and any other amounts provided under the Senior Secured

16   Notes immediately due and payable.  To date, neither the Senior Secured Noteholders nor the

17   Senior Secured Indenture Trustee have declared such debt immediately due and payable.

18        As of the Petition Date, approximately $125,000,000 of principal was due and owing

19   under the Senior Secured Notes, with accrued interest of approximately $_____.

20              c.    Default Under The Senior Subordinated Notes.

21        The Debtors defaulted under the Senior Subordinated Notes by failing to tender the initial

22   interest payment due on July 15, 2009.  As a result, the aggregate principal amount of the Senior

23   Subordinated Notes, plus accrued and unpaid interest, and any other amounts due and owing on

24   the Senior Subordinated Notes could be declared immediately due and payable by the Senior

25   Subordinated Note Indenture trustee or holders of 25% or more of the Senior Subordinated

26   Notes.

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

34

1    To date, neither the Senior Subordinated Noteholders nor the Senior Subordinated

2  Indenture trustee have declared such debt immediately due and payable.

3    As of the Petition Date, approximately $_____ of principal is due and

4  owing under the Senior Subordinated Notes, with accrued interest of approximately

5  $_____.

6  **C.    Events Leading To The Chapter 11 Cases.**

7    **1.    Economic Pressures.**

8       a.    Increased Competition.

9    In December 2004 the Black Trust acquired all of the equity interests in the then-existing

10  entities comprising the Debtors, except for Glenn Teixeira's equity interest.  At that time, the

11  Debtors held a 76% market share in the Mesquite hotel and gaming industry.

12    Between 2004 and 2008, the only non-Debtor-owned hotel and casino in Mesquite, the

13  Eureka, completed a $30 million expansion project.  Despite the Debtors' renovation and

14  expansion efforts, the completion of the Eureka expansion project, together with the increase of

15  gaming devices at other locations within Mesquite, reduced the Debtors' market share to 60%.

16  This increased competition necessarily resulted in a reduction of the Debtors' gaming and hotel

17  revenues.

18       b.    Unforeseeable Economic Downturn Through The Southwestern United

19          States.

20    The real estate market in Clark County, Nevada, as well as across the southwestern

21  United States, has experienced a significant downturn due to plummeting real estate values,

22  substantially reduced mortgage loan originations and securitizations, increased residential

23  mortgage foreclosures, and more generalized credit market dislocations and significant

24  contraction in available liquidity.  In fact, Nevada's foreclosure and unemployment rates are

25  among the highest in the country.  These factors, combined with significantly higher oil and

26  gasoline prices commencing in 2008, declining business and consumer confidence, and increased

27  unemployment, precipitated the current recession, resulting in dramatic decreases in tourism,

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

1    convention and gaming revenues in Nevada. These same factors have also forced consumers

2    within Nevada to reduce spending on gaming.

3    The industry-wide plummeting of revenues has resulted in traditionally higher-priced

4    hotel-casinos substantially discounting their rates and offering incentive packages such as free

5    slot play and credits or discounts at restaurants and spas to entice customers, including customers

6    who traditionally would have stayed or gambled at the Casinos.

7    According to the Abbreviated Revenue Release from the State of Nevada, Gaming

8    Control Board, Tax and License Division (the "Revenue Release") for October 2009, Nevada

9    gaming win has dropped precipitously for the current fiscal year to date, with statewide win

10    decreasing $7,859,778,888 (11.56%), and Clark County decreasing $6,660,867,460 (11.10%).[26]

11    In Mesquite, for September 2009 the gross gaming revenue was down 12.7% compared

12    to September 2008.[27] Similarly, the gross gaming revenue in Mesquite for the month of October

13    2009 was down 14% compared to October 2008.[28]

14    Slot machine revenue has suffered substantial declines during this economic downturn.

15    In Nevada, slot machine revenues statewide were down 12.78% for the first through the third

16    quarter of 2009 as compared with 2008, with Clark County being down 12.65%.[29] Similarly,

17    slot machine revenues statewide were down 8.46% for the calendar year ending December 31,

18    2008 as compared with 2007.[30] Thus, between December 31, 2007 and September 30, 2009,

19    revenue from slot machines has decreased 21.24% statewide and 21.12% in Clark County.

20

21

22    [26] See Nevada Gaming Commission and State Gaming Control Board, Abbreviated Revenue Release Index,
      *available at* http://gaming.nv.gov/mrrindex.htm.

23    [27] See _____.

24    [28] See id.

25    [29] See Nevada Gaming Commission and State Gaming Control Board, Quarterly Report for the quarter ended
      September 30, 2009, *available at* http://gaming.nv.gov/documents/pdf/r5_09sep.pdf.; see also Liz Benston, Gaming
      Revenue, Especially Slots, Continue Their Decline, Las Vegas Sun (May 9, 2008), *available at*

26    http://www.lasvegassun.com/blogs/gaming/2008/may/09/gaming-revenue-especially-slots-continue-their-dec/;    see
      also Howard Stutz, Gaming Revenues Tumble Again, Amount Wagered On Slots Decreases For Sixth Straight

27    Month, Las Vegas Review-Journal (June 12, 2008), *available at* http://www.lvrj.com/business/19817134.html.

28    [30] See id. at http://gaming.nv.gov/documents/pdf/r5_08dec.pdf.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc                                                    36

Revenue from games and tables statewide was also down 11.56% for the calendar year through the third quarter of 2009 as compared with 2008, with Clark County down 10.70%.[31] Similarly, revenue from games and tables statewide was down 12.16% for the calendar year ending December 31, 2008, with Clark County down 8.47%.[32]  Thus, between December 31, 2007 and September 30, 2009, revenue from games and tables has decreased 23.72% statewide, with Clark County down 22.95%.

Consistently with the market, in 2008 the Debtors' casino revenue decreased 23.6% to $81.8 million for the year ending December 31, 2008, as compared to $107.1 million for the year ending December 31, 2007.  This includes a $22.1 million decrease in slot revenues and a $2.1 million decrease in table game revenue.  Other gambling revenues decreased $1.1 million, the majority of which were poker revenues.  Similarly, food and beverage revenues decreased by 23% and hotel revenues decreased by 15% in 2008.[33]

Indeed, the gaming and hotel industry as a whole has faced challenges recently stemming from declining revenues and property values in addition to other factors, as evidenced by at least five large gaming businesses filing for Chapter 11 protection recently: (1) the Greektown Casino in Detroit, Michigan (see In re Greektown Holdings, LLC, et al., Case No. 08-53104-WSD (Bank. E.D. Mich. 2008)); (2) the Tropicana casino group (see In re Tropicana Entertainment, LLC, et al., Case No. 08-10856-KJC (Bankr. D. Del. 2008)), which owns hotel and casino properties throughout the country including on the Las Vegas Strip and in Atlantic City, New Jersey; (3) Trump Entertainment Resort (see In re TCI 2 Holdings, LLC, et al., Case No. 09-13654-JHW (Bank. D.N.J. 2009)), which involves a property in Atlantic City, New Jersey; (4) the Stations Casino group (see In re Stations Casinos, Inc., 09-52477-GWZ (Bankr. D. Nev. 2009)), which owns several hotels and casinos in Nevada; and (5) the Herbst Casino group (see In re Zante, Inc., et al., Case No. 09-50746-GWZ (Bankr. D. Nev. 2009)), which owns hotel and casino properties and slot routes in Nevada, California, Iowa and Missouri.

---

[31] See id. at http://gaming.nv.gov/documents/pdf/r5_09sep.pdf.

[32] See id. at http://gaming.nv.gov/documents/pdf/r5_08dec.pdf.

[33] See Black Gaming's Form 10-K for the fiscal year ending December 31, 2008, available at www.sec.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

37

In sum, due to the increased costs that precluded construction of the additional 180-room tower at the CasaBlanca Casino and the contemplated revenues therefrom, the Debtors needed strong financial performance under their existing operations in order to satisfy their financial obligations. Instead, in the last few years, the Debtors have faced dramatically declining hotel and casino revenues, based on reduced consumer spending, a tightening credit market, and an overall weakening economy. These market-driven challenges manifested after the Debtors leveraged themselves in 2004, leaving the Debtors in a highly precarious position at a time when they needed robust financial performance.

2.    **Financial Performance.**

The Debtors' recent financial performance on a consolidated basis has been as follows:

| | Year Ended 12-31-08 (audited)[34] | Year Ended 12-31-09 (unaudited) |
|---|---|---|
| **Revenues** | | |
| Casino Gaming | $81,831,000 | |
| Food and Beverage | $31,849,000 | |
| Hotel | $29,141,000 | |
| Other Revenues | $16,348,000 | |
| **Total Revenues** | $159,169,000 | |
| **Net Revenues** | $131,637,000 | |
| **Depreciation & Amortization** | | |
| **Total Costs and Expenses** | $164,899,000 | |
| **Income From Operations** | | |
| Interest Income | | |
| Interest Expense | | |
| Value of Derivative Instr. | | |
| **Net Income (Loss)** | | |

---

[34] See id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

38

1

**EBITDA**

2  **Casino Gaming EBITDA**

3  **Other & Corporate**

4  **EBITDA**

5  **Total EBITDA**

6

7  As of December 31, 2009, the Debtors' Condensed Consolidated Balance Sheet reported

8  total assets of $_____, and total liabilities, exclusive of certain commitments and

9  contingencies, of $_____.

10  As of the Petition Date, the estimated value of the Collateral securing the Senior Credit

11  Facility and the Senior Secured Notes was $_____.    This figure [includes/excludes]

12  _____.

13  **D.    Prenegotiated Plan Of Reorganization.**

14  As the economic recession substantially reduced the Debtors' revenues, and thereby

15  resulted in the impending inability to service the obligations under the Senior Credit Facility, the

16  Senior Secured Notes and the Senior Subordinated Notes, in 2008 the Debtors retained the

17  services of Gordon Silver as their restructuring counsel and XRoads Solutions Group, LLC

18  ("XRoads") as their financial advisors.  For well over a year, the Debtors have been exploring

19  and analyzing various restructuring scenarios and proposals.    This process has included

20  discussions, to varying degrees, with Wells Fargo, the Noteholders Consortium, and investors

21  consisting of Robert R. Black, Jr., individually and through the Black Trust (collectively,

22  "Black"), Michael Gaughan on behalf of himself and/or his designee(s) (collectively, "Gaughn"),

23  Anthony Toti, and Newport Global Advisors LLC or its affiliates (together with Black, Gaughan

24  and Anthony Toti, the "Investor Parties").

25  Despite the expiration of the March 9, 2009 forbearance period with regard to the Senior

26  Secured Notes, the parties have remained in active discussions regarding the terms of a

27  restructuring agreement.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

39

On December 22, 2009, a letter agreement, together with the Restructuring Term Sheet attached thereto (collectively, the "Lockup"), was entered into by: (i) the Debtors, (ii) the Black Trust, (iii) certain holders of a majority of the Senior Secured Notes (collectively, the "Consenting Senior Secured Noteholders"), and (iv) the Investor Parties. The Lockup provides for a restructuring of the Debtors under a plan of reorganization. A copy of the Lockup is attached hereto as Exhibit "C."

Pursuant to the Lockup, the Debtors have filed the Plan, which principally provides that:

(a)      all existing Equity Interests in Black Gaming will be extinguished and cancelled;

(b)      a new entity, New Black Gaming, will be formed;

(c)      each of the Senior Secured Noteholders will receive, in full satisfaction of their claims, their pro rata share of each of the following:

(i)      New Senior Secured Loan, representing a $62.5 million term loan with an interest rate of either (i) LIBOR plus 700 basis or (ii) a "Base Rate," which will be the greater of the prime lending rate or ½ of 1% over the Federal Funds rate, plus 700 basis points (subject in any event to a rate collar that imposes a maximum interest rate of 11.50% and a minimum interest rate of 8.50% per annum on the New Senior Secured Loan), due five years from the Substantial Consummation Date, collateralized by substantially the same collateral presently securing the Senior Secured Note Facility;

(ii)      a Cash Contribution by the Investor Parties of $9.25 million; and

(iii)      the Cash Payment, which is the cash in the possession of the Debtors immediately prior to the Substantial Consummation Date plus the $9 million Cash Investment, minus the sum of (A) the $10 Million Minimum Cash Amount, (B) the Senior Credit Facility Payment and (C) the Disputed Claim Reserve;

(d)      the Senior Subordinated Noteholders will receive, in full satisfaction of their claims, warrants for 5% of the fully-diluted Equity Interests in New Black Gaming struck at the enterprise value of (x) $140 million, plus (y) the aggregate amount as of the Effective Date of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

40

1  accrued and unpaid interest in respect of the notes issued pursuant to the new Senior Secured

2  Note Facility, less (z) the Cash Payment;

3      (e)    Wells Fargo will receive payment in full of its Allowed Claims under the Senior

4  Credit Facility; and

5      (f)    the Investor Parties will make cash contributions comprised of the Cash

6  Contribution and the Cash Investment, totaling a maximum of $18.25 million, in exchange for

7  100% of the Equity Interests in New Black Gaming, with such 100% interest subject to dilution

8  by the warrants that will be issued to the Senior Subordinated Noteholders.

9  **E.    Significant Events During The Chapter 11 Cases.**

10  The Debtors have operated their respective businesses as debtors-in-possession.  The

11  Bankruptcy Court has certain supervisory powers over the operations of the Debtors during the

12  pendency of the Chapter 11 Cases.  These powers are generally limited to reviewing and ruling

13  on any objections raised by a party-in-interest to business operations or proposed transactions of

14  a Debtor.  Except as otherwise authorized by the Bankruptcy Court, the Debtors are required to

15  give notice of any transactions not in the ordinary course of business and of the compromise of

16  any controversy to parties-in-interest who request such notice.  In addition, the Bankruptcy Court

17  supervises the employment of attorneys, accountants and other professionals.

18  **1.    First Day Motions.**

19  General Ex Parte Applications.  Concurrently with the filing of the Petition, the Debtors

20  filed various First Day Motions designed to assist the Debtors in making a smooth transition into

21  Chapter 11, including:

22      a.    Emergency Motion For Order Directing Joint Administration Of The Debtors'

23  Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) [Docket No. __];

24      b.    Emergency Motion Pursuant To 11 U.S.C. §§ 105(a) And 366 For An Order

25  Determining That Adequate Assurance Has Been Provided To Utility Companies [Docket No.

26  __];

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

41

c.      Emergency Application For Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts [Docket No. ___];

d.      Emergency Motion For Order (I) Authorizing Debtors To Pay Wages, Salaries, Benefits, Reimbursable Business Expenses And Other Employee Obligations, And (II) Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations [Docket No. __];

e.      Emergency Application For Order Permitting Debtors To Honor Hotel Room And Other Customer Deposits And To Honor Travel Agent Commissions [Docket No. __];

f.      Emergency Motion For Order Authorizing The Debtors To Honor Casino Chips And Other Gaming Liabilities [Docket No. __];

g.      Emergency Motion For An Order: (I) Allowing Administrative Expense Status For Goods Received Within The Twenty Day Period Before The Petition Date, And (II) Authorizing, But Not Directing, The Debtors To Pay Such Obligations [Docket No. __];

h.      Application For Order Authorizing The Employment Of Kurtzman Carson Consultants, LLC As Claims Administrator And Noticing Agent [Docket No. __]; and

i.      Emergency Motion For Interim Approval Of Stipulation Authorizing Use Of Cash Collateral By Debtors And Granting Adequate Protection And Scheduling A Final Hearing To Approve Stipulation Authorizing Use Of Cash Collateral By Debtors (the "Emergency Cash Collateral Motion") [Docket No. __].

These First Day Motions were heard on February 24, 2010, were generally approved, and corresponding orders were subsequently entered by the Bankruptcy Court.

**2.      Other Significant Motions And Post-Petition Events.**

a.      Cash Collateral Stipulation.

The Debtors filed the Emergency Cash Collateral Motion as a First Day Motion.  In the Emergency Cash Collateral Motion, the Debtors sought interim approval of a stipulation with Wells Fargo, the Consenting Senior Secured Noteholders and the Senior Secured Indenture Trustee authorizing the use of cash collateral and certain Disputed Cash Collateral (as defined in

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

42

the Emergency Cash Collateral Motion). On February 24, 2010, the Bankruptcy Court entered an interim order granting the Emergency Cash Collateral Motion, which permitted the Debtors to enter into the stipulation to allow them to use cash collateral and Disputed Cash Collateral as necessary to satisfy ongoing post-petition obligations, and to facilitate an effective and orderly reorganization.

        b.        <u>Retention And Employment Of Professionals.</u>

Various applications were filed for employment of professionals in connection with the Chapter 11 Cases. Such applications include:

        i.        Application For Order Approving Employment Of Gordon Silver As Attorneys For The Debtors [Docket No. _____];

        ii.        Application For Order Authorizing The Employment Of XRoads Solutions Group, LLC As Financial And Restructuring Advisor To Debtors [Docket No. _____];

        iii.        Application For Order Authorizing The Employment Of Holland & Hart, LLP As Special Timeshare Counsel For Debtors [Docket No. _____];

        iv.        Application For Order Authorizing The Employment of Greenberg Traurig, LLP As Gaming Regulatory, Securities, And Corporate Special Counsel For Debtors [Docket No. _____]; and

        v.        Application For Order Authorizing The Employment Of Swarts & Swarts, Certified Public Accountants As Debtors' Tax Advisors.

Various parties filed oppositions, and replies responding to such oppositions, to certain of the aforementioned employment applications. However, such employment applications were largely approved as requested by the parties, and corresponding orders were subsequently entered by the Bankruptcy Court.

**VIII.**
**DESCRIPTION OF THE PLAN**

**A.**    <u>**Overview Of Chapter 11**</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

creditors and interest holders. Besides permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly-situated creditors and similarly-situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan, and any creditor of, or equity holder in, the debtor, regardless of whether such creditor or equity holder (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the bankruptcy court's confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against, or interest in, a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote on the plan. Any classes that would receive a distribution of property under the plan, but are not unimpaired, will be solicited to vote to accept or reject the plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

44

1    Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify
2    the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan
3    divides Claims and Equity Interests into various Classes and sets forth the treatment for each
4    Class.  The Debtors also are required under Section 1122 of the Bankruptcy Code to classify
5    Claims and Equity Interests into Classes that contain Claims and Equity Interests that are
6    substantially similar to the other Claims and Equity Interests in such respective Classes.  The
7    Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with
8    the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a
9    Claim or Equity Interest will challenge the Plan's classifications and that the Bankruptcy Court
10   will find that different classifications are required in order for the Plan to be confirmed.  In such
11   event, the Debtors intend, to the extent permitted by the Bankruptcy Court, to make reasonable
12   modifications of the classifications under the Plan to permit Confirmation and to use the Plan
13   acceptances received in this solicitation for the purpose of obtaining the approval of the
14   reconstituted Class or Classes of which the accepting Holders are ultimately deemed members.
15   Any such reclassification could adversely affect the Class in which such Holder was initially a
16   member, or any other Class, by changing the composition of such Class and the vote required of
17   that Class for approval of the Plan.

18   The Debtors (and their respective Affiliates, agents, directors, officers, employees,
19   advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have,
20   participated in good faith and in compliance with the applicable provisions of the Bankruptcy
21   Code with regard to the distributions of securities under the Plan, and therefore are not, and on
22   account of such distributions will not be, liable at any time for the violation of any applicable
23   law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such
24   distributions made pursuant to the Plan.

25   Other than as specifically provided in the Plan, the treatment under the Plan of each
26   Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or
27
28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

45

Interests. The Debtors will make all payments and other distributions under the Plan, unless otherwise specified.

**B.** **Treatment Of Unclassified Claims Under The Plan**

    **1.** **Treatment Of Administrative Claims.**

Each Holder of an Allowed Administrative Claim will be paid in full and final satisfaction of such Claim, by the applicable Debtor or Reorganized Debtor (or otherwise satisfied in accordance with its terms), upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the 14th Business Day after such Claim is Allowed; and (iv) such date agreed upon by the Holder of such Claim and the applicable Debtor or applicable Reorganized Debtor or New Black Gaming.

    **2.** **Treatment Of Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim, if any, will be paid in full (or will be treated in compliance with Section 1129(a)(9)(C) of the Bankruptcy Code) by the applicable Debtor, or after the Substantial Consummation Date by the applicable Reorganized Debtor or New Black Gaming, on the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the 14th Business Day after the date on which an order allowing such Claim becomes a Final Order; or (iv) such date agreed upon by the Holder of such Claim and the applicable Debtor or applicable Reorganized Debtor or New Black Gaming.

**C.** **Classification And Treatment Of Claims And Equity Interests Under The Plan.**

    **1.** **Treatment Of Class 1 (Other Priority Claims).**

The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims, which consist of Other Priority Claims, will be unaltered by the Plan. Each Allowed Class 1 Claim, if any, will be paid in full by the applicable Debtor or applicable Reorganized Debtor or New Black Gaming upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the 14th Business Day after such Claim becomes an Allowed Claim; and (iv) such date agreed upon by the Holder of such Claim

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

46

and the applicable Debtor or applicable Reorganized Debtor or New Black Gaming. All Allowed Class 1 Claims will also be paid, contemporaneously with the payment of such Allowed Claims, interest from the Petition Date at the stated contractual rate for the Claim or, if no stated contractual rate, the Federal Judgment Rate.

Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims will not be entitled to vote on the Plan.

### 2. Treatment Of Class 2 (Other Secured Claims).

Holders of Allowed Class 2 Claims, which consist of Other Secured Claims (if any), will be paid in full in Cash or otherwise left Unimpaired by the applicable Debtor or applicable Reorganized Debtor or New Black Gaming upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the 14th Business Day after such Claim becomes an Allowed Claim; and (iv) such date agreed upon by the Holder of such Claim and the applicable Debtor or applicable Reorganized Debtor or New Black Gaming. Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims will be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote on the Plan.

### 3. Treatment Of Class 3 (Senior Credit Facility Claims).

Class 3 consists of the Holders of Senior Credit Facility Claims. This Class includes all Claims arising under, or in any way related to, the Senior Credit Facility. Holders of Allowed Class 3 Claims will receive on the Substantial Consummation Date payment in full of their Allowed Claims. Such Holders will also receive from the Debtors periodic "adequate protection" payments corresponding to interest otherwise payable for such period on the unpaid balance of the Senior Credit Facility at the non-default rate from the Petition Date until the Substantial Consummation Date. Holders of Class 3 Claims are Unimpaired and will be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims will not be entitled to vote on the Plan.

### 4. Treatment Of Class 4 (General Unsecured Claims).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

Class 4 consists of the Holders of General Unsecured Claims, other than Class 6, Class 7 and Class 8 Claims. Each Allowed General Unsecured Claim will be paid in full in Cash or otherwise left Unimpaired upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) the 14th Business Day after such Claim becomes an Allowed Claim; and (iii) such date as agreed upon by the Holder of such Claim and the applicable Debtor or applicable Reorganized Debtor or New Black Gaming.

All Allowed Class 4 Claims will also be paid, contemporaneously with payment of such Allowed Claims, interest from the Petition Date at the stated contractual rate for the Claim or, if no stated contractual rate, the Federal Judgment Rate.

Class 4 is an Unimpaired Class, and the Holders of Class 4 Claims will be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims will not be entitled to vote on the Plan.

5.    **Treatment Of Class 5 (Senior Secured Note Facility Secured Claims).**

Class 5 consists of the Holders of Senior Secured Note Facility Secured Claims. This Class includes all Secured Claims arising under, or in any way related to, the Senior Secured Note Facility. Holders of Allowed Class 5 Claims will receive, in full satisfaction of the Secured Claim portion of their Senior Secured Note Facility Claims.

(i)    New Senior Secured Loan in the amount of $62,500,000;

(ii)    the Cash Contribution; and

(iii)    the Cash Payment.

Items (i) and (ii) above will be paid or distributed on the Substantial Consummation Date, and the Cash Payment will be made seven days after the Substantial Consummation Date.

The New Senior Secured Loan will not be publicly-registered under the Securities Act of 1933, as amended (the "Securities Act"), and New Black Gaming will not be a publicly-reporting company under the Securities Exchange Act of 1934, as amended (the "1934 Act").

Holders of Class 5 Claims are Impaired and are entitled to vote on the Plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

48

The unsecured Claims portion of the Senior Secured Note Facility Claims will be treated as Class 6 Claims, as discussed directly below.

**6.      Treatment Of Class 6 (Senior Secured Note Facility Unsecured Claims.**

Class 6 consists of the unsecured Claims portion of the Senior Secured Note Facility Claims. Class 6 Claims will be subordinated to payment in full of Class 4 Allowed Claims but will not be subordinated to Class 7 Senior Subordinated Note Claims which are contractually subordinated to Senior Secured Note Facility Claims except for the treatment as provided for Class 7 Senior Subordinated Note Claims. Class 6 Claims will be discharged contemporaneously with the discharge of all Senior Subordinated Note Claims as provided for in Section 10.4 of the Plan.

Holders of Class 6 Claims are Impaired and are entitled to vote on the Plan.

**7.      Treatment Of Class 7 (Senior Subordinated Note Claims).**

Class 7 consists of the Holders of Senior Subordinated Note Claims. On the Substantial Consummation Date, Holders of Allowed Class 7 Claims will receive Senior Subordinated Note Warrants having a five-year term, exercisable for non-voting New Black Gaming Equity Interests amounting to 5% of the total Reorganized Black Gaming Equity Interests calculated on a fully-diluted basis. The exercise price of the warrants will be based on an enterprise value of New Black Gaming equal to $140 million, plus the accrued and unpaid interest on the Senior Secured Note Facility Claims as of the Effective Date, minus the Cash Payment. Holders of Class 7 Claims will not receive or retain any property on account of their Claims under the Plan, other than the Senior Subordinated Note Warrants. If the Holders of Class 7 Claims do not approve the Plan, they will receive nothing on account of their Claims. Holders of Class 7 Claims are Impaired and are entitled to vote on the Plan.

**8.      Treatment Of Class 8 (Intercompany Claims).**

Class 8 consists of all Intercompany Claims. This Class includes any Claim of a Debtor against another Debtor, regardless of whether set forth in an account reflecting intercompany book entries by one Debtor with respect to another Debtor. On the Substantial Consummation

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

49

Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims of any Debtor against any other Debtor will either be reinstated, in full or in part, or cancelled and discharged, in full or in part, in which case such discharged portion will be eliminated and the Holders thereof will not receive or retain any property or interest in property on account of such portion. In the event that an Intercompany Claim is owed by Oasis Rec to Black Gaming or any subsidiaries (other than Oasis Rec), the amount of such Claim will be considered a contribution to the capital of Oasis Rec. Holders of Class 8 Claims whose Claims are not reinstated in full or otherwise receiving treatment that would leave such Claims Unimpaired, but who are receiving cash or property under the Plan, are Impaired and entitled to vote on the Plan. Holders of Class 8 Claims whose Claims are not reinstated and who are not receiving any cash or property on account of such Claims are Impaired, are not entitled to vote on the Plan and will be deemed to have rejected this Plan.

**9.    Treatment Of Class 9 (Equity Interests In Black Gaming).**

Class 9 consists of the Holders of Equity Interests in Black Gaming as of the Record Date. Holders of Class 9 Equity Interests will receive nothing in respect of those Equity Interests, and those Equity Interests will be canceled and extinguished. Holders of Black Gaming Equity Interests will be conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code and, therefore, will not be entitled to vote on the Plan.

**10.    Treatment Of Class 10 (Intercompany Equity Interests).**

Class 10 consists of all Intercompany Equity Interests. Except as otherwise described in this Disclosure Statement, Class 10 Intercompany Equity Interests will be retained and the legal, equitable and contractual rights to which the Holders of Intercompany Equity Interests are entitled will remain unaltered. Class 10 is Unimpaired, and the Holders of Class 10 Interests will be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 10 Intercompany Interests will not be entitled to vote on the Plan.

**D.    Means For Implementation Of The Plan.**

**1.    Black Gaming.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

50

On the Substantial Consummation Date and after completion of all steps necessary for the implementation of the Plan, Black Gaming will be dissolved and all Black Gaming Equity Interests will be cancelled and extinguished.

**2.      New Black Gaming.**

By the Substantial Consummation Date, the New Black Gaming Organizational Documents will be executed and, to the extent required, filed with the Nevada Secretary.  The New Black Gaming Organizational Documents will (i) include a provision prohibiting the issuance of non-voting equity securities other than the New Black Gaming Equity Interests issuable upon exercise of the Senior Subordinated Note Warrants, but only to the extent such prohibition is required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Black Gaming Equity Interests in an amount not less than the amount necessary to permit the Distributions thereof under the Plan, and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated therein.   After the Substantial Consummation Date, New Black Gaming will be responsible for the preparation of all reports, tax returns and other governmental filings required to be filed by the Debtors and Reorganized Debtors and all obligations related thereto.  Additionally, in connection with any cancellation of debt income, Black Gaming and New Black Gaming will not make any election under Treasury Regulation section 1.1274-5(b)(2).

**3.      Reorganized Debtors.**

The Reorganized Debtors will continue to exist after the Substantial Consummation Date as separate entities. Where applicable, the existing articles of incorporation and bylaws, or articles of organization and operating agreements, will continue in effect following the Substantial Consummation Date, except to the extent that they are amended in conformance with the Plan, or by proper actions implemented after the Substantial Consummation Date. Additionally, on the Substantial Consummation Date, each Reorganized Debtor which is a qualified subchapter S subsidiary for federal tax purposes and which is a corporation for state

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

51

law purposes, will be converted into a limited liability company, and to the extent legally required, each Debtor which cannot be converted into a limited liability company will be merged into a new limited liability company.

    **4.**     **Additional New Black Gaming Provisions.**

    a.     **Documentation.** The New Black Gaming Organizational Documents will be substantially in the form set forth in Exhibit "E" hereto. Such documents, resolutions or similar documents related to the formation and governance of New Black Gaming under the Plan will be subject to applicable bankruptcy law and Nevada law. Following the execution of those documents on the Substantial Consummation Date, they will not be materially modified, amended or supplemented except as provided for therein until payment in full of the New Senior Credit Facility, unless otherwise approved by holders of a majority in interest of the face amount of the New Senior Secured Loan.

    b.     **Substantial Consummation Date Events.** On the Substantial Consummation Date the following will occur: (i) Black Gaming will contribute all of its assets, including the Intercompany Equity Interests in the Debtors and Reorganized Debtors, to New Black Gaming; and (ii) the Reorganized Debtors will execute and deliver to the New Administrative Agent the New Senior Secured Credit Agreement and related documents and the Cash Payment.

    c.     **New Black Gaming Equity Interest Distributions.** In addition and without regard to distributions from Excess Cash Flow which New Black Gaming may make to holders of New Black Gaming Equity Interests under the Plan and in the event New Black Gaming is organized as a tax partnership under applicable federal tax laws, rules and regulations, if the cumulative net taxable income of New Black Gaming for a calendar year exceeds the cumulative net tax losses of New Black Gaming for that year (as determined for federal income

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

tax purposes), then New Black Gaming will distribute to each holder of New Black Gaming Equity Interests cash in an amount equal to such holder's Tax Amount for such taxable year no later than 90 days, or otherwise as soon as practicable, after the end of such taxable year. Such distributions will be made to such holders of New Black Gaming Equity Interests pro rata in proportion to their respective Tax Amounts. Notwithstanding the above, any distributions (excluding distributions of Tax Amounts) from Excess Cash Flow made to the holders of New Black Gaming Equity Interests will not exceed $1,000,000 annually unless the ratio of New Black Gaming's total funded debt (at the time of measurement) to EBITDAR for the trailing 12 months is not greater than 4.0.

5.    **Post-Effective Date And Pre-Substantial Consummation Date Management And Operations.**

From the Effective Date until the Substantial Consummation Date, the Debtors will continue to be managed by their existing managers. members, officers and directors under their existing employment agreements, who will consult with the Requisite Majority regarding the management of operations, maintenance of working capital and utilization of cash flows of the Reorganized Debtors, all in accordance with applicable Gaming Laws. The Debtors and, after the Substantial Confirmation Date, the Reorganized Debtors and New Black Gaming will be responsible for the payment of all Allowed Claims pursuant to the Plan which are not paid on or before the Effective Date, as well as all Allowed Claims, including Taxes and Professional Fees, incurred by the Debtors and, with respect to Taxes, the holders of New Black Gaming Equity Interests, in operating their businesses and complying with the Plan up to and including Substantial Consummation Date, whether due and payable before or after the Substantial Consummation Date.

6.    **Post-Substantial Consummation Date Management Of New Black Gaming.**

On the Substantial Consummation Date, the initial board of managers of New Black Gaming will be comprised of the five individuals unanimously agreed upon by the Investor Parties. Frank Toti will assume the position of Chairman of the board of managers of New Black

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

53

Gaming, Robert R. Black, Sr. will assume the position of CEO of New Black Gaming, and Anthony Toti will assume the position of COO of New Black Gaming. After the first year, pursuant to the Shareholder Agreement and other corporate governance documents of New Black Gaming, the holders of New Black Gaming Equity Interests will elect, on a cumulative voting basis, the board of managers. (If New Black Gaming is formed as a corporation, then all references herein to a board of managers will mean a board of directors, and all references to managers will mean directors.) Each member of the board of managers must satisfy all applicable requirements under the Gaming Laws.

**7.      Initial Management Of Reorganized Debtors.**

By not later than the Confirmation Hearing, the Debtors will disclose the identity and affiliations of each Person proposed to serve on the initial board of directors or board of managers of each Reorganized Debtor, and, to the extent such Person is an Insider other than by virtue of being a director, the nature of any compensation for such Person. Each such director or manager shall serve from and after the Substantial Consummation Date pursuant to applicable law and the terms of the applicable organizational documents of the Reorganized Debtors and New Black Gaming.

**8.      No Corporate Or Limited Liability Company Action Required.**

As of the Effective Date or Substantial Consummation Date, as the case may be: (i) the adoption, execution, delivery and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate or limited liability company action to be taken by, or required of, each Debtor will be deemed to have occurred and be effective as provided in the Plan, and will be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the management of each Debtor. In particular, the adoption of the amended organizational documents, and the selection of directors and officers for each of the Reorganized Debtors will be binding and in full force and effect in all respects (subject to the provisions of the Plan and the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

54

Confirmation Order) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule (other than filing such organizational documents with the applicable governmental unit as required by applicable law) or the vote, consent, authorization or approval of any Person.

**9.    Effectuation Of Transactions.**

As of the Effective Date or Substantial Consummation Date, as applicable, the appropriate officers of the Debtors and the Reorganized Debtors and members of their respective boards of directors or board of managers, as the case may be, will be authorized to issue, execute and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name and on behalf of the Debtors and Reorganized Debtors and New Black Gaming, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

**10.    Debtors' Organizational Documents.**

As of the Substantial Consummation Date, the certificates or articles of incorporation and bylaws or other organizational documents of each of the Debtors will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, and will include: (i) a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated therein.    After the Substantial Consummation Date, such documents will not be materially modified, amended or supplemented except as provided for therein until payment in full of the New Senior Credit Facility, unless otherwise approved by holders of a majority in interest of the face amount of the New Senior Secured Loan.

**11.    Employment Agreements.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

55

Existing employment agreements with Senior Management will not be assumed on the Substantial Consummation Date, but they will remain in place and be honored until the Substantial Consummation Date. As of the Substantial Consummation Date, the Senior Management Incentive Plan will be applicable for New Senior Management.    After the Substantial Consummation Date, New Black Gaming and, if applicable, the Reorganized Debtors will enter into new employment agreements with New Senior Management.    Those new agreements will be subject to approval by the applicable members of New Senior Management, each of the Investor Parties and a majority of the Consenting Lenders, each in his, its or their sole and absolute discretion, and will provide for base compensation levels for the first year equal to the existing compensation levels, unless otherwise agreed by the applicable member of New Senior Management in his sole and absolute discretion.    In addition, the Senior Management Incentive Plan will remain effective after the Substantial Consummation Date for New Senior Management.

**E.** **Executory Contracts And Unexpired Leases.**

**1.** **Executory Contracts.**

Except for Executory Contracts and Unexpired Leases specifically addressed in the Plan or set forth on the schedule of Rejected Executory Contracts and Unexpired Leases attached as Schedule 7.1 to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order) ("Schedule 7.1"), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date will be deemed assumed by the applicable Debtor on the Effective Date.

**2.** **Approval Of Assumption Or Rejection.**

Entry of the Confirmation Order will constitute, as of the Effective Date: (i) approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption by the applicable Debtor of each Executory Contract and Unexpired Lease to which such Debtor is a party and which is not listed on Schedule 7.1, not otherwise provided for in the Plan and neither assumed, assumed and assigned nor rejected by separate order prior to the Effective Date; and (ii) rejection by the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

56

1  applicable Debtor of each Executory Contract and Unexpired Lease to which such Debtor is a
2  party and which is listed in Schedule 7.1.

3      To the extent applicable, all Executory Contracts or Unexpired Leases so assumed will be
4  deemed modified such that the transactions contemplated by the Plan will not constitute a
5  "change of control," however that term may be defined in the relevant Executory Contract or
6  Unexpired Lease, and any required consent under any such Executory Contract or Unexpired
7  Lease will be deemed satisfied by the Confirmation.  Also, to the extent applicable, all Executory
8  Contracts or Unexpired Leases of Black Gaming so assumed will be assigned to New Black
9  Gaming on the Substantial Consummation Date, and such assignment will not constitute a
10 "change of control," however that term may be defined in the relevant Executory Contract or
11 Unexpired Lease, and any required consent under any such Executory Contract or Unexpired
12 Lease will be deemed satisfied by the Confirmation.

13      **3.    Cure Of Defaults.**

14      The applicable Debtor will Cure any defaults under each Executory Contract or
15 Unexpired Lease that is assumed, as described in Section VIII.E.2 above, upon the latest of (i)
16 the Effective Date or as soon thereafter as practicable; (ii) such dates as may be fixed by the
17 Bankruptcy Court or agreed upon by such Debtor or Reorganized Debtor or New Black Gaming;
18 or (iii) the 14th Business Day after the entry of a Final Order resolving any dispute regarding (a)
19 a Cure amount, (b) the ability of the Debtor or Reorganized Debtor to provide adequate
20 assurance of future performance under the Executory Contract or Unexpired Lease assumed
21 pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code or (c) any
22 matter pertaining to assumption, assignment or Cure of a particular Executory Contract or
23 Unexpired Lease.  Schedule 7.3 to the Plan lists the Debtors' proposed Cure amounts, if any, that
24 will be paid on the Effective Date (the "Assumption Schedule").

25      Any party to an Executory Contract or Unexpired Lease who objects to the Cure amounts
26 on the Assumption Schedule must file and serve an objection on the Debtors' counsel not later
27 than 30 days after the Effective Date.  Failure to do so will be deemed consent to the applicable
28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

57

Cure amount listed on the Assumption Schedule. Any Cure amounts will be the responsibility of the applicable Reorganized Debtor and New Black Gaming. If there is a dispute regarding the amount of any Cure payment, the ability of a Reorganized Debtor to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed or assigned, or any other matter pertaining to assumption, then the Cure payments will be made following the entry of a Final Order resolving the dispute and approving the assumption. If a Debtor (other than Black Gaming) assumes an Executory Contract or Unexpired Lease and a non-Debtor party to such Executory Contract or Unexpired Lease objects to such Debtor's ability to provide adequate assurance of future performance (or if the time period for a non-Debtor to object to the cure amount has not yet lapsed), the Debtor may assign the Executory Contract or Unexpired Lease to Black Gaming. In such event, Black Gaming and New Black Gaming may demonstrate their ability to provide adequate assurance of future performance.

**4.      Post-Petition Date Contracts And Leases.**

Executory Contracts and Unexpired Leases entered into, and other obligations incurred, after the Petition Date by a Debtor will be performed by the Debtor or Reorganized Debtor or New Black Gaming, as applicable, in the ordinary course of its business.

**5.      Bar Date.**

All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease must be filed not later than 30 days after the Effective Date, or else they will be forever barred.

**F.      Manner Of Distribution Of Property Under The Plan.**

**1.      Distributions.**

Each Debtor, and if applicable, each Reorganized Debtor or New Black Gaming, will be responsible for making Distributions described in the Plan. Each Debtor, each Reorganized Debtor and New Black Gaming may make such Distributions before the allowance of each Claim and Equity Interest has been resolved if the Debtor, Reorganized Debtor or New Black

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

58

1  Gaming has a good faith belief that the Disputed Claim Reserve or Disputed Equity Interest

2  Reserve is sufficient for all Disputed Claims and Disputed Equity Interests.

3      **2.    No Recourse.**

4      No recourse shall ever be had, directly or indirectly, against the Debtors, the Reorganized

5  Debtors and New Black Gaming or against any agent, attorney, accountant or other professional

6  for the Reorganized Debtors and New Black Gaming under the Plan, or by reason of the creation

7  of any obligation, liability or indebtedness by the Debtors, Reorganized Debtors or New Black

8  Gaming under the Plan for any purpose authorized by the Plan.  All such obligations, liabilities

9  and indebtedness of the Debtors, the Reorganized Debtors and New Black Gaming will be

10  enforceable only against, and be satisfied only out of, the Assets or such part thereof as shall

11  under the terms of any applicable agreement be liable therefor or shall be evidence only of a

12  right of payment out of such Assets.

13      **3.    Reserves.**

14      Each Debtor, and if applicable, each Reorganized Debtor or New Black Gaming, will

15  establish and maintain a Disputed Claim Reserve.

16      **4.    Statements.**

17      The Debtors and, if applicable, the Reorganized Debtors and New Black Gaming, will

18  maintain a record of the names and addresses of all Holders of Allowed General Unsecured

19  Claims as of the Effective Date and all Holders as of the Record Date of Equity Interests of the

20  Debtors for purposes of mailing Distributions to them.  The Debtors, the Reorganized Debtors

21  and New Black Gaming may rely on the name and address set forth in the Debtors' Schedules

22  and/or proofs of Claim and the ledger and records regarding Holders of Equity Interests as of the

23  Record Date as being true and correct unless and until notified otherwise in writing.

24  **G.    Conditions To Confirmation Of The Plan, The Effective Date And The Substantial
        Consummation Date.**

25

26      **1.    Condition To Confirmation.**

27      It is a condition precedent to Confirmation that the Confirmation Order will be entered by

28  the Bankruptcy Court not later than 120 days after the Petition Date and will be in form and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

59

substance reasonably acceptable to the Debtors, Investor Parties and the Requisite Majority, as provided for in the Lockup Agreement.

2. **Conditions To The Effective Date.**

The following are conditions precedent to the Effective Date:

(i)     The Confirmation Order will be a Final Order;

(ii)     No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code will be made, or, if made, will remain pending, including any appeal;

(iii)     All documents necessary to implement the transactions contemplated by the Plan will be in form and substance reasonably acceptable to the Debtors, Investor Parties and the Requisite Majority; and

(iv)     Sufficient Cash and other Assets will have been set aside, reserved and withheld by each Debtor to make Distributions required by the Bankruptcy Code and the Plan.

3. **Conditions To The Substantial Consummation Date.**

The following are conditions precedent to the Substantial Consummation Date:

(i)     All approvals required for the transactions set forth in the Plan and effectuating documents will have been obtained from all Governmental and Regulatory Authorities;

(ii)     None of the Consenting Lenders, Investor Parties or Reorganized Debtors will be in material breach of the Plan or any other effectuating documents in effect from the Effective Date through the Substantial Consummation Date; and

(iii)     The Bankruptcy Court will have authorized the assumption and rejection of Executory Contracts and Unexpired Leases by the Reorganized Debtors, Black Gaming and New Black Gaming as contemplated by the Plan.

4. **Waiver Of Conditions.**

The Debtors, Investor Parties or a Requisite Majority, as applicable, may waive any or all of the other conditions set forth in the Plan and specifically the conditions described in Sections VIII.G.2 and VIII.G.3 above (except for the condition described in clause (i) of Section VIII.G.3)

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

60

(in each case for themselves but not for others) without leave or order of the Bankruptcy Court and without any formal action.

## IX.
## RISK FACTORS

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan and the transactions contemplated by the Plan involve the following risks, which should be taken into consideration.

**A.**    **The Debtors Have No Duty To Update.**

The statements in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein. The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

**B.**    **Information Presented Is Based On The Debtors' Books And Records, And Is Unaudited.**

While the Debtors have endeavored to present information fairly in this Disclosure Statement, there is no assurance that the Debtors' books and records upon which this Disclosure Statement is based are complete and accurate. Historical financial information contained herein, though, has been audited.

**C.**    **Projections And Other Forward-Looking Statements Are Not Assured, And Actual Results Will Vary.**

Certain information in this Disclosure Statement is forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and projections which may differ materially from actual future results. There are uncertainties associated with all assumptions, projections and estimates, and they should not be considered assurances or guarantees of the amount of funds that will be distributed or the amount of Claims in the various Classes that will be allowed. The amount of Allowed Claims in each Class, as well as Administrative Claims, could be significantly more than projected, which in turn could cause the value of Distributions to be reduced substantially.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

61

**D.    This Disclosure Statement Has Not Been Approved By The SEC.**

Although a copy of this Disclosure Statement was served on the SEC and the SEC was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement has not been registered under the Securities Act, or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the Exhibits contained herein, and any representation to the contrary is unlawful.

**E.    No Legal Or Tax Advice Is Provided To You By This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Creditor or Holder of an Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest and the applicable treatment under the Plan.

**F.    No Admissions Made.**

Nothing contained herein shall constitute an admission of any fact or liability by the Debtors or any other party nor shall it be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Equity Interests.

**G.    No Waiver Of Right To Object Or Right To Recover Transfers And Estate Assets.**

A Creditor's vote for or against the Plan does not constitute a waiver or release of any claims or rights of the Debtors (or any other party in interest) to object to that Creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or Estate assets, regardless of whether any claims of the Debtors or their respective Estates are specifically or generally identified herein.

**H.    Bankruptcy Law Risks And Considerations.**

**1.    Confirmation Of The Plan Is Not Assured.**

Although the Debtors believe the Plan will satisfy all requirements for Confirmation, the Bankruptcy Court might not reach that conclusion.  It is also possible that modifications to the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101900-001/824916_7.doc

62